# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. **04-22774**

CIV-UNGARO-BENAGES

MICCOSUKEE TRIBE OF INDIANS
OF FLORIDA,

MAGISTRATE JUDGE
Brown

      Plaintiff,

vs.

KRAUS-ANDERSON CONSTRUCTION
COMPANY,

      Defendant.

_____/



## COMPLAINT FOR RECOGNITION, REGISTRATION, AND
## ENFORCEMENT OF TRIAL DECISION (FINAL JUDGMENT)

Plaintiff, Miccosukee Tribe of Indians of Florida, by and through its undersigned attorneys, brings this action against Defendant, Kraus-Anderson Construction Company, and alleges as follows:

1.    This is an action seeking to have the United States District Court recognize, register and enforce the Trial Decision (final judgment) of the Miccosukee Tribal Court located in Dade County, Florida, that was rendered against Kraus-Anderson Construction Company on June 18, 2004, in the amount of $1,654,998.88. An authenticated copy of the Trial Decision (final judgment) is attached as Exhibit A.

2.    The court has federal question jurisdiction under 28 United States Code, Section 1331; diversity jurisdiction under 28 United States Code, Section 1332; and federal common law of comity jurisdiction under 28 United States Code, Section 1738.



3.     The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 United States Code, Section 1332.

4.     Venue in this judicial district is proper, pursuant to 28 United States Code, Section 1391(a), (b) and (c), because of diversity of citizenship and because it is the judicial district in which the events giving rise to the claims arose.

5.     The Plaintiff, the Miccosukee Tribe of Indians of Florida ("Miccosukee Tribe"), is a federally recognized Indian tribe located and having an Indian reservation in Dade County, Florida.

6.     The Miccosukee Tribe has established and operates a Tribal Court system.

7.     The Miccosukee Tribe has adopted rules of civil procedure and appellate procedure that apply to cases that are conducted by the Tribal Court, which are contained in its "Criminal and Civil Code."  Attached hereto as Exhibit B is a portion of those rules, section 13, which deals with appeals.

8.     Defendant, Kraus-Anderson Construction Company ("Kraus-Anderson"), is a corporation organized and existing under the laws of the state of Minnesota and has its principal place of business at 523 South Eighth Street, Minneapolis, Minnesota.  It is authorized to do business and engages in the construction business in Florida.

9.     Kraus-Anderson and the Miccosukee Tribe entered into contracts at the Miccosukee reservation in Dade County, Florida, for the construction of (1) a Resort Hotel, Convention and Conference Center on August 26, 1997; (2) a Halfway House, Clinic and Judicial Building on September 13, 1997; and (3) a K-12 School on September 18, 1998.  All construction was to take place on the Miccosukee reservation in Dade County, Florida.

10.    Pursuant to the agreements, Kraus-Anderson constructed the projects; and upon substantial completion of the projects, a dispute arose between Kraus-Anderson and the Miccosukee Tribe.

11.    Kraus-Anderson brought an action for breach of the contracts against the Miccosukee Tribe and filed it in the Tribal Court of the Miccosukee Tribe of Indians of Florida, located on the Indian reservation in Dade County, Florida.

12.    The Miccosukee Tribe asserted a counterclaim.

13.    The case was tried before the Tribal Court.  On June 18, 2004, the Tribal Court rendered its 166-page Trial Decision (final judgment) in favor of the Miccosukee Tribe and against Kraus-Anderson awarding the Miccosukee Tribe damages in the amount of $1,654,998.88.  (Exhibit A.)

14.    Kraus-Anderson, under the appeal procedure of the Tribal Court, appealed the decision of the Tribal Court, and the appeal was denied.  A copy of the Notice of Appeal is attached hereto as Exhibit C.  A copy of the Tribal appellate court's decision, dated July 15, 2004, is attached as Exhibit D.

15.    There have been no subsequent entries affecting the Tribal Court's Trial Decision.

16.    There is now due to the Miccosukee Tribe under the above-described decision (final judgment), the sum of $1,654,998.88.

17.    No part of the above-described decision (final judgment) recovered against Kraus-Anderson has been paid.

WHEREFORE, Plaintiff, Miccosukee Tribe of Indians of Florida, requests that this court find that the Trial Decision (final judgment) is entitled to recognition, registration and

enforcement in accordance with the applicable federal law and that this court enter its order recognizing, registering and enforcing the Tribal Court's Trial Decision (final judgment).

Dated this 2̲9̲ day of ̲O̲c̲t̲o̲b̲e̲r̲ , 2004.


_William E. Whitney_
William E. Whitney
Florida Bar Number 0241581
DUNLAP, TOOLE, SHIPMAN &
    WHITNEY, LLC
2057 Delta Way
Tallahassee, FL  32303-4227
850-385-5000
850-385-7636  Facsimile

Attorneys for Plaintiffs,
Miccosukee Tribe of Indians of Florida

**EXHIBIT A**

MICCOSUKEE TRIBAL COURT
MICCOSUKEE TRIBE OF INDIANS OF FLORIDA
<u>CIVIL DIVISION</u>

CASE NO.:  CV-00-21-A

**KRAUS-ANDERSON
CONSTRUCTION COMPANY,**

  **Plaintiff,**

**vs.**

**MICCOSUKEE TRIBE OF
INDIANS OF FLORIDA,**

  **Defendant.**

_____/

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA
MIAMI-DADE COUNTY, FLORIDA
I HEREBY CERTIFY that the foregoing is a true and
correct copy of the original on file in this office
WITNESSED by my hand _____ this _____ day
of _____
TRIBAL COURT CLERK

<u>**TRIAL DECISION**</u>

Tried in May and July, 2003
Decided on June 18, 2004

Gary S. Pitchlynn, Esq. and Steven K. Champlin, Esq. on behalf of the Plaintiff.
Davisson F. Dunlap, Esq. and Davisson Dunlap IV, Esq. on behalf of the
Defendant.

Before BERT and BILLIE, Tribal Judges.

THIS CAUSE came before the Court for Trial.

I.  <u>STATEMENT OF JURISDICTION</u>

This Court has jurisdiction pursuant to Title X ("Civil Procedure"), of the

Miccosukee Law and Order Code (hereinafter, "the Code").

II.   UNDERLINE(PROCEDURAL HISTORY)

On June 19, 2001, the Plaintiff filed a Statement of Claim against the Defendant

for nonpayment on construction projects pursuant to three Final Design and Construction

Agreements (hereinafter, "Agreement").   On July 31, 2001, the Defendant filed an

Answer to the Statement of Claim.   From May 5, 2003 to July 23, the parties shared

Discovery.   In May and July of 2003 a Trial ensued.

III.   UNDISPUTED FACTS

The facts show that on August 26, 1997 the parties signed an Agreement for the

construction of a Resort Hotel, Convention and Conference Center (hereinafter, "the

Hotel Project").   On November 13, 1997 an Agreement was signed for the construction

of a Halfway House, Clinic and Judicial Building (hereinafter, "the Campus Projects").

On September 18, 1998 an Agreement was signed for the construction of a K-12 School

("hereinafter, "the School Project").   All three Agreements included the same contractual

sections, defined as, "Terms and Conditions," plus one additional section, defined as,

"Addendum to Terms and Conditions."   The contract language was the same on the three

Agreements, with the exception of the percentage for costs incurred by the Design/

Builder in the interest of the project which were listed as 4% for the Hotel Project, and

6% for the Campus and School Projects and with regard to the Addendum to the Hotel

Project, the contract concluded with paragraph 14.4.1.16, as compared with the School

and Campus Projects, which concluded with paragraph 14.4.1.13.

2

IV.    THE DISPUTE

In its Statement of Claim, the Plaintiff argues that in consideration for the work and services provided, the Defendant owes the sums of $5,371,506.14 for the Hotel Project, $416,119.08 for the Campus Projects and $1,289,979.48 for the School Project. In its Answer, the Defendant disputes the sums owed, and argues that on the Hotel and Campus Projects, the Plaintiff charged for costs and expenses that are not justified; that Plaintiff undertook work that was not authorized and for which change orders were not executed; that it is entitled to a set-off against amounts due to Plaintiff on account of defects in the work and unjustified charges; that it was forced to retain another contractor to complete defects in the work performed by the Plaintiff; and that there existed substantial construction defects in the School building attributable to the design and construction by the Plaintiff, for which additional costs were spent by the Defendant to correct them.   The Plaintiff denies these allegations.   The following is a review of the relevant trial testimony and documentary evidence presented by the parties' witnesses in support of their respective positions.

V.    THE TRIAL TESTIMONY

A.    Testimony of Thomas Sackett

3

Thomas Sackett (hereinafter, "Mr. Sackett") was called as a witness by the Plaintiff.   He was the Project Director for all the projects.   He negotiated and signed all the Agreements as representative for the Plaintiff.

Mr. Sackett testified about his work experience with these types of projects and that the majority of his work in the last 10 years had been for Indian Tribes.   He estimated the dollar volume of hotel/casino type work the Plaintiff had done for Indian Tribes over the past 10 years to be in the range of $400,000,000.   According to Mr. Sackett, no other General Contractor in the country has done more work for Indian Tribes than the Plaintiff.

Mr. Sackett described the Agreements between the Plaintiff and the Defendant as a Design/Build under which the Plaintiff was to design and construct the described facilities.   He explained that under this type of Design/Build contract, the Plaintiff has responsibility for not just the construction, but also for the design.   Mr. Sackett characterized the Agreements as a cost reimbursable type contract, under which the Plaintiff was to be paid for the work plus a fee, with a guaranteed maximum cost for the contract price.   According to Mr. Sackett, a benefit of a Guarantee Maximum Price type of contract is that the owner knows that the price of the project, based on the defined scope, will not go over the stated cost.   The Plaintiff introduced in evidence Plaintiff's Trial Exhibits No. 10, No. 157, and No. 175 ("Hotel Project, Campus Projects, and School Project Agreements")

4

Mr. Sackett testified that the Guaranteed Maximum Price (hereinafter, "the GMP"), of the Hotel and Campus Projects was increased because of changes in the scope of the work requested by the Defendant.   In the Hotel Project, the changes totaled $11,882,486.00, which changed the GMP to $54,383,486.34.   The Plaintiff introduced into evidence Plaintiff's Trial Exhibit No. 11 ("Change Orders No. 1 through No. 5, No. 7 and No. 9") and Trial Exhibit No. 12 ("Change Orders No. 10 through 16") on this issue.

Mr. Sackett testified that the total costs for the Hotel Project was $50,137,616. He explained that these total costs reflected final construction costs of $48,209,246.49, plus $1,928,370, as per the Plaintiff's 4% fee for costs incurred on the project.   The Plaintiff introduced into evidence Plaintiff's Trial Exhibit No. 4 on this issue. Mr. Sackett stated that the total costs reflected here did not reflect the interest for late payments, per Section 5.3.1 of the Agreements.

Mr. Sackett testified that the total costs for the Campus Projects totaled $7,240,559.62.   He explained that these total costs reflected final construction costs of $7,028,021, plus $212,538.60, as per the Plaintiff's 6% fee for costs incurred on the project.   He further explained that because the total costs were higher than the GMP, the Plaintiff had a loss of $212,538.00 on these projects.   The Plaintiff introduced into evidence Plaintiff's Trial Exhibit No. 6 on this issue.

Mr. Sackett testified that the changes for the School Project totaled $530,000.00,

5

which changed the GMP to $9,100,000.00.  He explained that the total construction

costs, plus the Plaintiff's 6% fee for costs incurred, totaled $8,832,876.  Mr. Sackett

further explained that because the construction costs were less than the GMP, the

Defendant had construction savings of $323,733.00 on this project.   The Plaintiff

introduced into evidence Plaintiff's Trial Exhibit No. 7, Exhibit No. 9,  Exhibit No. 192

on this issue.

    Mr. Sackett testified regarding the Plaintiff's basics of compensation under the

Agreement.   On this subject, he explained that Section 13.1.1 of the Addendum to Terms

and Conditions (hereinafter, "the Addendum"), the first source of compensation was costs

incurred by the Design/Builder in the interest of the project.   According to Mr. Sackett,

included within the term "in the interest of the project" were design services, costs

reimbursement for work, a percentage for insurance, transportation and bonding, etc.

    The second source of compensation was a fee of four percent (4%) for the costs

incurred by the Design/Builder in the interest of the project.   The third source was for

additional services, which he explained was to be computed on an hourly basis at

standard hourly rates or a mutually agreed lump sum cost.

    Mr. Sackett testified regarding changes to the projects.  He stated that changes

to the projects were covered by Section 8.1.2.1 of the Addendum, which provided that,

"Owner and Design/Builder hereby agree that Owner will not issue any Change Order,

Constructive Change Directive or any other amendment or modification to the Contract

Documents without obtaining the prior resolution from the Miccosukee Tribal Council."

Mr. Sackett explained that during contract negotiations, the Defendant insisted in such

a provision because they wanted the governing body of the Tribe to know what was

going on with the project and project related costs, and for any enhancements that led to

Change Orders being approved through a governing body rather than an individual

person.   However, he stated that despite this provision, the Defendant never provided

Tribal Council Resolutions for any of the Change Orders.   Mr. Sackett explained that he

was told that there was no need for the Resolutions because the Tribal Council had given

the Defendant's Representative, Chairman Billy Cypress (hereinafter, "Chairman

Cypress"), all the authority to make changes to the work and contract.

In addition to the changes reflected in the Change Orders in Plaintiff's Trial

Exhibit No. 11, there were other changes that increased the Hotel Project's GMP that the

Plaintiff and the Defendant agreed to, but the Defendant would not sign the Change Order

for it.   The total amount reflected in these unsigned Change Orders was $2,636,971.00

The Plaintiff introduced into evidence Plaintiff's Trial Exhibit No. 12 on this issue.

Mr. Sackett described the circumstances that gave rise to them.

He stated that the first, Change Order No. 10, was for providing Category 5 Cable

to the guest room television locations for future in-room gaming.   The total amount for

this change was $74,816.00.   Mr. Sackett testified that this change was under the

direction of Chairman Cypress, who requested to upgrade the original television system

7

to a Smart Technology System which required a special television set, and to increase the size of the television sets that were in the rooms.   He testified that the Smart System was ultimately installed, but it took a special cabling, known as Category 5.   Mr. Sackett stated that he personally spoke with Chairman Cypress about this work and that Chairman Cypress requested it.

Mr. Sackett stated the second, Change Order No. 11, was for adding a Service Link and Police Station to the Hotel and existing Bingo Hall.   The total amount for this change was $663,343.00.   Mr. Sackett testified that he first looked at the project, he recommended a single point of entry for all employees, but that the Defendant did not want it included with the original design criteria.   He explained that a small police station already existed at that prior location, but that Chairman Cypress told him, "No, when we do this connecting link we want a police station in there, we want holding cells, we want interrogation rooms, we want TV cameras, we want recording information to do interrogations, we want toilet rooms, we want evidence rooms."   Mr. Sackett stated that the work involved very specialized criteria and equipment, which he personally spoke with Chairman Cypress about, and that Chairman Cypress requested it and approved it. The Plaintiff introduced into evidence Plaintiff's Trial Exhibit No. 117 ("Final Construction Drawings dated June of 1998") on this issue.   Mr. Sackett explained that, as the construction drawings in Exhibit No. 117 showed, the connecting link and police station were not initially included in the project.

8

The third, Change Order No. 12, was for adding a concrete heliport pad elevated above roof level.   The total amount for this change was $116,337.00.   Mr. Sackett testified that as the concrete frame of the building was being poured out and the building was around the fifth floor, the Chairman told him, "I want to add a heliport or a helipad to the top of the hotel.   It's something we need to have, and can you get going on this and design this into the frame of the building."   Mr. Sackett further testified that Chairman Cypress said that it was needed for emergencies, and to avoid heavy traffic during special shows.   Mr. Sackett explained that the heliport was not included in the original construction drawings.   He testified that the Defendant built all the stories of the building in August of 1998, and that on September 23, 1998 he sent a letter to Chairman Cypress that included an item on FAA approvals, to Tribal Government for heliport construction at the hotel.   The Plaintiff introduced into evidence Plaintiff's Trial Exhibit No. 134 on this issue.

Mr. Sackett testified that the fourth, Change Order No. 13, was for furnishing and installing additional Security and Surveillance Equipment.   The total for this change was $266,563.00.   Mr. Sackett testified that initially, there was a budget of $400,000.00 for surveillance and security of the gaming floor.   He further testified that Chairman Cypress said to interface with the Defendant's Gaming Director, Paul Skeados (hereinafter, "Mr. Skeados"), and that after being presented with the design, Mr. Skeados added a number of things such as cameras in the elevators and on every floor.   Mr. Sackett stated that he

9

had a conversation in Tampa, Florida with Chairman Cypress about this matter, and that

Chairman Cypress said, "Well, I suppose we better go ahead, let's get this done."

Mr. Sackett testified that the fifth, Change Order No. 14, was for providing

additional mechanical and electrical systems in the Main Equipment Room.   The total

amount for this change was $131,464.00.   Mr. Sackett testified that this change involved

building a specialized mechanical system, known as a Liebert Unit, to keep the telephone

room cool, along with other things that this room required.   He testified that he spoke

with Chairman Cypress about this matter and that Chairman Cypress said, "We've got to

have it, the telephone company is saying this room has to be cooled, this is the amount of

heat that this equipment is going to put out."   Mr. Sackeet explained that after the

Defendant had made its selection with regards to the telephone equipment, additions to

the mechanical and electrical systems became necessary to accommodate this change.

He stated that this took place well after the Agreement for the Hotel Project was signed,

and about three (3) months before the hotel opened.

Mr. Sackett testified that the fifth, Change Order No. 15, was for the furnishing

and installation of the mechanical and electrical equipment, and architectural finishes

associated with the Retail Shop, Beauty Salon, Child Care and Teen Arcade areas.   The

total amount for this change was $1,045,748.00.   Mr. Sackett explained that this change

involved the construction of various spaces for mechanical, electrical and architectural

finishes for the retail shops, beauty salon, child care and teen arcade.   He stated that the

10

original construction drawings did not include these various spaces.   Mr. Sackett testified that he was having dinner with the Richard Brostrom (hereinafter, "Mr. Brostrom"), at the Hotel's Fine Dinning Restaurant in late April of 1999, when Chairman Cypress came and said, "I want these facilities built out and I want them built out before this facility opens for the grand opening."

Mr. Sackett testified that the sixth, Change Order No. 16, was for providing the Krome Avenue Site Entrance improvements.   The total amount for this change was $338,700.00.   Mr. Sackett testified that this was a totally separate project and that Chairman Cypress had come to him and asked for the Plaintiff to do it.   Mr. Sackett stated that he expressed some reluctance because he was not familiar with the State of Florida's criteria for this type of work, and because the bid to the parking lot had already been awarded to Rose Engineering, but that Chairman Cypress said, "Oh, no, no, no, no, you don't have to bid it out.   You just have Rose Engineering do this.   We've got to have this entrance in and we have to have the signage in when this facility opens."

The Plaintiff's Trial Exhibit No. 12 also included three unsigned Change Orders that provided a credit for partial direct purchases and payments for materials by the Defendant.   These were Change Order No. 8 for $4,019,819, Change Order No. 17 for $4,466,420.47), and Change Order No. 18 for $930,294.29.

Mr. Sackett stated that there was nothing in the Agreements that required Change Orders adjusting the GMP to be in writing or signed before the work was done.   He

11

explained that the Plaintiff's responsibility was only to prepare the Change Orders for the Defendant's approval and execution.  Mr. Sackett testified that these Change Orders were unsigned because the Defendant's Representative, Chairman Cypress, told him that he wanted the actual costs of the work that was asked in those Change Orders.  He explained that in these projects a lot of things were said orally in meetings and that on several instances the Defendant gave Construction Change Directives orally.

During cross-examination, Counsel for the Defendant referred to Plaintiff's Trial Exhibit No. 32.24, which was one of the meetings between representatives of the various subcontractors, the Plaintiff and the Defendant.  Counsel referred to Meeting Minutes No. 24 which included an entry that read, "All future change orders to the owner must be submitted to the Chairman for approval with time and costs specifically addressed."  In response, Mr. Sackett stated that he did not know what caused this particular item to be added, but subsequently thereafter he began to follow this procedure, unless Chairman Cypress gave a directive in which costs could not be added therein.  Mr. Sackett explained that in several letters after that, Chairman Cypress gave direction to do certain things that would have increased the costs.  He stated that the Plaintiff was following these procedures, except when Chairman Cypress asked him to accelerate and do the build-out of the retail spaces.

During cross-examination, Counsel for the Defendant referred to Minute Meetings No. 32.30, under the heading of "Action By," that contained an entry that read, "All

12

future change orders to the owner must be submitted to the Chairman for approval with time and costs specifically addressed."   When asked about this matter, Mr. Sackett admitted that this language was included in every single Minute Meeting from February of 1999 forward.   He further admitted that this language did not say that Change Orders could be submitted after the work was completed, but explained that he was directed to do so in the oral form.   He stated that the issue came up when the Defendant reviewed a Change Order for the parking lots and did not like an allowance the Plaintiff had included.   Mr. Sackett explained that, at the time, there was no exact figure on completion of those parking lots because the Defendant was filling them in, and then he was asked by the Defendant's on-site Representative, Julio Martinez (hereinafter, "Mr. Martinez"), to do some pricing.   Mr. Sackett further stated that after that, Chairman Cypress said that he would not sign any changes unless they reflected actual costs for the work.   Mr. Sackett explained that the method for a Change Order after that was to sit down with Mr. Martinez and give him a preliminary number before the final cost, and that the approval would be given by Mr. Martinez nodding his head in agreement for the change to proceed.

During cross-examination, Counsel for the Defendant referred to the Summary of Change Indexes and the A-U-T-H that listed unsigned Change Orders No. 11 and No. 12 as approved even though Chairman Cypress had never signed them.   Mr. Sackett explained that at the time, Chairman Cypress had approved them and the final costs had

not been put together.   However, he stated that he had no explanation as to why the Summary of Change Indexes listed Change Orders No. 11 and No. 12 approved and signed.

Counsel for the Defendant referred to Meeting Minutes No. 5.24.115 which included an entry that read, "Future change orders must be submitted to the Chairman." In response, Mr. Sackett recognized that he never received a written Change Order before the retail spaces were done, but stated that the work had been approved back in February of 1999, before that entry.   Mr. Sackett recognized that it was not unusual for an owner who is presented with a written Change Order to decide not to do the work, and that Chairman Cypress reviewing a retail space design was not the same as him signing a Change Order approving the change.   However, he explained that because Chairman Cypress approved the design, gave verbal authorization to proceed, and wrote a letter in June 1, 1999 ordering all the work to be completed, it did not matter whether the Change Order was signed or not.   Mr. Sackett also recognized that the letter of June 1, 1999 does not address the subject of written Change Orders.

Counsel for the Defendant referred to the Change Order involving the service link, and noted that Mr. Sackett had pricing information and cost information regarding the service link back in 1988, but had not submitted the Change Order for signature until July 7, 1999.   Mr. Sackett explained that he had retyped Change Orders that were lost by Mr. Martinez and that he wanted to meet with Chairman Cypress in order to sign off on

14

the unsigned Change Orders, but Chairman Cypress was not available.   He further

explained that if he had proposed a given cost before a change, he would have been

unable to recoup the difference, because Chairman Cypress had said, "I want all costs on

every change submitted to me because I don't want to pay any cost above your cost of the

work when it's complete."   Mr. Sackett stated that this was done before Chairman

Cypress' request for future work was included on the Minute Meetings of February of

1999.

During cross-examination, Counsel for the Defendant referred to Meeting Minutes

No. 32.11 and No. 32.14 of August 10, 1998 on the subject of the service link.   In

Meeting Minutes No. 32.11 there was an entry that read, "Bidding proposal to be issued

shortly after all the design documents have been received.   The finishes are likely to be

based on a contingency amount.   The complete scope has to be reviewed by the council."

In Meeting 32.14 there was an entry that read, "Exterior connecting link, documents have

been distributed for pricing."   When asked about this matter, Mr. Sackett stated that he

did not know when pricing was received, and that this would be information that Mr.

Brostrom, as Project Manager, would know about.   Counsel for the Defendant also

referred to Meeting Minutes No. 9 of February 11, 1998, in "Defendant's Trial Exhibit D,

that contained an entry that read, "Change orders were received for the connecting link

and the child activity center."   When asked about this matter, Mr. Sackett admitted that

on February 11, 1998 no Change Order for the connecting link had been received because

15

such a Change Order was not submitted until July 20, 1999.   He stated that he did not know the details of it, but that the design team anticipated that there would be a Change Order for it.

Counsel for the Defendant asked Mr. Sackett about Meeting Minutes No. 32.9 and No. 32.11 of July of 1998 on the subject of the heliport.   Meeting Minutes No. 32.9 had an entry that read, "Helicopter landing pad plan preliminary reviewed."   Meeting Minutes No. 32.11 had the same entry, but on the right-hand side there was an entry that read, "closed."   When asked about this matter, Mr. Sackett stated that such entry did not indicate that the issue had been resolved, but that he did not know exactly what it meant.   Mr. Sackett admitted that the helipad did not require permission from the Federal Aviation Administration (hereinafter, "the FAA).

During cross-examination, Mr. Sackett also testified about unsigned Change Orders for the Campus and School Projects.   In regards to the Campus Projects, he testified that Chairman Cypress told him that the Miccosukee Police Department needed additional parking, and requested that a sidewalk be incorporated along the road in front of the police department.   The Plaintiff introduced into evidence Plaintiff's Trial Exhibit No. 159 on this issue.

Mr. Sackett testified regarding the time of substantial completion for the Hotel Project and delays.   He stated that according to the Agreement on the Hotel Project, the date of substantial completion, "of the project other than the Hotel and Recreation

16

Center" was December 17, 1998, and that the date for the Hotel and Recreation Center

was April 5, 1999.  Mr. Sackett explained that the part "of the project other than the

Hotel and Recreational Center" referred to the first floor, which ultimately became the

Gaming Area, and the second floor restaurants.

Mr. Sackett testified that after the execution of the first Change Order, the date of

substantial completion was changed to June 10, 1999, as to the Hotel and Recreation

Center, and February 11, 1999 for the balance of the project.  Mr. Sackett stated that

after agreeing to this extension of time, Chairman Cypress verbally told him not to expect

any additional time extensions for the Hotel Project.  Mr. Sackett testified that the

Defendant caused a variety of delays that would have justified time extensions by Change

Order, but Chairman Cypress refused.  He described actions and/or inactions by the

Defendant that he argued caused delays and impacted the Construction Schedule.

Mr. Sackett testified about Section 14.4.1.15 of the Agreement that read, "The

date of substantial completion shall be extended by a period of time equal to any

period by which substantial completion is delayed as a result of any of the following

events:  Change orders, labor disturbances, unavailability of materials . . ."

Mr. Sackett stated that the Defendant's failure to provide the services and arrange

for the various consultants needed, and the late approval of the design drawings were a

first cause of delay.  He explained that the Defendant's delay in procuring the survey and

soil borings for the deep foundation system caused a delay of almost two months for the

17

commencement of work.   The Plaintiff introduced into evidence Plaintiff's Trial Exhibits

No. 25 and No. 113 on this issue.

Mr. Sackett stated that the Defendant not hiring a Code Consultant until April 21,

1998 was a second cause of delay.   Mr. Sackett explained that the design team needed

the advise of the Code Consultant for the drawings to comply with the South Florida

Building Code.   He stated that the Miami-Dade Fire Department and the project's

insurance carrier had also requested the Code Consultant.   The Plaintiff introduced into

evidence Plaintiff's Trial Exhibit 31 on this issue.

Mr. Sackett testified that the addition of the parking lot areas in late fall of 1998,

was a third cause of delay.   He explained that this late addition of more than

$5,000,000.00 to the scope of the work, considerably impacted the construction

schedule, because in addition to the amount of labor, it required the hiring of a

Superintendent and Project Manager, plus dealing with the flooding caused by the lack

of connection to discharge storm water coming off the building.   He testified that

Chairman Cypress recognized these problems and agreed to amend the date

of substantial completion for Phase I, II and III of the parking areas from June 10, 1999

to July 3, 1999.

Mr. Sackett stated that the late connection of the water and sewer service by the

Defendant was a fourth cause of delay.   He explained that although the Construction

Schedule called for the installation of the water and sewer extension for August of 1998,

18

it was not done on time because the Defendant did not hire the subcontractor for the job until April of 1998. The Plaintiff introduced into evidence Plaintiff's Trial Exhibits No. 95 and No. 96 on this issue. Mr. Sackett explained that the existing Bingo Hall only had a well system and a very small water treatment facility, and the Hotel would need a huge amount of water usage. He explained that the Plaintiff was responsible for the installation of the water and sewer service, which was to be extended from the existing Bingo Hall. Mr. Sackett testified that in September 11, 1998, the water and sewer project was stopped. The Plaintiff introduced Plaintiff's Exhibits No. 97, No. 146, and No. 147 on this issue. Mr. Sackett explained that the lack of water placed the Plaintiff in a very difficult situation because it meant that the domestic water pumps for the buildings, the high-rise fire pumps for the sprinkler system, the kitchen equipment or the plumbing system could not be tested. He stated that under these conditions, the Plaintiff could not turn over the Hotel on February 11, 1999. The Plaintiff introduced into evidence Plaintiff's Trial Exhibits No. 101 and No. 102 on this issue. Mr. Sackett testified that the water and sewer was not installed until some time in April of 1999.

Mr. Sackett stated that the addition of the retail spaces in late April of 1999, which added almost $2,000,000.00 of work, was a fifth cause of delay.

Mr. Sackett testified that one of the things that also caused delay and impacted the Construction Schedule was the Defendant's responsibility for ordering all materials. He explained that this placed the Plaintiff at the mercy of how fast the Defendant would

19

approve and send out the Purchase Orders for the materials.   He stated that some times this approval would take two or three weeks for a Purchase Order to be ready.   Mr. Sackett explained that in the case of the School Project, the delay in issuing Purchase Orders resulted in vendors and subcontractors not supplying any more materials and mechanical items.   The Plaintiff introduced into evidence Plaintiff's Trial Exhibit No. 191 on this issue.   He explained that this situation caused a problem with finishing the School because the Construction Schedules could not be met, and like the Plaintiff, the mechanical and electrical subcontractors were also not being paid.   Mr. Sackett stated that the situation worsened because the Defendant was paying the main subcontractor on the project, Betancourt & Associates, directly.   He stated that this resulted in the Plaintiff having to pay for $300,000.00 worth of kitchen equipment in order to finish the School.   Mr. Sackett stated that the Plaintiff has not been reimbursed for this kitchen equipment.

During cross-examination, Counsel for the Defendant asked Mr. Sackett about the absence of any requests for time extensions for the work reflected in the unsigned Change Orders.   Mr. Sackett admitted that there were no such requests, and that in the first groups of Change Orders, the Plaintiff could have absorbed the additional work within the time frame.

Counsel for the Defendant asked Mr. Sackett about delays due to the late installation of the water and sewer.   Counsel referred to Minutes Meeting No. 32.24 of

20

February of 1999, which showed an entry that read, "Sewer and water system piping was set and poured into the pile cap across a canal on January 8, 1999.  The connection to the underground lines were expected to take place on January 9th and 10th with completion schedules as follows:  The piping flushed on February 17[th], chlorination of the water line performed on February 22[nd]."  Counsel referred to Meeting Minutes No. 5.8.32, which showed entries that read, "The sewer and water system was set and poured . . ."  "Work completion schedule as follows . . ."  "Force main pressure testing schedule for March 5th and lift station sign-off is also needed."  When asked about these entries, Mr. Sackett admitted that they referred to the sanitary sewer and the force main pressure testing, but that he was not sure whether the sewer was installed.

Counsel for the Defendant asked Mr. Sackett about Meeting Minutes No. 6.16.110 of December 15, 1998, which included an entry that read, "The sprinkler system is active.  All contractors must exercise care when working around the sprinkler heads."  In his response, Mr. Sackett stated that he did not know what this entry was referring to because there was no sprinkler system in the Hotel that was active, and there was no water, therefore, that entry was a little bit out of context.  The Defendant introduced into evidence Defendant's Trial Exhibit J on this issue.

Counsel for the Defendant asked Mr. Sackett about Meeting Minutes No. 6.16.110 of January 19, 1999, which included an entry that read, "The sprinkler system is active.  All contractors must exercise care when working around sprinkler heads.  Any damage to

21

the system must be reported in order to avoid injuries or damage to surrounding work.

Currently there have been 16 unreported breaks.  Any future breaks, repair costs will be

distributed evenly among all contractors if no responsibility is acknowledged."  Mr.

Sackett testified that he could not explain this entry and that Mr. Brostrom would know

more about it.  The Defendant introduced into evidence Defendant's Trial Exhibit K

on this issue.

Counsel for the Defendant referred to Meeting Minutes No. 6.24.165, which

included an entry that read, "There are increased incidents of screws in plumbing pipe.

drywall installers must be careful to install material to avoid damage which will cause

leaks."  In explaining this entry, Mr. Sackett stated that at the time there was no water in

the system, and that they were looking for future water leaks and warning people to be

careful once the water came on.  The Defendant introduced into evidence Defendant's

Trial Exhibit L on this issue.  Counsel also asked Mr. Sackett about Minutes Meetings

No. 6.20.138 in this Exhibit, which included an entry that read, "Starters are being

worked on for the chiller water pumps along with permanent power for the air handlers

and fan coil is expected to be completed this week."  "Starter installation is complete for

chiller water pumps along with permanent power for air handlers and fan coil units.  The

system is being filled for final test with a temporary water source.  Underground tie-in

completion is needed from Solo from completion.  Pumps should begin on Wednesday,

February 10th, 1999 circulating air."  When asked about this entry, Mr. Sackett explained

that that was not occurring, and that they were using a garden hose.

Counsel for the Defendant asked Mr. Sackett whether he had written a letter to the Defendant stating that the Plaintiff was entitled to additional time because of the delay caused by the late installation of the water and sewer.   In response, Mr. Sackett stated that he did not because Chairman Cypress had told him that he did not want any kind of letter like that.

Mr. Sackett testified regarding the issue of overtime.   He explained that overtime was necessary for a variety of reasons.   One of these reasons was the weather.   Mr. Sackett explained that there were three or four occasions when the project had to be shut down because of weather issues, resulting in two days of lost time.   He stated that when he tried to obtain a time extension due to the weather, Chairman Cypress told him, "I'm not going to give you any more time extension.   Get this job done and get it done on the time that you said you were going to get it done."

Mr. Sackett testified that overtime was also necessary due to the addition of the parking lots and retail space to the scope of the work in late April of 1999.   He stated that those changes represented almost $12,000,000.00 worth of additional work to the project.   Mr. Sackett explained that for example, if the work was not completed on a Friday and they had to come in on Saturday to strengthen PT Cables to keep the job going, overtime was used.

Mr. Sackett testified that in addition to these changes to the scope of the work,

23

Chairman Cypress also moved up, by ten (10) days, the date of substantial completion. Mr. Sackett stated that in May 3, 1999, Chairman Cypress sent him a letter that included language that read, "You continue to assert that you will have no problem meeting the June 1 turnover date" and "I expect you to take immediate action to expedite the work on the project." Mr. Sackett testified that he interpreted this letter as a change to the date of substantial completion from June 10, 1999 to June 1, 1999. The Plaintiff introduced into evidence Plaintiff's Trial Exhibit No. 136 on this issue. Mr. Sackett explained that as a result of this letter, he was put in a situation where he had to compress his schedule to finish the tasks, in order to complete the project.

Mr. Sackett testified that after receiving the May 3, 1999 letter, he wrote a response on May 12, 1999, wherein he informed Chairman Cypress that in order to meet the request for early completion, he had accelerated construction sequencing, and that overtime was being used daily and on weekends. He explained that the term "to accelerate its activities" meant providing more labor on the project either in crew sizes or working more than one shift, or working overtime, and more than one shift would be like an eight-hour shift and then possibly a second eight-hour shift after that, with another crew. Mr. Sackett testified that Chairman Cypress never objected to such overtime. The Plaintiff introduced into evidence Plaintiff's Trial Exhibit 137 on this issue.

During cross examination, Mr. Sackett testified that he had never written a letter to Chairman Cypress informing him that additional time was needed to complete

24

the Hotel.  Mr. Sackett recognized that although the term "overtime" did not appear in the Agreement between the Plaintiff and the Defendant, the Plaintiff provided many subcontractors with specific Change Orders to their contracts, authorizing the use of overtime.  Mr. Sackett explained that the part in the Agreement that referred to all labor, included overtime because overtime is all labor.  Mr. Sackett stated that from the very beginning, the Plaintiff intended to use overtime, and that he considered overtime as costs incurred for the benefit of the project since Chairman Cypress asked him to accelerate and finish the hotel ten (10) days early.  Mr. Sackett further stated that there were times when he authorized his subcontractors to use overtime even before the letter of May 3, 1999 from Chairman Cypress.  He explained that before the May 3rd letter, overtime was used due to weather conditions.  He stated that, for example, if the workers did not get their job done on a Friday and they had to come back on Saturday to strengthen PT Cables to keep the job going, overtime was approved for that, and that was acceptable under "means and method" to keep the project on schedule.

During cross-examination, Counsel for the Defendant asked Mr. Sackett whether the Plaintiff's contracts with its subcontractors authorize the use of overtime.  In his response, Mr. Sackett stated that he was not too familiar with those subcontracts.

During cross-examination, Mr. Sackett was also asked regarding the issue of overtime versus bonuses for Administrative Personnel.  He explained that Administrative Personnel were paid a bonus instead of the overtime.  This meant that at the end of the

project, the Plaintiff paid its Administrative Personnel a bonus instead of overtime.

Mr. Sackett testified regarding Defective Work.  He stated that he never received any written notices from the Defendant regarding faults or defects to the work.  Mr. Sackett testified that the Plaintiff had a contractual right to charge for repairing damaged work on the job.

During cross-examination, Counsel for the Defendant introduced into evidence several sample AIA Contracts that contained a specific section dealing with emergencies and repairs to damaged or nonconforming work.  Under these sample contracts, the contractor had the right to be reimbursed if it had to correct damaged work.  Mr. Sackett recognized that the Agreement between the Plaintiff and the Defendant does not have a similar provision for damaged or nonconforming work.  Mr. Sackett, however, explained that the Plaintiff is entitled to recover its costs in the interest of the project.  The Defendant introduced into evidence Defendant's Trial Exhibit B on this issue.

Counsel for the Defendant asked Mr. Sackett about Section 13.2 in the Agreement between the Plaintiff and the Defendant, titled "Reimbursable Expenses."  Mr. Sackett recognized that Section 13.2 does not list damaged or nonconforming work as a reimbursable expense.  However, he explained that the Plaintiff had been charged for damaged or nonconforming work in the interest of the project.

Mr. Sackett testified about Corrective Work.  He stated that if a correction in the work was caused by a mistake that was made by the Plaintiff's design professionals, that

26

was something the Defendant had to pay and that the Plaintiff was not responsible for it. Mr. Sackett explained that the Plaintiff was not able to buy errors and omissions Insurance, and that they depended on their designers for that reason. He explained that Section 14.4.1.12 of the Agreement allowed for such waiver of liability, and that design mistakes were included within this waiver. Mr. Sackett stated that a wrong design would be one of the inherent situations in this case because this project was a fast track construction with limited amount of time for the design.

During cross-examination, Counsel for the Defendant referred to Section 9.1 of Article 9 of the Agreement that read, "The Design/Builder shall promptly correct Work rejected by the Owner or known by the Design/Builder to be defective or failing to conform to the Construction Documents . . ." Mr. Sackett recognized that under this Section the Plaintiff continued to be responsible for correcting defective work on the projects.

Mr. Sackett testified about travel and living expenses, and per diems. He explained that airplane tickets, subsistence, Project Manager subsistence, Superintendent, relocation expenses, and car allowances are the various categories included with traveling to the project. Mr. Sackett explained that he expected that some Project Manager would have to travel and be paid a subsistence, because that was a very standard procedure in his business. He stated that this included expenses for gas and oil for the various vehicles, equipment rental of certain equipment for the project.

27

During cross examination, Mr. Sackett stated that Section 13.1.1 of the Addendum allowed the Plaintiff to charge for these expenses under the term "transportation." Mr. Sackett explained that "transportation" meant getting personnel, materials and subcontractors to the project. He explained that he interpreted "transportation" as anything that involved moving materials, documents and personnel, and that he charged the Defendant for it under his interpretation. Mr. Sackett recognized that if the 0.5 percent in Section 13.1.1 included "transportation," the Plaintiff could not charge for those expenses. Mr. Sackett recognized that the Agreement between the Plaintiff and the Defendant did not authorize the Plaintiff to charge for travel expenses, housing and per diem for its employees, but that those expenses were allowed as "transportation." He recognized that the Agreement did not include the terms travel expenses, per diem or housing. Mr. Sackett further recognized that there are many AIA Contracts that include a separate provision for all these expenses. The Defendant introduced into evidence Defendant's Trial Exhibits A, B, H, I, and S on this issue.

Counsel for the Defendant asked Mr. Sackett about the Plaintiff's Final Draw Request, which included additional travel charges for $1,453.00 for the period of January 8 through January 11, 2000, after the projects were completed. Mr. Sackett explained that it was for various trips undertaken by representatives of the Plaintiff to meet with representatives of the Defendant in order to resolve this dispute.

Mr. Sackett testified about legal expenses. He explained that legal fees were

incurred for negotiating the Agreement and for other various things that were involved with the sales tax issue.  Mr. Sackett further explained that the Plaintiff charged about $18,000.00 for legal expenses on the projects, and that it was also done under the term "transportation."

During cross examination, Counsel for the Defendant asked Mr. Sackett about several charges for legal work incurred after the completion of the projects.  Mr. Sackett explained that the additional legal work was for final settlements by the Plaintiff arising from claims by subcontractors, which in turn reduced the final bill by $300,000.00.  He explained that it was part of the Plaintiff's job and for the benefit of the Defendant. Counsel also asked Mr. Sackett about charges for legal fees for consultations between the Plaintiff and its lawyers, regarding the final amount claimed to be owed by the Defendant.  Mr. Sackett explained that the Plaintiff was entitled to charge for that, because they involved attorney's fees for settlement and not for litigation purposes.

Mr. Sackett testified regarding the Plaintiff's role as Purchasing Agent on behalf of the Defendant and the Plaintiff's fee for costs in the interest of the project.  Mr. Sackett explained that the Plaintiff entered into a Purchasing-Agent relationship with the Defendant, in order for the Defendant to save the sales on the purchase of building materials for the projects.  He stated that this arrangement was negotiated between the Plaintiff and the Defendant.  He explained that in practice, the Plaintiff would place an order with a subcontractor that included materials, and then the subcontractor would send

29

a bill to the Plaintiff for the labor and the materials.   Mr. Sackett testified that this arrangement later changed.

Mr. Sackett explained that a subcontractor got a notice from the State of Florida's Sales Tax Division stating that they were not going to exempt the sales tax on the materials.   He explained that after that, Chairman Cypress wrote a letter to all the vendors stating that the Defendant was a sales tax-exempt entity and that the Defendant would hold harmless any subcontractor or the Plaintiff for any sales tax collection. Mr. Sackett explained that this letter was rejected by the State of Florida.

Mr. Sackett testified that Counsel for the Defendant in this case became involved on the sales tax issue, and that after consultations with the State of Florida the procedure was changed.   According to Mr. Sackett, under the new procedure the Defendant would send the Purchase Order for the materials to the vendor, to be followed with payment directly by the Defendant.   The Plaintiff introduced into evidence Plaintiff's Trial Exhibits No. 202, No. 203, No. 205, No. 206, No. 207, and No. 209 on this issue.

Mr. Sackett testified that after the procedure was changed, Counsel for the Defendant advised that the Agreement between the Plaintiff and the Defendant be amended to reflect the new procedure.   Mr. Sackett testified that he asked Mr. Martinez about amending the Agreement but that Mr. Martinez stated, "Well, it's perfectly clear in Mr. Dunlap's letter and I don't believe we need an amendment to the contract."   Mr. Sackett explained that after that, the Defendant began issuing the

30

Purchase Orders for the materials.

Mr. Sackett testified that the reason why he was trying to obtain the amendment to the Agreement was because once the Defendant started purchasing materials through Purchase Orders there would be a deduction on Change Orders issued from the Plaintiff's contracts for $16,000,000.00, and since the Plaintiff's fee was based on a total contract for labor, material, overhead and profit, the Plaintiff wanted to make sure that its fee for materials was not reduced based on the new procedure. Mr. Sackett explained that after the new procedure was implemented, the Defendant continued to pay all of the Plaintiff's fees on materials, as reflected in the Applications for Payment. Mr. Sackett testified that until the Defendant filed its Pre-Trial Catalogue on April 19, 2003, in connection with this case, he was not aware that the Defendant believed that the Plaintiff was not entitled to its fee on the materials.

During cross-examination, Mr. Sackett recognized that the Agreement between the Plaintiff and the Defendant only allowed the Plaintiff to be compensated for the costs incurred by the Defendant on the projects. Mr. Sackett also recognized that if the Defendant directly purchased the materials, the Plaintiff could not bill the Defendant for those materials. Mr. Sackett stated that the Plaintiff had provided deductions on Change Orders for Purchase Orders that the Defendant issued. When asked by Counsel for the Defendant whether the amount that the Defendant directly paid for materials was not part of the costs incurred and the Plaintiff was not going to get paid for that, Mr. Sackett

31

stated that he could not answer that question.   The Defendant introduced into evidence Defendant's Trial Exhibit No. 12 on this issue.

Mr. Sackett testified about unit billing.   He explained that the General Conditions in the Agreements listed the Project Manager and the various staff people assigned to the projects, and how they would charge an estimated number of hours based on the scope of the work.   He testified that the General Conditions Document was given to the Defendant before the execution of the Agreements.   He explained that the Plaintiff charged unit rates for administrative, clerical and accounting persons located in the office and the field.

During cross-examination, Counsel for the Defendant asked Mr. Sackett about union employees vs. non-union employees.   Mr. Sackett explained that if the Plaintiff hired a person who was a member of a union to work on the projects, the Plaintiff would charge the Defendant the 65% of the gross payroll for that employee.   Mr. Sackett recognized that if the employee hired was not a member of a union, the Plaintiff could not have charged the Defendant the 65% of the gross payroll.   Mr. Sackett explained that the Plaintiff belonged to the American Association of General Contractors and was part of a collective bargaining agreement, and therefore, it did not have non-union supervisors in the company.   He explained that these projects were very important for the Plaintiff and therefore they brought their key personnel from Minneapolis to supervise the projects.   Mr. Sackett testified that he had informed the Defendant that the Plaintiff was

32

going to use union labor on the projects and that such a decision was going to increase the cost of the projects. Furthermore, he testified that he had informed Mr. Martinez about this decision and that such decision was the reason for the 65% of the gross payroll section in the Agreements. When asked by the Defendant's Counsel whether the Agreements included the term union labor, Mr. Sackett recognized that they did not.

Mr. Sackett testified about the problem with the Smoke Evacuation System that came up during construction of the Hotel Project. He stated that during the spring of 1998, there was an issue as to whether a Smoke Evacuation System was needed on the first and second floors of the Hotel. The Plaintiff introduced into evidence Plaintiff Trial Exhibits No. 14 and No. 30 on this issue. Mr. Sackett testified that the original construction documents did not provide for the Smoke Evacuation System on the first and second floors, and that some time in August of 1998, the Defendant's Code Consultant, Felix Pardo (hereinafter, "Mr. Pardo"), took the position that it was required. He stated that Mr. Pardo's opinion prevailed and the Smoke Evacuation System was installed on the first and second floors.

Mr. Sackett did not consider the addition of the Smoke Evacuation System as a big deal because it did not require any removal of any kind of existing construction work. He described that the work was just adding the new duct system in the various component areas of the first and second floors and continuing on with the work that was up in the ceiling area. In regards to the cost, Mr. Sackett testified that it was not a significant cost

33

because it was covered within the costs the Plaintiff had in the contract price.   However, Mr. Sackett stated that the costs for materials, labor and equipment were not included in the contract price, and that the Defendant was required to pay for those costs, regardless of when the installation took place.

        B.     Testimony of Michael Mason

Michael Mason (hereinafter, "Mr. Mason") was the second witness called by the Plaintiff.   He was the Assistant Project Manager in the Hotel Project, and reported to Mr. Brostrom.

Mr. Mason testified about his work experience.   He stated that he had been employed with the Plaintiff for five years, and that before working with the Plaintiff he worked with Turner Construction Corporation, a General Contractor.   Mr. Mason described Turner Construction as having a volume of 2.2 billion in revenues for the year he had started working with them.   Mr. Mason testified that while working with Turner Construction, he gained experience in construction management which included tracking the cost on several projects.   He described his work in several projects in Houston, Texas;  Chicago, Illinois;  the Caribbean;  and Fort Lauderdale and Miami, Florida. Mr. Mason testified that as a result of his experience while working with Turner Construction in the Miami area, he became reasonably comfortable and familiar with the South Florida Building Code.

Mr. Mason testified about travel and living expenses, and per diems.   He testified

34

that on those occasions when he had to work away from home, Turner Construction had

provided him with additional payments for travel, subsistence and per diem, which were

pretty much standard for any employee that had to work out of town on company

business.   He explained that those kinds of costs were generally passed on to the owner.

Mr. Mason testified that he was hired by the Plaintiff on March 23, 1998, and that

his first posting was on the Defendant's Hotel Project.   He described that his duties were

to assist Mr. Brostrom on the day-to-day administrative duties for work related to the

project, which involved taking care of answers to Requests for Information (hereinafter,

"RFI") from contractors and from the Plaintiff's field supervision.   Mr. Mason's duties

also included attending several owner/architect/contractor meetings, subcontractor

meetings, processing submittals and shop drawings, and finding area contractors capable

of performing quality work on the project.   Mr. Mason stated that by reason of his past

work experience and education, he felt fully qualified to handle the responsibilities that

were given to him by the Plaintiff.   Mr. Mason testified that he was on the project from

March 23, 1998 until November of 1999.

Mr. Mason's testified that his responsibility for subcontractors and for cost

analysis were his biggest day-to-day responsibilities.   He stated that this included

administering subcontracts to ensure the correctness of the charges.   He explained that

when it was necessary for subcontractors to perform work on time and material, the

subcontractor would get time sheets signed by the Field Superintendents representing that

they accurately performed the work, which in turn would be sent in with the costs for time and materials.   Mr. Mason explained that he would then verify their labor rates and material costs, and made sure that the number of hours and wage rates being charged were correct.   He explained that if the bill reflected an extra charge for additional work performance, he would look at the costs for that part of the work to be performed, to make sure that the work conformed with what the area costs were, as well as making sure what materials were being proposed and what being assigned, in order to perform the work needed.

Mr. Mason testified regarding delays to the Hotel Project.   He identified the addition of the heliport, the lack of water and sewer and the addition of the retail space as three significant challenges for the project.

In regards to the heliport, Mr. Mason testified that the construction was within a couple of floors of topping off the building, when it had to stop in order to wait for a design to be made by the architects/engineers in order to implement the heliport above the roof level.   He explained that the work involved new structural information so that contractors could extend columns upward, it involved roofing details, where the roofer already had ongoing work, it involved concrete work, where there was a larger area of concrete to pour, and it also involved some additional steel supports.   Therefore, the addition of the heliport extended the time to complete the work until Spring.

Mr. Mason testified that the lack of water and sewer resulted in delays.   First, he

36

explained that when the Plaintiff requested for concrete to be poured on the job, there was no water source available in order to pour the concrete and finish the slabs. He testified that in order to do the work, they had to take 50-gallon drums and set them on the deck of the concrete contractor. Secondly, he explained that there was no portable drinking water for the workers, which resulted in the Plaintiff having to bring water and ice from outside. Third, he explained that when it became time for the testing of the mechanical systems, there was no connection for the systems to be properly filled and tested. According to Mr. Mason, there was no connection to allow the conditioning needed for the installation of millwork and some of the more temperature sensitive finishes. Mr. Mason testified that the installation of the water and sewer system was the responsibility of the Defendant. The Plaintiff introduced into evidence Plaintiff's Trial Exhibit No. 100 on this issue. Mr. Mason testified that the water and sewer was not installed until April of 1999, just a few weeks before the delivery of the Hotel Project.

In regards to the retail space, the teen arcade and the child care areas, Mr. Mason explained that when the construction began in the retail space, the gaming area had already been opened for public access, and there were four areas that were spread apart which had minimum or restricted access for getting labor and material in and out of the building. He explained that this meant over $1,000,000.00 of work to be put in place in a condensed area in order to perform the work. Mr. Mason testified that under the original Construction Documents, these areas were not going to be finished by the

37

Plaintiff, and that it was not until an owner/architect/contractor meeting on April 15,

1999, that Becky Buster, an employee of the Defendant informed them that the Defendant

expected the retail space to be completed by June 1, 1999.  Mr. Mason testified that prior

to that meeting, no date had been set for the delivery of the retail space, the teen arcade

and the child care.  He stated that Chairman Cypress and Mr. Brostrom also attended that

meeting, and that Chairman Cypress said that he wanted the retail areas finished by the

time of the grand opening, regardless of costs.  Mr. Mason stated that he came out of the

meeting with the understanding that the Chairman was willing to pay all reasonable costs

associated with the work, including overtime.

   Mr. Mason explained that the dollar value of the combination of these retail spaces

was $1,045,000.00.  He explained that the addition of the retail spaces impacted the

work schedule, because it resulted in the Plaintiff having to implement additional

manpower by hiring subsequent contractors that were not on the job at the time, just to

free up enough labor to perform the work by its given time.  He explained that it also

affected the subcontractors such as the base contractors, mechanical, plumbing and fire

protection, because the Plaintiff could not hire an outside contractor to perform that

extension of work, since the contractors previously hired already knew the system.  He

further explained that they had labor in these additional spaces, which needed to be

provided in a confined area, while performing the already contracted work.  Mr. Mason

explained that the addition of the retail spaces resulted in a situation where a few weeks

before the Plaintiff was expected to deliver the Hotel Project, an already fairly compressed activity was compressed even more, as more work was incorporated into the last few weeks.

Mr. Mason testified regarding defective work and back charges.  He explained that "back charge" is a tool used when a contractor failed to perform his work and you have to bring in another contractor to do the work.  He explained that when this occurs, the first contractor is charged the cost of the work performed by the second contractor. Mr. Mason further explained that when this occurs, the work is still completed, but the cost is not, and therefore, there is no additional cost to the job because it is a part of the performance of the work.  He characterized the purpose of back charging as an attempt to save costs to the owner, because it results in the owner not paying for the cost of the extra work since it is a part of the work already established.

Mr. Mason explained that the second scope of a back charge was to be able to identify the damage to another's product.  He explained that under these circumstances, the contractor causing the damage would be back charged for the repair of that product by another contractor.  Mr. Mason testified that there were several instances where he was involved with back charging subcontractors for either damages or because of work that they had to perform in addition to work done by someone else.  Mr. Mason offered an example of a back charge that occurred during the installation of the Smoke Evacuation System.

39

During cross-examination, Counsel for the Defendant asked Mr. Mason about the delay caused by the addition of the helipad.   Mr. Mason stated that his testimony during direct examination was not that the addition of the helipad had held up the project, but that it was a challenge.   He then stated that yes, the helipad had delayed the construction, to a point.

Counsel for the Defendant asked Mr. Mason about Change Orders when additional time is necessary.   Mr. Mason explained that if the overall construction schedule is going to be affected by a change, the additional time and money must be reflected in the Change Order.   However, Mr. Mason explained that if a deadline within a schedule is going to be delayed, without impacting the overall schedule, the Change Order will not need to reflect the additional time.   The Defendant introduced into evidence Page 42 of Mr. Mason's Deposition Testimony on this issue.

Mr. Mason explained that despite the addition of the helipad, the project's Master Schedule was completed as scheduled, but that there was a delay to the time for which they were planning to achieve topping out the roof.   Mr. Mason recognized that this was a situation where he felt that the change was going to cause additional time, but that the additional time could be absorbed in the overall schedule, and therefore, there was no need to get a Change Order for additional days.

Counsel for the Defendant asked Mr. Mason about the water and sewer issue. Mr. Mason recognized that the Minutes Meeting reflected in Plaintiff's Trial Exhibit

No. 100 took place early in the job when the pouring of concrete started, and that at the time, the water and sewer work was not scheduled to be completed.   Mr. Mason recognized that when the Plaintiff was planning to do the job, they were aware of the sources of water that were available and what kind of water sources were going to be available when it started pouring the concrete.   Mr. Mason stated that when they started pouring concrete, they knew that the available source of water was a garden house, and that the Plaintiff was aware of what the constraints were.

Counsel for the Defendant asked Mr. Mason about the Minutes Meeting reflected in Plaintiff's Trial Exhibit No. 100.   Mr. Mason explained that he had called this meeting in March of 1999, because it was a critical time in the job as they had passed the latest deadline given, which had been in August of 1998.   Mr. Mason stated that had there been a critical point six (6) months earlier, he would have called the meeting then.   Mr. Mason recognized that once those time frames were established, water was brought to the building roughly in the time frame that was discussed at that meeting.   Mr. Mason recognized that he did not suggest that a letter or a Change Order be sent to the Defendant requesting additional time based on the water and sewer problem.

During cross-examination, Counsel for the Defendant addressed the issue of Change Orders written by the Plaintiff to subcontractors.   Mr. Mason recognized that he wrote a lot of those Change Orders, and that he personally chose the language used in them to describe the nature of the changes.

41

During cross-examination, Counsel for the Defendant asked Mr. Mason about the Change Orders wherein he authorized additional payments to M. Ecker, a subcontractor, to correct the work initially done by some other subcontractor.   In response, Mr. Mason explained that some of the work was to make amendments to other work performed. Mr. Mason explained that the term "corrective work" was a general term that just meant that you had to perform another step of construction to bring it up to a standard of how your work was being performed.   Mr. Mason explained that he did not sign any Change Orders, that he would bring the information and prepare the Change Order for Mr. Brostrom's signature.

During cross-examination, Counsel for the Defendant asked Mr. Mason about the term "traffic damage" that was used in some of the Change Orders.   Mr. Mason explained that he collected costs for the additional work that had to be done to resolve a problem.   Mr. Mason explained that the Plaintiff was performing the work under a fast track construction schedule, and that in the process of a fast track job there are incidences within that job where the work is damaged and has to be repaired and the offending party is not known.   He further explained that when there is a guaranteed maximum contract, the costs within the guaranteed max covers traffic damages or those types of costs.

During cross-examination, Counsel for the Defendant asked Mr. Mason about the term "fast track."   Mr. Mason explained that "fast track" means that the builder is working along with the design at the same time he is building, and ultimately there is a

schedule for the completion of the project that may be a bit faster than a normal design-then-construct type of project. He stated that there were items that happened during the course of the job that were due to the fast nature of the project design going along with construction.

Counsel for the Defendant asked Mr. Mason about charges for travel, living expenses and per diems while he was employed by Turner Construction. Mr. Mason recognized that he never reviewed the contracts between the owners and Turner Construction, and therefore he did not know whether authorization for those charges was included in the contracts. Mr. Mason testified that when he was employed with Turner Construction as cost engineer and reviewed cost progression on the projects, Turner Construction and the owners had General Conditions assignments, and General Conditions allowed for travel, transportation, living costs, and expenses. He stated that travel, expenses and per diems were items that were in the contract. The Defendant introduced into evidence Pages 28 and 29 of Mr. Mason's Deposition Testimony on this issue. Mr. Mason testified that the contracts he was familiar with when working with Turner Construction had specific contractual provisions that authorized Turner Construction to recover employee reimbursements like travel and expenses. He explained that the body of the main contract referred to the terms and that there were backup attachment documents which expressed the costs to those terms. Mr. Mason testified that he had not read the Agreements between the Plaintiff and the Defendant in

43

this particular case.

At the conclusion of cross-examination, Judge Billie asked Mr. Mason whether he had done a Critical Path Analysis in regards to the addition of the retail spaces, whether he had showed it to the Defendant, and whether it reflected that it was going to require additional days.  Mr. Mason explained that he had done a Critical Path Analysis but not requested any additional days from the Defendant.  He explained that instead, he supplemented the forces and did selective overtime in order to complete the schedule within the expected time frame, and this was presented to the Defendant in the form of a Change Order for the cost.

### C.   Testimony of Paul Mittendorff

Paul Mittendorff (hereinafter, "Mr. Mittendorff") was the third witness called by the Plaintiff.  He was an architect with Elness Swenson Graham ("ESG"), the design professionals employed by the Plaintiff to perform all the architectural design services, coordinate with the consulting designers, engineering groups, and act as liaison between the Plaintiff and the design team.

Mr. Mittendorff explained the design process.  During cross-examination, he confirmed that ESG was responsible for all designs meeting the requirements of the South Florida Building Code.

### D.   Testimony of Richard Brostrom

Richard Brostrom (hereinafter, "Mr. Brostrom") testified for the Plaintiff.

He was the Plaintiff's Vice President and Project Manager.   He was the Project Manager for the Hotel Project.   His duties included issuing bid packages, analyzing proposals, awarding contracts to subcontractors, preparing the four-week schedules, directing the weekly Meeting Minutes, attending subcontractor Minute Meetings, updating the Defendant about the issues and results of the bids, and coordinating all office personnel employed by the Plaintiff.   His duties also included pay applications, final billings, liens, and all paperwork associated with the Hotel Project.   He was not involved in the Campus or School Projects.

Mr. Brostrom testified that when performing his duties, he primarily dealt with the Defendant's On-Site Representative, Julio Martinez.   Mr. Brostrom testified that near the end of the project he met almost daily with Chairman Cypress.   Mr. Brostrom next testified about his educational and work experience.

Mr. Brostrom testified that he had earned a Bachelor's Degree in Architectural Drafting in 1975 and started working for the Plaintiff in 1979.   He described his experience with several large scale projects, and projects similar to the Hotel Project.

Mr. Brostrom testified that he kept the Defendant well informed about the progress of the job.   He explained that he regularly met with representatives of the Defendant, and almost twice a week with Julio Martinez.   Mr. Brostrom explained that every other week he attended Owner/Architect/Contractor Meetings wherein he answered questions and provided information to representatives of the Defendant.   He explained

45

that he also sent letters, documents, transmittals, and drawings to the Defendant on a regular basis.   About his communication with Julio Martinez, he stated that "We had hundreds, literally hundreds of documents that were sent to him from meeting minutes, to schedules, to contracts."   The Plaintiff introduced into evidence Plaintiff's Trial Exhibit No. 142 ("Correspondence Log") on this issue.   Mr. Brostrom testified next about the work reflected in the unsigned Change Orders.

Mr. Brostrom testified in detail about the exterior connector link, helicopter landing pad, and gaming layout.   He explained that Chairman Billy Cypress had ordered these additions to the project and was aware of their construction.   Mr. Brostrom testified about the use of Change Orders.

Mr. Brostrom explained that he utilized written Change Orders if the added work increased the Guaranteed Maximum Price (hereinafter, "the GMP").   He explained that if the added work did not involve an adjustment to the GMP or involved a request for an extension of time, no Change Order was utilized.   Mr. Brostrom stated that he had discussed this approach to Change Orders with Mr. Martinez, and Mr. Martinez agreed.

Mr. Brostrom testified about the issue of substantial completion.   He stated that the first objective was to complete the project by June 10, 1999.   He explained that in April of 1999, the water was finally available, the testing and balancing was being done, the original scope of work had been completed, and over $5,000,000.00 of parking lot work was being performed.   Mr. Brostrom testified that on April 28, 2004 he and

46

Mr. Mason met with Chairman Cypress, and Chairman Cypress told them that he wanted the retail space, beauty shop, and child care completed by June 1<sup>st.</sup>   Mr. Brostrom stated that this directive and the subsequent letter of May 3, 1999 from Chairman Cypress made it clear that the Defendant wanted the retail space to be opened by June 1st.

Mr. Brostrom testified about the issue of corrective work.   He stated that if work was damaged by a subcontractor and the offending subcontractor was identified, he would issue a back charge for the amount of the damage.   He explained that the net effect was no additional cost to the Defendant.   Mr. Brostrom reviewed in detail several of the back charges and explained that they totaled $218,464.00.   Mr. Brostrom testified that there were other damages for which he did not back charge the subcontractor.   He explained that due to the fast-track method of construction used, there were many trades working in a small area, and this resulted in "traffic damage."   He explained that in those circumstances where the subcontractor responsible for the damage could not be identified, no back charge was issued.   He testified that the total for this category was $33,338.09.

Mr. Brostrom testified about charges for travel, subsistence, and per diem for persons who were not regularly located in the project.   The Plaintiff introduced Plaintiff's Trial Exhibit No. 108 into evidence on this issue.   He explained that there was $200,000.00 charged for travel, $40,000.00 for subsistence, and $56,000.00 for housing.   Mr. Brostrom testified that it was in the interest of the project for the

47

Defendant to pay the airfare of two Superintendents who resided in Minnesota and frequently traveled to and from the project.   Mr. Brostrom explained his decision as follows:

> "These individuals, again, were very instrumental in the success of this project.   They had a lot of experience with these delivery models, both on fast track and hotel experience.   Realizing that they were Minnesota superintendents, it was in the interest of the project to keep those people both happy, as it were, as it relates to the workplace and their family lives as well.   So every other week they would split their times and one would go back for the weekend and then be back the following Monday morning."

Mr. Brostrom further explained that the charges for airfare for the wives and children of these two employees had been removed from the bill that was presented to the Defendant, and this was reflected in on Job Cost Ledger.

Mr. Brostrom testified about the issue of field conditions.   He stated that this category included items such as glass windows damaged due to storm, bullet, or theft. He explained that this category also included items not properly built due to the fast-track method of construction used on the project.   He testified that the charge for field conditions was $259,655.00 reflected in Plaintiff's Trial Exhibit No. 209.

Mr. Brostrom testified about the issue of corrective work.   He stated that corrective work was necessary to deliver the project according to the Defendant's expectations.   The Plaintiff introduced Plaintiff's Trial Exhibit No. 111 on this issue.

Mr. Brostrom testified about subcontractors' overtime.   He explained that these

48

were subcontractors' Change Orders in which the subcontractors requested overtime.

He stated that he approved the charges based on "selective overtime."  He explained

that the term meant overtime applied by management to key areas that required work to

be completed without hindering other work in progress.  He stated even if the project had

not been impacted by additions to the scope of the work, since the project had a short

schedule, the use of overtime would have been necessary anyway.  Mr. Brostrom

explained that because the Hotel Project was being built with a fast-track method,

planned overtime was an element right from the outset.  He testified that the charge

for subcontractors' overtime was $322,463.92, which was reflected in Plaintiff's Trial

Exhibit No. 112.  Mr. Brostrom described this amount as a small number for this type of

project.  He explained that the Plaintiff had never built a hotel/casino project without the

use of overtime.  He stated that he did not know of any other contractor who had not use

overtime in a type of project like the Hotel Project.  Mr. Brostrom testified that he

thought it was in the interest of the project for this overtime to be spent in this case.

Mr. Brostrom testified about the issue of labor charges.  He stated that the project

required large amounts of general labor for the work performed in the field.  He stated

that this included either union employees or trades people performing services.  He

explained that the Plaintiff employs general laborers who are members of unions.  He

stated that the Plaintiff utilized a key group of supervision forces that were union

employees, and hired a local firm that provided nonunion labor at a fixed labor amount.

49

Mr. Brostrom explained that this resulted in a substantial savings for the Defendant.

Mr. Brostrom testified about the Smoke Evacuation System and about the work and materials that were required for its installation. He explained that the majority of the work involved was mechanical and the cost involved was approximately $137,000.00. He explained that the Change Order represented a change to a subcontractor and that the GMP for the project was not increased. He stated that the work was performed in the Fall of 1998. Mr. Brostrom explained that the cost of construction for this addition at the time it was added, versus if it had been done earlier, was $5,000.00, and that the GMP was increased for this amount.

Mr. Brostrom testified about the Plaintiff's method of billing on the project. He explained in detail how all the charges were computed and offered a breakdown of the sum that remained unpaid, according to the Plaintiff's claim.

During cross-examination, Mr. Brostrom confirmed that the Plaintiff had a fundamental contractual obligation to do the project in a way that would be the most cost effective for the Defendant, but not necessarily at the lowest price.

During cross-examination, Mr. Brostrom admitted that the Defendant was charged a billing rate for administrative personnel instead of their actual salaries. Mr. Brostrom admitted that the Agreement did not include specific language authorizing charges based on a billing rate. He also admitted the absence of the term "union labor" in the Agreement. He also admitted that the term "construction labor" as defined in Section

50

13.1.1 of the Agreement did not apply to a truck driver in Minnesota who was a union employee.  Mr. Brostrom explained that this truck driver would deliver different parts from the Plaintiff's yard to their office in Minnesota which would then be sent to Florida, and therefore, his work was within the definition of "in the interest of the project."

During cross-examination, Mr. Brostrom was asked about actions by the Defendant, which the Plaintiff argued had delayed the project, which included the delay in providing water.  He confirmed the testimony of Mr. Sackett on this issue.

During cross-examination, Mr. Brostrom was asked about the unsigned Change Orders.  He confirmed the testimony of Mr. Sackett on this issue.

During cross-examination, Mr. Brostrom was asked about the GMP.  He explained that the Plaintiff could not charge the Defendant for the amount of GMP reflected in the Agreement.  He confirmed that under the Agreement, the Plaintiff could only charge for its costs incurred on the project.

During cross-examination, Mr. Brostrom was asked about the Defendant's Trial Exhibit No. 1.  He was asked in detail about each of the additional charges involving corrective and defective work, and general conditions reflected in that exhibit.

During cross-examination, Mr. Brostrom was asked about the Plaintiff's settlements with subcontractors.  He admitted that the settlements did not address the issue of charges being disputed by the Defendant.  Mr. Brostrom admitted that the Plaintiff and not the Defendant was responsible for the subcontractors' charges.  Thus,

51

the Plaintiff would have been responsible for the sum of $300,000.00.

E.      Testimony of Felix Pardo

Felix Pardo (hereinafter, "Mr. Pardo") was the first witness called by the Defendant.   He was the Code Consultant employed by the Defendant to assist the Plaintiff regarding compliance with the South Florida Building Code.

Mr. Pardo testified about his professional experience.   He stated that he was a registered architect since 1978, and that he practiced in the fields of architecture and planning.   He described his work for 10 years with Mr. Lloyd Frank Vann, who wrote the South Florida Building Code.   Mr. Pardo testified that his work experience has included working for the United States Federal and State Governments, State and County Governments, and Municipalities, and commercial and residential projects, including parking structures, judicial buildings, hospitals, and work on historic buildings.   He listed his membership in several professional organizations that included past Director, and current member of the American Institute of Architects, member of the American Society of Interior Designers,  past Chairman of the Board of Architects of the City of Coral Gables, Florida, current Chairman of the Planning and Zoning Board of the City of Coral Gables, and past Code Enforcement Officer for that city.

Based on the recommendation of Mr. Sackett, the Defendant hired Mr. Pardo as Code Official for the Hotel and Campus Projects.   His duties included weekly visits to the construction sites, attending meetings, conducting inspections, and to answer

52

questions for the parties and the Plaintiff's consultants in matters relating to the South

Florida Building Code.   He also reviewed Applications for Payments in order to certify

that the percentage of completion for the projects was accurately reflected on the draw

requests.   Mr. Pardo also reviewed the Plans and Specifications to ensure compliance

with the South Florida Building Code.   Mr. Pardo testified that pursuant to Section

14.4.1.11 of the Addendum, the Plaintiff was responsible for designing and building the

projects according to the South Florida Building Code, Dade County Edition.

Mr. Pardo testified about "Reimbursable Expenses" under Section 13.2 of the

Addendum.   He explained that it was his experience that a contractor would only be able

to recover from the owner expenses for travel and per diem, where such expenses are

specifically included in the contract as reimbursable.   He stated that the same applied

to expenses for overtime and corrective work.   In the case of corrective work, however,

he explained that it would be unusual to include that topic in the contract because it would

be an early admission by the contractor that he expects to make mistakes and for the

owner to pay for them.   He also explained that in the case of Change Orders, the

requirements that they be shown to the owner for approval and signature were very

specific.

Mr. Pardo testified on the issues of "field conditions" and the "fast-track" method

of construction.   He explained that a "field condition" would be the actual condition that

is seen at the project.   If there is an existing building, he explained, a "field condition"

53

would be something that is separate.   He stated that in the present projects, the "field

condition" would be the type of materials, the finishes, the structure, the lights, and the air

conditioning.   He explained that these would be the field conditions a person would be

able to see.   He further explained that as different levels of construction are being

completed, there may be certain conflicts between the construction plans and what is

being built that may arise and must be addressed.   He provided the example of a column

that may had been set and because someone did not think about it, a condition was created

that required moving a door over a couple of inches to be able to accommodate that field

condition.

Mr. Pardo explained that there are two types of "field conditions."   One type is

when the project is underway and there is something that exists, which is uncovered

during the actual construction.   A second type is an unforeseen condition that could not

have been predicted.   He presented the example of a wall being removed or ground

excavations commencing, and then finding the condition.   Mr. Pardo stated that in the

case of a new structure, the field condition usually occurs as a result of a conflict between

the designer and its consultants making a mistake, an error or omission with the

condition.

In regards to a correlation between the "fast-track" method of construction and

"field conditions," Mr. Pardo explained that the "fast-track" method is normal

construction in a simultaneous manner.   He stated that a contractor experienced with this

type of construction would reduce the margin of error, and that the "fast-track" method is not an excuse for mistakes.   He explained that some contractors specialize in this method of construction.   He further stated that based on his experience, where field conditions occur and corrections are necessary, the contractor or subcontractors would be the ones who should bear the costs because the owner is relying on their expertise.

Mr. Pardo explained that one of the guarantees of a Design/Build project is that the contractor is designing and building.   He explained that one of the selling points during negotiations in a Design/Build project is that the contractor is not going to have any conflicts because the contractor is both the designer and the builder of the project, and that this team approach prevents discrepancies between the drawings, the design, and the construction.   He further explained that although it is called Design/Build, in practice becomes a "Build/Design" because the project is usually driven by the builder with the designer staying behind.   Mr. Pardo stated that this fact is another reason why the cost of mistakes should not be passed on to the owner.

Mr. Pardo testified about the issue of the Smoke Evacuation System on the Hotel Project.   He testified that when he was hired, the plans for the project were not complete. He stated that there would be weekly and biweekly meetings wherein he was given floors 3-9 and some architectural plans for the first and second floors.   He stated that the Defendant had made an agreement with the Miami-Dade County's Fire Department (hereinafter, "MDCFD") under which MDCFD would respond to any future fire at the

facility.   As part of this agreement, MDCFD would also review the drawings for fire

compliance, and they would conduct inspections.

Mr. Pardo stated that when he received the package for floors 3-9, he delivered it

to MDCFD who reviewed the fire alarm system, the smoke removal system, and all of the

existing requirements to ensure compliance with the South Florida Building Code.   He

stated that on the smoke removal system for the first and second floors, he did not receive

any plans until some time in August of that year, at which time he delivered the plans to

MDCFD for review.

Mr. Pardo testified that on March 18, 1998, ESG architects made an inquiry

regarding the Smoke Evacuation System, to which he responded.   In his response, Mr.

Pardo specifically stated that Chapter 39 of the South Florida Building Code required

the Smoke Evacuation System.   He stated that at the time he wrote his response, he had

only received architectural plans of the first and second floors that did not include the

system.   He explained that the system was not supposed to be included in the

architectural plans, but in the mechanical plans.   Mr. Pardo stated that he did not receive

the mechanical plans until August of 1998, at which time he noticed that the Smoke

Evacuation System had not been included.   He testified that he immediately contacted

Mr. Brostrom, and representatives from MMC and Gartek.   Mr. Pardo explained that

MMC was the Plaintiff's subcontractor for mechanical work, which included air

conditioning, fire sprinklers, and plumbing.   Gartek was the Plaintiff's mechanical

56

engineer responsible for reviewing the drawings.

Mr. Pardo testified that on September 16, 1998, Mr. Sackett wrote a letter to Chairman Cypress discussing the topic of the Smoke Evacuation System. He testified that although this letter states that he was sent a copy, he never received it, and had first heard of it when the Defendant's On-Site Representative, Julio Martinez, contacted him and requested a response. On May 22, 1998, Mr. Pardo wrote a response explaining in chronological order what had occurred with the Smoke Evacuation System. Mr. Pardo testified that he received the first drawings of the Smoke Evacuation System from MMC on September 21, 1998.

Mr. Pardo testified about the alleged delays caused by a lack of water on the Hotel Project. He stated that it was his opinion that the subcontractor hired by the Defendant to install the water and sewer system, Solo Construction did not materially delay the project. He explained that a review of the CPM Schedule for the water and sewer, which showed August 31, 1997 as the date the work started, and February 15, 1998, as the date of completion, was not a realistic schedule, considering the scope of the work.

Mr. Pardo explained that there were two components to the work to be performed by Solo Construction. The first component consisted of off-site water and sewer extensions that were located on Krome Avenue, Miami-Dade County and not on the Miccosukee Reservation. Mr. Pardo explained that this meant that Solo Construction had to go through a permit process where several state agencies had to review and

approve the plans.   Mr. Pardo noted that Solo Construction had not been hired until April

of 1998, which was beyond the time scheduled for the completion of the work.

Mr. Pardo testified that the water component of the work performed by Solo

Construction would have been included in the critical path when the contractor could not

have completed the final plumbing inspection because of the lack of water.   He stated

that even though Solo Construction had not been hired yet when he arrived on the project,

there was water being used by the contractor for whatever purposes they needed it for.

Mr. Pardo testified that he did not recall attending any job meetings where the Plaintiff

indicated that the sources of water available to them were inadequate and causing a delay

to the project.

Mr. Pardo explained that water was needed for purposes of powering the water

chilled system for the air conditioning, and that there were water sources available that

could be used for that purpose.   He explained that the first of these water sources was the

existing Miccosukee Indian Bingo facility, which was fully functioning.   According to

Mr. Pardo, the second of these water sources was the option of drilling a well, which he

described as a commonly used alternative.   He explained that this option was easily

available because the existing Miccosukee Indian Bingo facility already had wells.

Mr. Pardo stated that the lack of water would had been a critical path problem if

the Plaintiff had reached the stage for final plumbing or activating the sprinklers.   He

further stated that the sprinklers could have remained dry until the final fire review or

58

final test, which did not occur until the end of May of 1999.

Mr. Pardo testified about Minute Meeting 5.8.32 of February of 1999, which stated that the water system was ready for certification of bacteriological tests, and that the water pipes were ready for flushing on September 17, 1998.  He noticed that this showed that the water line was connected and the certification for a water meeting had been granted.

Mr. Pardo testified about work performed by a subcontractor, Sutherland Construction.   He stated that Sutherland Construction was one of the Plaintiff's subcontractors.   He stated that Sutherland Construction performed corrective work for work that had been incorrectly performed by other subcontractors hired by the Plaintiff. Mr. Pardo explained that the finish work was performed by another subcontractor hired by the Plaintiff, M. Ecker, and not by Sutherland Construction.

Mr. Pardo testified about the date of completion of the Hotel Project.  He stated that a Temporary Certificate of Occupancy was issued on June 2, 1999, and a final Certificate of Occupancy in August of 1999.  Mr. Pardo explained that on June 2, 1999, the Defendant could utilize the premises for its intended purposes.

Mr. Pardo testified about the air conditioning system in the School Project.   He stated that the air conditioning did not work properly and it was a chronic problem.  He explained that MMC tried to fix the problem but was unable to do so.  He stated that after months, maybe a year, the Defendant hired a local contractor, Earl Heywood, who

59

fixed the malfunction.   Mr. Pardo explained that the problem was that the air

conditioning had been improperly installed and some components had been improperly

designed.

During cross-examination, Mr. Pardo confirmed that his current compensation in

this case was $150.00 per hour and that the Defendant was the source of this

compensation.   He agreed that due to his professional experience, the Plaintiff had been

correct in recommending his hiring to the Defendant.

During cross-examination, Mr. Pardo confirmed that the Smoke Evacuation

System was required in the Hotel Project.   He further confirmed that the Plaintiff

installed the system, and that the system was currently in operation.

During cross-examination, Mr. Pardo was asked about the schedule for the

water and sewer system.   He stated that if the Defendant had in fact not hired Solo

Construction until April of 1998, meant that the schedule was already off by five months

by the time Solo Construction was hired.

F.      Testimony of Julio Martinez

Mr. Martinez was the second witness for the Defendant.   He was the Defendant's

On-Site Representative for the projects.

Mr. Martinez testified regarding his education and professional experience.   He

graduated from Florida International University in Miami, Florida with a Bachelor in

Science Degree in economics and a Minor in accounting.   Mr. Martinez has been

working with the Defendant's Finance Department since June of 1989.

Mr. Martinez testified that he attended some of the negotiations and meetings between the Plaintiff and the Defendant before the execution of the Agreements. He stated that the design/build concept was discussed during some of those meetings, and that the Plaintiff explained it as a much easier way to build the projects because they would be the single point of responsibility for the entire process. Mr. Martinez also stated that it was the Plaintiff who suggested the time frame for the construction.

Mr. Martinez testified about Exhibit A of the Agreement for the Hotel Project. He stated that he was aware that Exhibit A was attached to the Agreement, behind the Addendum Section, but that he was not aware of any other attached exhibit.

Mr. Martinez testified about the tax-exempt issue. He stated that there were discussions between the Plaintiff and the Defendant about the fact that the projects were to be tax-exempt. He stated that part of the reason why the Plaintiff was chosen as the contractor, was because they had experience working with Indian Tribes, and were aware of the savings that the tax-exempt status represented for the Defendant on the purchase of materials. Mr. Martinez further stated that the provision in the Agreements for the Purchasing Agent was Mr. Sackett's suggestion, who emphasized the Plaintiff's familiarity with this type of procedure. Mr. Martinez stated that the Defendant had never used this type of procedure before.

Mr. Martinez testified about the date of substantial completion for the Hotel

61

Project.   He stated that the building was supposed to be completed in two phases.   The first phase, which included the gaming space or first floor restaurants, was to be completed in December of 1998.   This time frame was selected by the Plaintiff, at which time there was no indication by the Plaintiff that they could not meet this time frame.

Mr. Martinez testified about his first concern regarding the Plaintiff's charges on the projects.   He stated that it was a common practice for the Defendant to conduct an auditing at the end of a particular period of time, based on generally accepted accounting principles.   Mr. Martinez stated that he commenced this auditing process in June or July of 1999, at which time he started to review the then current Pay Applications and the attached documents.

Mr. Martinez started that prior to July of 1999, he never had the time to do this auditing.   He testified that as he commenced reviewing the documents, he remembered questioning Mr. Brostrom about several of the expenditures.   However, Mr. Martinez stated that Mr. Brostrom's explanation and interpretation of the compensation language in the Agreement did not coincide with his.   Mr. Martinez testified that he noticed that some charges, such as the sponsorship for the Grand Opening of the Hotel, were not proper.   Mr. Martinez also noticed additional charges in the name of Kraus-Anderson Realty, and other vendors, such as Willoway Enterprises, that he could not recognize.   In the particular case of Willoway Enterprises, he testified that Mr. Brostrom explained that it was for credit risk or risk analysis consulting.   Mr. Martinez testified

62

that after that, the Defendant felt deceived, and began to ask for additional documentation for the charges made.

Mr. Martinez testified that as he began to receive the additional documentation, more charges that he felt were inappropriate were discovered.   He also stated that the Plaintiff's explanations were also inappropriate.   Mr. Martinez identified charges for travel, employees' time, and employees' salaries in this category.

Mr. Martinez testified that as he started challenging some of the charges, he learned that many of the records for those charges were kept in Minnesota, and were either not available, no where to be found, or incomplete.   Mr. Martinez offered examples of records being incomplete, in regards to the bidding process for some of the subcontractors, the work being awarded to a subcontractor who was not the lowest bid, Mr. Sackett's work time on the projects, administrative personnel and employee costs, and travel expenses.

Mr. Martinez testified about billing rate charges for employees.   He stated that when he questioned Mr. Sackett about these charges, he indicated to him that they were appropriate pursuant to a document listing those charges that he said had been provided to the Defendant, but which had not been attached to the Agreement.   Mr. Martinez stated that he first learned of the existence of this document when he questioned Mr. Sackett on billing rate charges, at which point and Mr. Sackett sent him a copy via facsimile.   He stated that he did not discuss the document with anybody before the signing of the

Agreement, and that the document was not attached to the Agreement.   Mr. Martinez

stated that the document was not attached to the Campus or School Agreements either,

and that he had never seen the document as been applied to those two projects.

Mr. Martinez testified about the Basic Compensation Section of the Agreement

and "costs incurred by the design/builder."  He stated that he interpreted the language

"costs incurred" to mean actual costs that the Defendant had to pay.   Thus, he believed

that direct purchases of material by the Defendant did not qualify as "costs incurred

by the design/builder."  Mr. Martinez also testified about other language in the Basic

Compensation Section.

In regards to the language, "including design services, administrative, clerical

and accounting persons located in the office and field," Mr. Martinez testified that he

interpreted this to mean that the Basic Compensation Section included the Defendant's

administrative, clerical, and accounting personnel, located on-site and in Minnesota, that

were required for some of the work.   He included within this definition clerical

employees in the Accounting Department, and company executives involved in specific

negotiations on the projects.   Mr. testified that that the Basic Compensation Section

should not have included a truck driver in Minnesota.   In regards to "construction labor,"

he interpreted this to mean that laborers and non-administrative personnel were included,

as workers for the project.

In regards to the language, "an amount equal to sixty-five percent (65%) of gross

payroll of the workers and personnel described above directly employed by the Design/Builder . . .," Mr. Martinez testified that the term "gross payroll" meant a worker's hourly rate multiplied by the number of hours worked, which produces the total amount of wages before any deductions for taxes.   He testified that he interpreted the rest of the sentence which stated, ". . . to compensate the Design/Builder for taxes, insurance, contributions, assessments and benefits, temporary utilities, heat and water . . ." to mean that the 65% charge not only covered employees' benefits, but also everything else listed. Mr. Martinez explained that since the amount generated by the 65% charge was so far above the employees' benefits paid by the Defendant, that the only logical explanation was for charges for temporary utilities, heat, and water to be covered within this same section as well.

In regards to the language, ". . . an amount equal to one-half of one percent (0.5%) of the Guaranteed Maximum Contract Sum (as herein defined) to compensate the Design/ Builder for a portion of the cost of its umbrella liability insurance, legal costs (other than those arising from disputes between the Owner and Design/Builder or from disputes between Design/Builder and any subcontractor of Design/Builder), transportation, subcontractor bonding, and other facilities and services necessary for proper execution of the Work, whether, temporary or permanent . . .," Mr. Martinez testified that this 0.5% resulted in a charge of $250,000.00 to the Defendant.   He stated that when he asked Mr. Sackett how much the Plaintiff had paid for the umbrella liability insurance on the

project, he discovered that the Plaintiff had paid for an entire year worth of umbrella

liability insurance, to cover the entire company and their businesses, totaling about

$230,000.00.   Mr. Martinez explained that since this amount was so far above what the

Plaintiff paid for the umbrella liability on this project, the only logical explanation would

be that the fee generated would also cover the costs listed.

In regards to the 4% fee stated in Section 13.1.1(b) of the Hotel Project (and 6%

for the other two projects) on the costs described in the previous section, Mr. Martinez's

interpretation of this fee was that it applied to actual amounts paid.   He also stated that

he interpreted them as not applying to the amounts generated by the 0.5% and 65% fees,

because those were not actual costs.   He stated that it was unreasonable for the Plaintiff

to receive an additional percentage out of a profit it was already receiving.   Thus,

Mr. Martinez testified that the profits from the 65% and 0.5% fees were a separate fee

instead of a "cost incurred" by the Plaintiff.   He next testified on the issue of charges for

travel, per diem, and housing of Plaintiff's employees.

Mr. Martinez stated that he believed that the additional charges for travel, per

diem, and housing for Plaintiff's employees were covered by one of the aforementioned

fees.   He stated that the Plaintiff never justified those charges under any specific

provision of the Agreement.   Instead, the Plaintiff justified them under the document that

had not been attached to the Agreement.   Mr. Martinez next testified about the issue of

overtime charges for subcontractors and some of the Plaintiff's employees.

66

In regards to overtime charges for subcontractors, the Defendant introduced into evidence Plaintiff's Trial Exhibit No. 112, which reflected a charge of $332,493.92 on the Hotel Project. Mr. Martinez explained that Plaintiff's Trial Exhibit No. 112 reflected overtime charges for subcontractors that were included in Change Orders. Mr. Martinez explained that there was no section in the Agreement that allowed the Plaintiff to charge for overtime costs. Mr. Martinez stated that despite many periodic meetings with Mr. Sackett and Mr. Brostrom throughout the duration of the projects, he was never told about the use of overtime. Mr. Martinez explained that such a rampant use of overtime was a sign of poor management by the Plaintiff. Mr. Martinez stated that due to the 4% fee (6% on the other two projects) on costs and the use of overtime increased the Defendant's costs and the Plaintiff's profit on the projects. Mr. Martinez expressed the same opinion on the issues of travel and per diem charges for some of the Plaintiff's employees. Mr. Martinez next testified about charges for correction work.

In regards to the issue of charges for corrective work, Mr. Martinez stated that he found additional subcontractor charges for "repairs" and "corrective work." He stated that although he relied on Mr. Pardo's expertise on some of the technical corrective work included in some of the Change Orders, most of the charges were clearly classified as repairs to items that had been damaged. Mr. Martinez stated that in his opinion, the Defendant did not have to pay for corrective work, because to do so meant paying for the work twice. He explained that in those situations where the Plaintiff was unable to

67

determine who caused the damages, the Plaintiff should bear the responsibility.

Mr. Martinez stated that his opinion was based on the Plaintiff's description of the

design/build method of construction during the negotiation process, as one where the

Plaintiff would be the single point of responsibility, and where the Plaintiff was the one in

complete charge of coordinating and supervising all the projects.   He explained that the

same rationale applied to the issues of defective work and "field conditions."   Mr.

Martinez next testified about the issue of the Plaintiff acting as "Purchasing Agent" on

behalf of the Defendant for purposes of materials.

Mr. Martinez explained that when the Plaintiff's method was not accepted by the

State of Florida, it was clear that the Defendant had to be the direct purchaser of the

materials.   Mr. Martinez stated that after this occurred, Mr. Sackett never discussed

drafting a Change Order to the Agreements with him, in order to reflect this change, and

that the Plaintiff's fee on the purchase of those materials no longer applied.

Mr. Martinez next testified about the Change Order process.

On the issue of the Change Orders, he agreed with Mr. Pardo that they had to be

signed and approved by Chairman Cypress.   Mr. Martinez explained that Chairman

Cypress did not want any changes unless he signed and approved them through the use of

a Change Order.   Mr. Martinez explained that he did not have the authority to authorize

any work, and that only Chairman Cypress, as the Defendant's Agent, had that authority.

He explained that on several occasions during meetings or Progress Meetings with the

68

Plaintiff, the Chairman made it clear that all changes needed to be put in writing and submitted for approval.   Mr. Martinez further explained that this was part of the Defendant's regular business practice in all its business endeavors, and not just for these projects.   He stated that "approval" meant a written approval signed by the Chairman. On this issue, the Defendant introduced into evidence Plaintiff's Trial Exhibit 32 ("Owner, Architect & Contractor Coordination Meeting"), Meeting No. 24 of February 18, 1999, Item No. 5.24.115, which showed an entry that read: "All future change orders to the Owner must be submitted to the Chairman for approval with time and cost specifically addressed."   The Defendant introduced into evidence Plaintiff's Trial Exhibit No. 88, which showed a transmittal letter that included options that read: "For Your Approval, For Your Use, As Required," and reflected the Chairman' signature. Mr. Martinez explained that this particular transmittal reflected the Chairman's signature authorizing the particular work in the child care areas.   The Defendant also introduced into evidence Plaintiff's Trial Exhibits No. 55-60, No. 71, No. 81, No. 83, No. 107, and Defendant's Trial Exhibits E and F, which showed requests for additional work, which Mr. Martinez explained he was never asked to submit to the Chairman for approval and signature.   Mr. Martinez next testified about the issue of the work performed by Solo Construction.

In regards to the work performed by Solo Construction, Mr. Martinez stated that he had discussed with the Plaintiff's representatives the issue of whether the work by Solo

Construction was delaying the Plaintiff's work on the Hotel Project.   Mr. Martinez

explained that as the Hotel Project progressed, it became evident that it was taking longer

than originally estimated for Solo Construction to bring the water and sewer to the

project, and that he was worried about whether it would have an impact on the Plaintiff's

ability to complete the project.   However, Mr. Martinez testified that he was aware of the

progress made on construction, and that the Plaintiff was behind schedule.   He testified

that Mr. Brostrom confirmed during one of their walks through the project, that the

project, according to the designed time line, could not be completed by the February of

1999 deadline.   Mr. Martinez explained that he continuously asked Mr. Brostrom

specifically about Solo Construction, "Is it stopping you, is it stopping you?"

and that Mr. Brostrom response was no.   However, Mr. Martinez testified that some time

after that, when it had become obvious that the Plaintiff was not going to be able to

complete the project by the February deadline, Mr. Martinez said to him, "Well, there's

no water to the project, I cannot start the chillers."   Mr. Martinez testified that he

interpreted Mr. Brostrom's complaint as an excuse to try to justify the fact that they were

behind schedule on the project.   He described that he could see a lot of unfinished areas

and opening spaces on the building.   Mr. Martinez next addressed the issue of the

additional work on the parking lots.

Mr. Martinez testified that the Plaintiff had expressed to Chairman Cypress that

they wished to do the work on the parking lots.   Mr. Martinez explained that the

70

Defendant could have easily assigned this matter to another contractor.   He explained

that the Plaintiff had been trying to obtain this additional work way before February of

1999.  Mr. Martinez next testified on the issue of the "Building Official."  He stated that

even though the Agreement did not require the Defendant to employ a "Building

Official," the Defendant decided to do so at the request of Mr. Sackett.  Mr. Martinez

next testified about the issue of "punch lists."

Mr. Martinez stated that Mr. Mittendorff of ESG was the person who did the initial

Punch List on the Hotel Project.  Mr. Martinez testified that at the time, the building was

in a state where there was a lot of unfinished work such as the entire east wall and

corridor.  Mr. Martinez explained that Mr. Mittendorff told him that the project was not

at a stage where the Punch List could be used because most of the building was

unfinished, and therefore not ready for a Punch List.  Mr. Martinez stated that Mr.

Mittendorff had to make a second visit for that purpose.  Mr. Martinez testified on the

issue of the helipad, and whether it delayed the progress of the work.

Mr. Martinez stated that the Hotel and Campus Projects involved having a helipad.

He stated that Mr. Sackett informed him that a permit from the Federal Aviation

Administration (hereinafter, "the FAA") would likely be needed for it.  Mr. Martinez

testified that after consultations with the Chairman, the Defendant hired a consultant for

this purpose.  However, Mr. Martinez explained that some time later, the consultant came

back and informed him that the FAA did not require a permit for private landings, and

therefore, no permit was needed in this case.   Mr. Martinez stated that the Plaintiff never

told him that the issue of the permit was interfering with any of the construction.

Mr. Martinez next testified on the issue of the installation of security cameras in the Hotel

Project.   Mr. Martinez next testified on the issue of budget versus actual costs.

The Defendant introduced into evidence Plaintiff's Trial Exhibit No. 15 on this issue.

Mr. Martinez testified that although Plaintiff's Trial Exhibit No. 15 reflected a

savings totaling $4,244,869.00 for the Defendant, this so called "savings" really had no

meaning.   Mr. Martinez explained that under the nature of the Agreements between the

parties no such "savings" were allowed.   Mr. Martinez explained that since the

Defendant was required to pay "actual costs" on the projects, there could not be any

"savings."   According to Mr. Martinez, the GMP reflected in the Agreements was a

budget number not to be exceeded by the Plaintiff.

Mr. Martinez explained that the GMP is for the benefit of the parties.   It is for the

benefit of the Defendant because it informs them what the actual costs are going to be.   It

is also for the benefit of the Plaintiff because it offers them a lot of room to attempt to

make charges for many things, as long as those charges remain under the GMP.   He

stated that this created a fundamental problem in this case.

Mr. Martinez explained that when he conducted an audit of the projects, the audit

revealed that the Plaintiff had made many charges that appeared to be for the sole purpose

of reaching the GMP amount.   Mr. Martinez explained that many of the charges were

72

purely discretionary.   In furtherance of this topic, Mr. Martinez testified about a

deductive Change Order reflected in Plaintiff's Trial Exhibit No. 11.

Mr. Martinez testified that Change Order No. 6 was the Change Order in which

direct purchases of materials were deducted from the amount paid by the Defendant.

Mr. Martinez explained that since the Defendant was directly making the purchases, he

did not understand why this Change Order was necessary.   He explained that this

procedure was confusing the issue and making it more difficult for the Defendant to

follow-up on the GMP.   He stated that when he asked about it, Mr. Sackett said that this

was how the Plaintiff's Accounting Department wanted these amounts reflected on their

Applications for Payment.   Mr. Martinez next testified about the School Project.

In regards to the School Project, Mr. Martinez testified that some time in June or

July of 1999, the Defendant started to audit some of the costs on this project.   He

explained that as some of the issues were being raised regarding the shifting of several

costs, the Defendant stopped all payments on this project.   Mr. Martinez explained that as

the School Project was almost completed, the children were in a trailer, awaiting their

transfer to the new school, and therefore, the Defendant wanted the project completed

within the specified time frame.   Mr. Martinez testified that he believed the Plaintiff was

using the School Project as leverage to force the issues in the Hotel Project.   Mr.

Martinez  stated that the Plaintiff then started to demobilize their work force on the

School Project.

73

Mr. Martinez explained that as a result of this demobilization, the shell contractor, Betancourt Castellon and Associates (hereinafter, "BCA") was being prevented from completing the project. Mr. Martinez explained that since BCA did not have direct control over the subcontractors, he could not utilize them for the electrical and mechanical work that was needed. Mr. Martinez stated that it was then that the Defendant asked BCA to complete the project, which it did. Mr. Martinez explained that the Defendant paid BCA $2,077,056.63 to finish the School Project. However, he explained that since the Plaintiff's records showed that the Defendant had directly paid BCA $1,712,362.63, the Plaintiff should subtract from its Final Application for Payment the amount of $364,694.00. Mr. Martinez noted that the Defendant had also challenged the $32,796.72 that the Plaintiff had charged for travel on this project. Mr. Martinez next testified about the problems with the school's air conditioning.

Mr. Martinez testified that since the opening of the school, there were difficulties in temperature control. He stated that Metropolitan Mechanical had been one of the first major subcontractors to demobilize from the project, and that they had apparently not finished the mechanical systems, or had not install them properly. Mr. Martinez explained that he had been informed that the air conditioning part of the system was not balanced, and it was unable to control the humidity in the entire building. He testified that as a result of this problem, there was a condensation problem that resulted in dripping, which in turn caused the ceiling tiles to fall. Mr. Martinez offered the example

74

of the damage to the laminated wood alongside the atrium, which was damaged and had to be refinished. He also testified about additional problems with noisy air handlers above classrooms.

Mr. Martinez stated that he informed Mr. Betancourt of these problems, and that he suggested a company called Earl Heygood, whose primary responsibility with the local school system was to test, balance, repair, and maintain air conditioning systems. The Defendant introduced into evidence Defendant's Trial Exhibit No. 11 on this issue, which showed a total payment of $97,020.00 for work on the school. Mr. Martinez also testified on the issue of delay damages on the Hotel Project.

Mr. Martinez explained that the Agreement included a provision that authorized the Defendant to collect the amount of $1,000.00 for each day the Plaintiff was late in completing the project. Mr. Martinez explained that the Agreement listed two different completion dates: February 12, 1999 and June 10, 1999. He agreed with Mr. Pardo's opinion that substantial completion was achieved on or about June 2nd or 3rd, and that it was the Defendant's position that there should be a calculation at a rate of $1,000.00 per day, for delay damages, between the February 12 and the June 2nd or 3rd dates. Mr. Martinez next testified about charges for some of the Plaintiff's employees after the conclusion of the projects, and after they had left the projects. The Defendant introduced Plaintiff's Trial Exhibit No. 4 into evidence on this issue.

Mr. Martinez identified several charges in Attachment 3 to the Plaintiff's Trial

Exhibit No. 4 that he characterized as improper. They included charges of $45,956.00; $2,450.00; $10,555.00; $5,000.00; $253.00 for a phone bill; $73.00 for messenger service; $230.00; $1,793.00; $105.00; $44.00 for Federal Express; $69.00 for the Department of Revenue; $4,200.00 for GE Capital Modular Space Center on Quality; $1,057.47 for David Hinsa; $97.13 for David Kammueller's phone bill; $27,757.89 for Kraus-Anderson Realty Company; $115.26 for Mike Mason; $2,655.64; $27.05 for Larry Peters; $339.19; $1,466.45 for Tom Sackett; $329.00; $657.54; $5,333.00 for Jerry Dries for Travel One; $825.60; $1,851.48 for UPS bills; $903.57 for Hinsa and Greg Ryder, and other employees. Mr. Martinez next testified regarding charges under "field conditions." The Plaintiff's Trial Exhibit No. 109 was introduced into evidence on this issue.

Mr. Martinez reviewed the Plaintiff's Trial Exhibit No. 109. He stated that the Defendant should not have been charged the amount of $259,655.18 for "field conditions." He expressed the same opinion regarding the $33,938.09 charged for "traffic damage." The Defendant introduced into evidence Plaintiff's Trial Exhibit No. 110 on this issue. Mr. Martinez also stated that the Defendant should not have been charged the $141,349.11 for "corrective work" reflected in Plaintiff's Trial Exhibit No. 111, or the $322,463.92 for overtime reflected in Plaintiff's Trial Exhibit No. 112.

During cross-examination, Mr. Martinez confirmed that he attended many Owner/Architect/Contractor Coordination Meetings. He admitted that he visited the projects' sites daily.

76

On the issue of Change Orders, Mr. Martinez confirmed that the Chairman handled all Change Orders that adjusted the GMP, and that there was no Resolution that referred to Change Orders.   However, he stated that there was a Resolution at the beginning of the projects that authorized the Chairman to sign Change Orders.

During cross-examination, Mr. Martinez stated that he did not remember any instances where Chairman Cypress would make a decision and not communicate that decision to the Plaintiff.   However, Counsel for the Plaintiff read from Page 90 of Martinez's Deposition Testimony wherein he had stated that in meetings with the Plaintiff he would communicate decisions made by Chairman Cypress.   On Page 194 of that Deposition, Mr. Martinez had also stated that on occasions, members of the Business Council would tour the projects, look at items, and accept them.   In his Deposition Testimony, Mr. Martinez also confirmed that there were no written records reflecting these acceptances.   He had also confirmed that many of the Council's directives were oral, an only a few were written.

Mr. Martinez was asked during cross examination about the Defendant's decision to stop all payments to the Defendant.   Mr. Martinez confirmed that at the time, there was still some work left for the Plaintiff to complete.   The unfished work included the parking lot, Punch Lists, project closeouts, and the School Project.

In regards to the School Project, Mr. Martinez confirmed during cross-examination that after the Plaintiff started to demobilize its mechanical and electrical personnel, he

was approached by Mr. Betancourt, who offered to complete the project.  Mr. Martinez

stated that the Defendant then hired BCA to complete the School Project.  Mr. Martinez

testified that it was his understanding that BCA had completed the shell work, plus the

mechanical and electrical systems on the project.  However, the Plaintiff's Counsel noted

from Deposition Exhibit No. 257, an entry showing that the Plaintiff had given the

Defendant a credit of $1,712,362.63 for the School Project.  The Defendant's Counsel

also read from Page 29 of Mr. Betancourt's Deposition, wherein Mr. Betancourt had

stated that BCA had not done any mechanical, plumbing, or electrical work on the School

Project.  In response, Mr. Martinez explained that he remembered that BCA had

completed some mechanical and electrical work, but that he did not know whether this

work was defined within the scope of BCA's contract, or if they had to expand the scope

of work resulting from the departure of Parsons Electric or other subcontractors.  When

asked why he wanted to deduct from the Plaintiff amount the Defendant paid BCA for

completion of the School Project, despite the Plaintiff having given the Defendant credit

for that amount, Mr. Martinez stated that the rationale was based on the Defendant's

expectation of Plaintiff's completion of the project.  Mr. Martinez was also asked about

additional repairs by the Defendant on the school.  On this issue, he confirmed that

Mr. Heywood was first contacted about the repairs in October of 2001, some 22 months

after the Temporary Certificate of Occupancy had been issued.

     During cross-examination, Mr. Martinez was asked about the Change Order

process.   He confirmed that the purpose of the Change Orders, whether signed or

unsigned, was to increase or decrease the GMP.   He further confirmed that in this case,

changes made from time to time did not affect the GMP, and that they were done by the

Plaintiff by means of to carrying out the broad intent of the contract documents as

provided in Section 2.2.15 of the Agreements.   However, Mr. Martinez explained that

section allowed the Plaintiff to make only minor changes without the Defendant's

approval.

In regards to the unsigned Change Orders, Mr. Martinez reviewed those contained

in Plaintiff's Trial Exhibit No. 12.   He confirmed that the Chairman had in fact ordered

the work reflected in those Change Orders.   Mr. Martinez explained that the Defendant's

position was that those Change Orders should not have increased the GMP.  He further

explained that the Defendant believed they had already paid for the work reflected in

those Change Orders.

During cross-examination, Mr. Martinez was questioned regarding the issue of

the "Purchasing Agent."   Mr. Martinez admitted that although one of the options

presented by the Defendant's Counsel specifically mentioned an amendment to that

particular section of the Agreements, no such action was taken by the Defendant.

F.     Testimony of Douglas Wright

Mr. Wright was the third witness for the Defendant.   He was the Defendant's

expert witness in this case.

Mr. Wright testified about his educational and professional experience.   In regards

to his educational experience, he stated that he had earned a Bachelor in Science Degree

for mechanical engineering, and was a registered engineer in the states of Alabama and

Florida.   His professional experience includes working with International Business

Machines, Corp., Caldwell Construction Company (hereinafter, "Caldwell"), and Watkins

Engineers and Contractors ("Watkins").   Mr. Wright explained that he worked as Project

Manager with Caldwell and Watkins , and in this capacity he routinely dealt with many of

the current issues presented in this case.   Mr. Wright next testified about his involvement

with this case.

Mr. Wright testified that he was approached by the Defendant's Counsel, whom he

described as having done legal work for Watkins, to assist him in estimating the cost of

a project like the Hotel Project.   Mr. Wright stated that Watkins had built several hotels,

but never a casino.   Therefore, he contacted Watkins's parent company, Dillingham

Construction Company (hereinafter, "Dillingham") in Pleasanton, California who

provided information on two hotels with a casino that they had built, and which showed

the same quality and number of rooms as the Defendant's hotel.   He stated that after a

review of the Plans and Specifications for the Hotel Project, he spent two days looking

80

through the project, and after having done this, he prepared an estimate.  Mr. Wright explained that he was familiar with the materials and techniques used on this project.

Mr. Wright testified about the issue of subcontractor Change Orders.  He stated that he had reviewed the Change Orders the Plaintiff issued to its subcontractors, and the documentation attached to them.  He explained that such documentation would reflect the reasons for the change, the number of hours it took to construct, prepare and install it, along with overhead, and profit.  Mr. Wright explained that the Change Order may also had reflected a Request for Information (hereinafter, "RFI").  He also stated that he reviewed information from the architects regarding subcontractor Change Orders.
Mr. Wright next testified about the design/build concept.

In regards to the design/build concept, Mr. Wright, like Mr. Martinez, explained the single source and centralized responsibility advantages of this type of concept.
Mr. Wright stated that in a design/build project, the contractor has a higher obligation to the owner because the contractor is responsible for insuring that the design meets the owner's needs.  Mr. Wright explained that under the design/build concept, the architect works for the contractor.  Consequently, the contractor is responsible to the owner for the architect's work.  Mr. Wright next testified regarding the "fast track" mode of construction.

Mr. Wright testified that in the last ten (10) years, every contractor in the industry feels that due to the market conditions, all the projects have been built under the fast

track method, and that in the State of Florida the fast track projects far exceeded the number of non-fast track projects.  He explained that in a non-fast track project, the owner would hire an architect who would complete the entire designs, finish schedules, select the colors of the paint, and then schedule the project for the bidding process.  Mr. Wright explained that once a bid is accepted and a contractor selected, the contractor and the owner would enter into a contract, and the construction begins.  Mr. Wright stated that in contrast, when the fast track mode is used, the site work is commenced immediately, and once the structural and civil design is completed, that part of the work is subjected to the bidding process.  He stated that the fast track mode tends to save overall time, from the time the project was first conceived, until the time it was completed.

Mr. Wright stated that in a design/build project, the fast track nature of construction would not excuse the contractor's responsibilities for mistakes or oversights in the design.  He explained that mistakes or oversights could be prevented by properly coordinating the release of the civil work and structural design.  Mr. Wright next addressed the issue of Plaintiff's compensation pursuant to the Agreements.

Mr. Wright characterized the Agreement between the parties as a "cost plus Contract," under which the Plaintiff was entitled to certain fees, including a fee for "costs in the interest of the project."  He explained that the Plaintiff was also entitled to be reimbursed for items listed in Section 13.2.1 of the Agreements under "Reimbursable

Expenses."

Mr. Wright explained that if a contractor intends to charge the owner for travel

moving, food, and lodging, those expenses must be addressed in the contract.   He stated

that if the contract did not specifically address those expenses, the owner would likely

assume that they were included in the contractor's fee.   Mr. Wright stated that it was a

common practice in the industry for those issues to be addressed during the negotiation

phase, when the contractor was negotiating its fee.   He explained that the contractor

would normally inform the owner how much travel was included in that fee.

Mr. Wright noted that the "Reimbursable Expenses" Section of the Agreements did

not specifically include charges for travel, per diem, or the other aforementioned

expenses.   Mr. Wright stated that those charges could not have been supported as

"in the interest of the project" under Section 13.1 of the Agreements because there was

no limitation on these expenditures.   Mr. Wright next addressed the issue of "defective

work."

Mr. Wright testified that the Defendant should not have been charged for

"defective work," and if the defects were caused by subcontractors, the Plaintiff had

the authority to hold them responsible.   Mr. Wright stated that if the contract

does not specifically state who would absorb the cost for defective work, the

responsibility would be the contractor's.   He explained that if the contractor

wanted the owner to bear such cost, it should have been listed in the contract under a

"Reimbursable Costs" provision.   Mr. Wright reviewed three samples of contracts provided by Mr. Blair that listed these specific costs as reimbursable.   Mr. Wright next addressed the issue of "changes in the work."

Upon reviewing Article 8 of the Agreements, Mr. Wright testified that such section was standard in the industry.   He explained that the main purpose of this section was to avoid disputes because the writing would reflect that the parties had agreed to modify the original agreement for a specific scope of work, money, and time.   Mr. Wright characterized the Change Order as another contract between the parties.   He explained the Change Order as a change beyond what was contemplated by the parties when they first entered into the contract.

Mr. Wright reviewed Sections 8.1.4 and 8.1.5 of the Agreements.   He explained that these sections provided a mechanism if the parties were unable to agree on the price of the change.   He further explained that if the Defendant had refused to sign the Change Order, the Plaintiff still had the options of requesting a written "directive" for the work, or not performing the work at all.   Mr. Wright stated that since the Defendant was a government and therefore not subject to a contractor's lien, it made all the more sense for the Plaintiff to have secured a signed Change Order.   Mr. Wright next testified on the issue of "field conditions."

Mr. Wright testified about Plaintiff's Trial Exhibit No. 109 which reflected a charge of $259,000.00 for "field conditions encountered on the job" for the Hotel Project.

84

He stated that the term "field conditions" did not accurately reflect the charges in this exhibit because they involved work that had to be redone due to either damage, negligence, poor design, or work that had not been done correctly the first time. Mr. Wright stated that he did not agree with Mr. Brostrom's justification for these charges resulting from the "fast track" method, because that was no excuse for poor workmanship.   Moreover, Mr. Wright noted that there was no specific provision in the Agreements that authorized the Plaintiff to make these charges.   Therefore, he stated that the Defendant should not have been responsible for these charges.   Mr. Wright next testified about defective work.

Mr. Wright expressed the same opinion regarding the charges for defective work as he had expressed for corrective work.   The Defendant introduced Plaintiff's Trial Exhibit No. 111 which included correspondence and photos about poor workmanship. Mr. Wright also testified about charges for "traffic damage."   On this issue, he stated that the Defendant should not have been charged for traffic damage because there was no provision in the Agreements authorizing those charges, and since they were caused by the subcontractors, either the subcontractors or the Plaintiff should have paid for them. Mr. Wright next testified regarding the issue of overtime.

In regards to charges for overtime, Mr. Wright reviewed Plaintiff's Exhibit No. 112.   He explained that all the overtime shown in this exhibit was paid to the subcontractors.   He explained that the overtime could have been included as part of

85

the subcontractor's bidding package.   He also explained that the Plaintiff could have used other less expensive options, such as double shifts.   Mr. Wright also stated that if the Plaintiff anticipated the use of overtime before the signing of the Agreements, the Plaintiff should have included it as a reimbursable expense.   Mr. Wright also addressed the issue of unauthorized subcontractor Change Orders.

On the issue of subcontractor Change Orders, Mr. Wright reviewed Defendant's Trial Exhibit No. 1.   He testified that he prepared this exhibit after reviewing all the subcontractor Change Orders, the supporting documentation, and the Depositions of Mr. Brostrom, Mr. Sid Dahlin, and Mr. Dave Kammueller, and tried to make a determination regarding the appropriateness of the charges.   Mr. Wright offered detailed testimony as to each of the items listed in Defendant's Trial Exhibit No. 1 (Items 1-458).   He then concluded that the list reflected a total of $3,225,487.53 as proper charges.   Mr. Wright explained that this amount included the subcontractor back-charges reflected in Plaintiff's Trial Exhibit No. 107, the "field conditions" charges reflected in Plaintiff's Trial Exhibit No. 109, the "traffic damage" charges reflected in Plaintiff's Trial Exhibit No. 110, the "corrective work" charges reflected in Plaintiff's Trial Exhibit No. 111, and the "overtime" charges reflected in Plaintiff's Trial Exhibit No. 112.   Mr. Wright next testified about the issues of "Punch List" and demobilization from the job site.

Mr. Wright stated that based on his experience, it should not take a contractor, in a project like the Hotel Project, more than 45 days from substantial completion to final

86

completion.   He explained that the contractor would complete the Punch List and demobilization process.   Therefore, Mr. Wright explained that the Plaintiff should have been off the site by August of 1999.

During cross-examination, Mr. Wright admitted that his fee as an expert witness for the Defendant was $150.00 per hour.   He recognized that during his Deposition on March 12, 2003, he had stated that he had not made a list of the subcontractors' changes, and total charges for overtime and corrective work.   He also recognized that he was not involved in the actual negotiations for the Hotel Project.

During cross-examination, Mr. Wright was questioned on the subject of Change Orders.   Mr. Wright admitted that his review of the records revealed that there were many changes made on the projects that do not have a written Change Order preceding the performance of the work.   He also admitted that he was not aware when he was preparing Defendant's Trial Exhibit No. 1, that Change Order No. 11 in Plaintiff's Trial Exhibit No. 11, extended the time for completion of Phase 1, Phase 2, and Phase 3 of the parking areas from April of 1999 to July of 1999.   And he further admitted that he was not aware of the issue involving the Smoke Evacuation System on the Hotel Project.

During cross-examination, Mr. Wright was also questioned on the subject of changes by the Plaintiff that were upgrades or enhancements to the projects.   He admitted that he had not made a list or quantified those changes.   Mr. Wright was asked about this issue during re-direct examination.   He stated that the Plaintiff was responsible

87

for obtaining the Defendant's approval for any deviation from the final design that increased the amount the Defendant was going to pay on the projects.   Therefore, he explained that every upgrade should have been accompanied by a letter, or a submittal from the Defendant, reflecting their approval.

      F.     <u>Testimony of Chairman Cypress</u>

Chairman Billy Cypress (hereinafter, "the Chairman") was the fourth witness for the Defendant.   The Chairman testified that he learned about the Plaintiff at a Gaming Trade Show in Tampa, Florida where he met Mr. Sackett.   The Chairman stated that during discussions with Mr. Sackett he learned that the Plaintiff had experience in working with Indian Tribes.   The Chairman testified about several subsequent meetings with Mr. Sackett and other representatives of the Plaintiff to discuss the projects.

Chairman Cypress testified about a Miccosukee General Council Meeting held on August 7, 1997 wherein the Plaintiff was selected as the General Contractor for the Hotel Project.   The Defendant introduced Defendant's Trial Exhibit 7 which reflected the Minutes of that meeting.   A review of the Meeting Minutes reveal that Mr. Sackett represented that it would take approximately three (03) months to complete the drawings and that an early preparation of the work would be approximately two-and-a-half (2 ½) to three (3) months.   He stated that if the work progressed on schedule, the gaming area should be available in the Fall of 1998 with the hotel ready to be opened in the Spring of 1999.   Mr. Sackett stated that in total, it would take approximately sixteen (16) months to

88

complete the hotel and twelve (12) months to complete the casino, convention center, and restaurant. Mr. Sackett further stated that since he was aware that the Defendant wished to have the project completed as soon as possible, the Plaintiff would try to complete it by the Christmas Season of the following year.

Chairman Cypress testified about the negotiations that lead to the signing of the Agreement for the Hotel Project. He stated that the parties were represented by their respective Counsels during these negotiations. Chairman Cypress testified about several of the provisions reflected in the Agreement.

Chairman Cypress stated that during the negotiations, he asked the Plaintiff about the 65% fee reflected in Section 13.1.1 and about the large number generated by such fee, at which time he was explained that it was to cover the items that followed in the sentence. Chairman Cypress next addressed the issue of Change Orders as reflected in Section 8.1.1 of the Agreements..

Chairman Cypress testified that he wanted to avoid potential problems that may be created by unauthorized persons ordering changes to the work that would result in an increase on the cost of the project. Therefore, he stated that he was very clear in insisting that all changes on the project had to be authorized by him, in writing, and in his role as the Defendant's Agent. Chairman Cypress explained that he expected the Change Order to reflect the actual price and the duration of the work. Chairman Cypress testified next about Change Order No. 1 which he signed and approved in November of

1997.

Chairman Cypress explained that Change Order No. 1 reflected the deep

foundation system.   He explained that pursuant to this Change Order, having the time of

completion for the project extended was justified.   Chairman Cypress also reviewed

Change Orders No. 3, No. 4, No. 5, No. 7, and No. 9.   In regards to Change Order No. 9,

he explained that the time for completion of Phase 1, Phase 2, and Phase 3 of the parking

lots was extended to July 7, 1999.   Chairman Cypress testified next about the unsigned

Change Orders.

On the issue of the unsigned Change Orders, Chairman Cypress reviewed

Change Orders No. 10, No. 11, No. 12, No. 13, No. 14, No. 15, and No. 16.   He

explained that although he had explicitly told Mr. Sackett to gather the cost and prepare

the Change Order with such cost, these Change Orders were not presented to him until

after the project had been completed.   Chairman Cypress noted that Change Orders

No. 12 and No. 13 showed that there was additional information pending for the work.

In regards to Change Order No. 15, Chairman Cypress explained that the Defendant was

not contesting the cost of the child care portion of it, because he had signed and approved

the revisions to the plan as reflected in Plaintiff's Trial Exhibit No. 88.

Chairman Cypress testified about discussions with Mr. Sackett about costs to be

reflected in the Change Orders and requests for extension of time.   He testified that he

had never told Mr. Sackett that he was not going to sign any more Change Orders until

after the work was completed and the costs were actually known.   Chairman Cypress

also testified that he had never said that he would not grant requests for extension of time.

He explained that he had only told Mr. Sackett that the requests of time had to be

justified.   Chairman Cypress next addressed some of the comments regarding these

issues reflected in the Meeting Minutes for the project.

Chairman Cypress was asked about Meeting Minutes No. 32.6 of June 11, 1998

where the issue of the service link was discussed.   He confirmed that at the time, the

relocation of the service link had not been accepted.   A review of Meeting Minutes

No. 32.9, No. 32.11, and No. 32.14 showed that information for the work was still

pending and that there had been no approval.   Chairman Cypress stated that it was the

same for the Change Orders reflecting the helipad, the security and surveillance

equipment, mechanical and electrical equipment in the telephone equipment room, and

the retail area.   He confirmed that this work and pending information was reflected in

Plaintiff's Trial Exhibits No. 80 and No. 88.   Chairman Cypress testified next about his

letter of May 3, 1999 addressed to Mr. Sacket reflected in Plaintiff's Trial Exhibit

No. 136.

Chairman Cypress stated that he wrote that letter after a conversation with

Mr. Sackett, wherein he was told that the Hotel Project could be completed on June 1,

1999.   Chairman Cypress explained that at one point Mr. Sackett had even commented

to him that he could finish the project in May of 1999.   Chairman Cypress explained that

the intent of the letter was to remind Mr. Sackett about his promise, not to change the date of substantial completion.   He addressed Mr. Sackett's response reflected in Plaintiff's Trial Exhibit No. 137.   Chairman Cypress explained that Mr. Sackett's response should not be interpreted as a change to the substantial completion date because the date in the Agreement was what governed.   He stated that Mr. Sackett never indicated to him that there would be additional charges for overtime.   Chairman Cypress next addressed the subject of additions and enhancements to the projects.

Chairman Cypress stated that from the beginning, one of his concerns had been to prevent unauthorized changes to the projects.   He stated that his concern was reflected in Meeting Minutes 5.24.115 which showed an entry that read: "All future change orders to the owner must be submitted to the Chairman for approval with time and costs specifically addressed."   He stated that he was very clear that any changes or additions to the projects had to be approved by him and that the method for such approval was in the form of a signed Change Order.   Chairman Cypress explained that this issue was different than the issue of the unsigned Change Orders, because this issue referred to additions and enhancements that the Plaintiff decided to do on its own without prior approval from the Defendant.   He explained that those unauthorized additions and enhancements increased the cost that the Defendant expected to pay for the project.

Chairman Cypress was asked about Plaintiff's Trial Exhibit No. 20.   He stated that he had never seen that exhibit before the signing of the Agreements, and that the

92

exhibit was not attached to the Agreements when he signed them.   Chairman Cypress testified next about the Smoke Evacuation System for the Hotel Project.

Chairman Cypress stated that Mr. Pardo had confirmed that the system was needed for the first and second floors of the Hotel.   Chairman Cypress stated that he wrote a letter to Mr. Sackett clearly stating that the Defendant could not be expected to pay for the re-design.   This letter was reflected in Plaintiff's Trial Exhibit No. 148.   He explained that when he noticed that Mr. Sackett's response was not satisfactory, he wrote directly to the Plaintiff's Chairman, Bruce Engelsma (hereinafter, Chairman Engelsma) addressing this issue.   Chairman Engelsma wrote a response in which he confirmed that a new design had been prepared, and assured Chairman Cypress that the costs for this correction would be included in the contract amount.   This response is reflected in Plaintiff's Trial Exhibit No. 124.   Chairman Cypress stated that he understood this to mean that there would be no additional expenses for the installation of the system, and therefore, he was surprised when the auditing conducted by Mr. Martinez revealed that the Defendant had been charged for it.   Chairman Cypress next addressed the issue of delays on the Hotel Project due to lack of available water.

Chairman Cypress testified that there was ample water available at the adjacent Bingo Hall building and at a well dedicated to fire suppressant.   Chairman Cypress stated that he felt that Mr. Sackett's complaint about the water was an excuse to justify the fact that the work was behind schedule.   He confirmed that the water from the

93

Bingo Hall was indeed used to test the air conditioning system.   He explained that

he was never informed that construction was delayed because there was not enough

water available.   Chairman Cypress next testified about Defendant's Trial Exhibit 1

("Challenged Subcontractor Change Orders").

Chairman Cypress reviewed Items No. 207, No. 208, No. 214, No. 218, No. 229,

No. 270, No. 286, No. 292, and No. 339.   He explained that these items reflected

changes for improvements and upgrades that the Defendant had never requested or

approved.   He explained that the Plaintiff had arbitrarily decided to make these changes

because they were "in the interest of the project."

During cross-examination, Plaintiff's Counsel stated that he agreed with Chairman

Cypress in that there was a real difference of opinion in interpreting the language within

the Agreements.   Chairman Cypress admitted that all interested parties and their

respective Counsels were present during the negotiations of the Agreements.

In regards to the issue of the GMP, Chairman Cypress admitted during cross-

examination that the GMP was what placed a limit on the Plaintiff's spending on the

projects.   However, he explained that the GMP was "a ceiling" on spending and not a

justification for the Plaintiff to increase the costs up to that amount.   Therefore, he

explained, the Plaintiff could not incur additional expenses without prior authorization

from the Defendant.

During cross-examination, Chairman Cypress was asked about the issue of the

94

lack of water.   He confirmed that the Defendant had originally said that the water would be available on February of 1998 but it was not available until April of 1999.   He was asked next about the unsigned Change Orders.

Chairman Cypress testified during cross-examination regarding the work reflected in the unsigned Change Orders.   He stated that he had ordered the work, but that the work should not have been done until he had agreed and signed a written Change Order that reflected "actual costs" for the work.   He explained that he considered the work without a singed Change Order as unauthorized, because the Defendant was never given the opportunity to accept it or reject it.   Chairman Cypress confirmed that the Minute Meetings on the projects and the Schedule of Values showed that the work was being performed.

### G.   Testimony of Randall Smith

Mr. Randall Smith (hereinafter, "Mr. Smith") testified for the Plaintiff.   Mr. Smith worked for Metropolitan Mechanical Contractors (hereinafter, "MMC") the mechanical subcontractor on the projects.   He stated that he had been employed with MMC for 6 ½ years as Senior Designer and Project Manager, and that he had been in the construction industry for 25 years.

Mr. Smith testified about the School Project.   He stated that when MMC left the School Project, they had completed the project, and that a balance contractor had already come in to perform a test and balance, which he explained was the final stage in

completion. He explained that a Balancing Report was peformed, Gartek Engineering

Corporation (hereinafter, "Gartek"), ESG, and Mr. Pardo performed their final

inspections. He stated that Mr. Pardo issued a Certificate of Occupancy on the project.

Mr. Smith stated that Parsons Electric (hereinafter, "Parsons") was the electrical

subcontractor working with them and that they too completed the project.

Mr. Smith was asked about the Punch List work on the School Project. He

explained that Gartek performed the Puch List work and electrical inspections. He

testified next about warranty work.

Mr. Smith testified that MMC never received any warranty calls for work

performed on the School Project. In regards to the report prepared by Mr. Heygood in

October of 2001, he stated that he had reviewed it, and that the report reflected a lack

of maintenance on the system. He confirmed that this report was prepared 22 months

after he had completed the project. However, during cross-examination, Mr. Smith

confirmed that some of the items reflected in the report did not involve simple

maintenance work.

        H.     Rebuttal Testimony of Richard Brostrom

Mr. Brostrom testified as a rebuttal witness for the Plaintiff. He addressed

the Defendant's claim regarding overcharges for administrative labor. After reviewing

Defendant's Exhibit Q, he stated that the $1,655,347.50, which Mr. Martinez identified

as being charged to the Defendant, was incorrect because it did not reflect the "No

Charges to Owner." Mr. Brostrom explained that even by using Mr. Martinez's calculation, the overcharges on this issue would be $278,509.00 and not the $945,028.49 amount he presented during his testimony. Mr. Brostrom next addressed Defendant's Trial Exhibit No. 1.

In regards to Defendant's Trial Exhibit No. 1, Mr. Brostrom stated that it contained changes agreed by the Defendant pursuant to a signed Change Order. He identified Items No. 240, No. 413, No. 414, Nos. 417 through 419, Nos. 421 through 424, and Nos. 426 through 428 for a total of $262,590.13 to be in that category. He explained that Defendant's Trial Exhibit No. 1 showed duplications for $8,300.77. He also explained that Exhibit No. 1 reflected Change Orders with duplications in value of $87,094.00.

In regards to overtime charges, Mr. Brostrom testified that Exhibit No. 1 showed $296,150.00 for overtime. He explained that this amount was actually less than the amount he had included in his calculations. He explained that Exhibit No. 1 included charges that were not additional costs for the Defendant. He stated that the total for those was $1,138,587.18, and did not include field labor or traffic damage.

I.    Testimony of Kenneth Blair

Mr. Kenneth Blair (hereinafter, "Mr. Blair") was called as an expert witness by the Plaintiff. Mr. Blair testified that he worked as a consultant in construction and engineering issues. He stated that he had been hired by the Plaintiff to analyze the

97

facts and render an expert opinion.   In terms of education, he stated that he had earned a Bachelor and a Master's Degree in Science, in Civil Engineering, and was a Registered Engineer in New Jersey, Pennsylvania, and Maryland.   Mr. Blair testified that he had been working in the engineering field since 1969.

Mr. Blair testified that in preparation for his testimony, he had interviewed several of the Plaintiff's officers and employees, reviewed many of the Depositions of witnesses, including the Depositions of Mr. Wright, Mr. Pardo, and Mr. Martinez, reviewed the parties' Agreements, and the project files.   He stated that he had worked approximately 400 hours on the investigation of this case.

Mr. Blair testified about the advantages of the Design/Build method of construction, which included the ability of the owner to go to a sole source, as well as a decrease in the amount of time spent on the project, and a lump sum price with a contingent fee that would cover anything that might go wrong during the project.   He stated that under this method, the actual costs are paid for by the owner and therefore capped by the ceiling of the GMP.   He further explained the advantages from the design perspective.

Mr. Blair testified that the amount charged for field conditions reflected in Plaintiff's Trial Exhibit No. 109 was reasonable, in light of the fast-track method of construction.   He testified next on the issue of changes on the projects.

On the issue of changes to the projects, Mr. Blair stated that Section 2.2.15 of the

Agreements allowed the Plaintiff to make actual changes without the Defendant's approval.  He explained that according to that section, anything that contributed to the work being done reasonably inferable from the design documents, was not a change which required a Change Order.   He explained that the only restriction on the Plaintiff's discretion was the GMP.   Mr. Blair stated that although Section 8.1 of the Agreements required a Change Order whenever there was a change in scope of the work that would adjust the GMP, a review of the file history on the projects showed that the parties were using the term contract sum to mean the GMP.  He explained that in his opinion the two terms were synonymous.  Mr. Blair next testified about the issue of overtime.

On the issue of overtime, Mr. Blair stated that Section 2.2.5 of the Agreements authorized the Plaintiff to use overtime as a means or method of carrying out the work. He explained that the use of overtime was normal on a fast-track project involving a hotel/casino.   He stated that the amount of overtime used in the projects was not excessive.  He was asked next about the issue involving the 65% fee.

On the issue of the 65% fee, Mr. Blair stated that temporary utilities, heat, and water were not included in the 65% burden rate because there is no correlation amongst them.   In regards to travel, subsistence or per diem costs, he testified that they did not have to be separately stated in the contract.   Mr. Blair expressed the same opinion regarding Minneapolis construction labor costs, charges for Punch Lists and management.

During cross-examination, Mr. Blair admitted that he had been a litigation

expert since 1985, had not done any design work since then, and had never prepared a bid estimate for a project. He stated that expenses incurred by the Plaintiff could be charged to the Defendant if they were incurred in the interest of the projects as provided in Section 13.1.1 of the Agreements. He admitted that many of the standard forms in the industry contained specific provisions that authorized the contractor to recover for travel expenses. He explained that these charges would normally be listed under reimbursable costs. He was also asked next about defective and nonconforming work.

During cross-examination, Mr. Blair admitted that a contractor in a fast-track project would normally anticipate defective or nonconforming work. He stated that the parties' Agreements did not include such a provision, but that it was still within the intent of the document. He was asked next about the issue of Change Orders.

During cross-examination, Mr. Blair admitted that the Agreements required Change Orders to adjust the contract sum needed to be in writing, and that any costs incurred by the Plaintiff would in turn be paid by the Defendant. He admitted that the contract sum was the total of the costs incurred by the Plaintiff in the interest of the projects, plus the applied fees. Mr. Blair agreed that under Section 13.1.1 of the Agreements, anything that increased the costs of the projects also increased the contract sum. He stated that generally in the construction industry contractors obtain written Change Orders before performing the work involved. He explained that this was the

100

standard in the industry, but not in these projects.   Mr. Blair was asked next about punctuations used in the Agreements.

During cross-examination Mr. Blair was asked about the punctuations used in his copy of Section 13.1.1.   In regards to the provision describing the 65% fee, the record showed that he had placed a semicolon after ". . . assessments and benefits . . ." instead of the comma that appeared in the original Agreements.   He explained that he had done that to separate the phrases because the comma meant to include what followed afterwards.

VI.   DISCUSSION

The Court has carefully reviewed all pleadings, trial exhibits and testimony, legal arguments, and the parties' responses to Requests for Additional Information from the Court, as well as Miccosukee and Florida law.   The Court's Decision has incorporated, almost verbatim, the testimony presented during the trial.   This Trial Decision is based on this record.

A.   Choice of Law

Article 11, Section 11.2, of the Agreements states that disputes shall be governed by the law of the place where the work is located.   Similarly, Section 14.4.1.5, of the Addendum reads:

> "**Applicable Laws.**  This Agreement and all rights and obligation
> thereunder, including matters of construction, validity and performance
> shall be governed by the substantive contract laws of the State of Florida
> and other substantive laws of the Miccosukee Tribe and shall insure
> to the benefit of and be binding upon the parties hereto, its or their
> heirs, representatives, successors and assigns." [Emphasis in original text].

101

A review of the record clearly shows that the parties intended that disputes be governed by a combination of Miccosukee and Florida substantive law. In Florida, it is a well established principle that the law chosen by the contract applies so long as "there is a reasonable relationship between the contract and the state whose law is selected and the selected law does not conflict with Florida law or confer an advantage on a non-resident party which a Florida resident does not have." Forzley v. AVCO Corp., 826 F.2d 974 (11th Cir. 1987).

Title X, Section 1, of the Miccosukee Code reads:

> "**Law Applicable in Civil Actions.** In all civil actions the Miccosukee Court shall apply applicable laws of the United States and authorized regulations of the Secretary of the Interior and ordinances, customs and usages of the Tribe. Where doubt arises as to customs and usages of the Tribe, the Court may request the advice of persons generally recognized in the community as being familiar with such customs and usages. Any matter not covered by applicable Federal law and regulations or by ordinances, customs and usages of the Tribe may be decided by the Court according to the laws of the State of Florida, if it considers the same consistent with Miccosukee custom." [Emphasis in original text].

In the case at bar, the Court does not find any conflict between Miccosukee customs and usages and Florida substantive law. Furthermore, a review of the pleadings does not show that either party has specifically pled the application of non-Florida substantive law in this action. In Florida, when a party seeks to apply the substantive law of a jurisdiction other than Florida, after having so provided in the agreement, the party must specifically plead the application of the non-Florida substantive law in any

102

action seeking to apply that law.  Owens-Corning Fiberglass Corp. v. Engler, 704 So.2d 594 (Fla. 4th DCA 1997).  Thus, pursuant to the parties' intent, as reflected in the Agreements, the Court will apply Florida substantive law to the issues involved.

 B.   The Plaintiff's Claims

The Plaintiff's claims are based on the balance of the projects.  They include Change Orders, several fees for costs, charges in the interest of the projects, retainage, and interest on past due payments.  The Court will address each of these issues.

 1.   The Change Orders

The Plaintiff is requesting compensation reflected in several unsigned Change Orders.  The Plaintiff argues that the work was ordered by the Chairman, in his capacity as the Defendant's authorized Agent, that it was beyond the scope originally provided in the Agreements, and that it was in excess of the GMP.  In contrast, the Defendant argues that the doctrine of sovereign immunity bars this claim because Article 8 of the Agreements required a signed Change Order authorizing the additional work. The Defendant relies in the Florida case of County of Brevard v. Miorelli Engineering, Inc., 703 So.2d 1049 (Fla. 1997) in support of its argument.  The Plaintiff, however, argues that the Miorelli decision does not apply to the present case because the Agreements did not require a written Change Order before work was commenced, the work was ordered by the Chairman, who had the authority to do so, and the Defendant expressly waived its sovereign immunity in Section 14.4.1.2 of the Agreements.

103

In Miorelli, the facts show that the contractor entered into an agreement with Brevard County to design and build a spring training facility for the Florida Marlins. 703 So.2d at 1050. After the contractor began developing the facility, a dispute arose between the contractor and Brevard County, which resulted in Brevard County terminating the contract and withholding amounts due under the contract. Id. The contractor sued Brevard County, asserting a variety of claims including a breach of contract claim seeking damages for extra work done on the facility which was beyond that described in the contract. 703 So.2d at 1050. In a motion for partial summary judgment, Brevard County argued that the extra work claim was barred by the doctrine of sovereign immunity because the extra work was outside the terms of the express contract and no written change orders, as required by the contract, had been issued authorizing the extra work. Id. The trial court denied Brevard County's motion, and the Fifth District Court of Appeal affirmed that portion of the order which denied the motion for summary judgment on the claim for damages for extra work. 703 So.2d at 1050. The Florida Supreme Court granted certiorari.

In its analysis, the Court recognized that the Florida legislature had explicitly waived sovereign immunity in tort for personal injury, wrongful death, and loss or injury of property, but there was not express legislative waiver for contract claims. County of Brevard v. Miorelli Engineering, Inc., 703 So.2d 1049, 1050 (Fla. 1997). Based on a review of the record, the Court concluded that the contractor's extra work claims were for

104

work totally outside the terms of the contract, and therefore, without a written change

order, the doctrine of sovereign immunity precluded recovery of the cost of the extra

work.   703 So.2d at 1051.   The Court refused to hold that the doctrines of waiver and

estoppel could be used to defeat the express terms of the contract, reasoning that to do so

could result in an unscrupulous or careless government employee altering or waiving the

terms of the written agreement, thereby exposing the sovereign with potentially unlimited

liability.   Id.

In the case at bar, a review of the record shows an express clause in the

Agreements that deal with the issue of sovereign immunity.   Section 14.4.1.2 of the

Addendum reads:

> "**Waiver of Sovereign Immunity.**   The Owner hereby waives any
> defense of sovereign immunity from suit in Miccosukee Tribal
> Court in connection with any action or proceeding, including any
> claim, cross-claim or counter-claim, brought by or against it in
> connection with this Part 2 or any of the transactions contemplated
> in this Part 2 (a "Claim") for and only with respect to actions
> brought in Miccosukee Tribal Court.   Owner does not waive
> immunity in any form for actions in any court (including
> Miccosukee Tribal Court) not in connection with this Part 2 or
> any of the transactions contemplated in this Part 2."   [Emphasis in
> original text].

The law is clear that "suits against Indians are thus barred by sovereign immunity

absent a clear waiver by the tribe or congressional abrogation."   Oklahoma Tax Comm'n

v. Potawatomi Indian Tribe, 498 U.S. 505 (1991) (citing  Santa Clara Pueblo v. Martinez,

436 U.S. 49 (1978)).   Since there was no congressional abrogation in the present case,

105

the question for this Court is whether the Defendant unequivocally waived its sovereign immunity in the Agreements.

The decision to waive its immunity and consent to suit is one of the most important decisions a sovereign makes. The waiver of immunity, which involves issues of public policy and law, may have profound consequences and lasting repercussions. Therefore, a waiver of sovereign immunity should come about only after careful thought and deliberation by the people who stand to be directly affected by such a waiver.

In the case at bar, the record shows that the Defendant executed a contract that expressly included a provision for waiver of sovereign immunity in connection with transactions contemplated in the contract. The record, however, does not show any of the discussions or considerations that supported the inclusion of this waiver in the Agreements. The record also does not show a specific mechanism or procedure in the Miccosukee Constitution or the Miccosukee Code to effectuate this waiver. In the absence of such mechanism or procedure for guidance, the Court has no choice but to rely on the specific language of the Agreements.

The express language in Section 14.4.1.2 reads:

> "The Owner hereby waives any defense of sovereign immunity from suit in Miccosukee Tribal Court in connection with **any action or proceeding, including any claim, cross-claim or counter-claim**, brought by or against it in connection with this Part 2 **or any transactions contemplated** in this Part 2 (a "Claim") for and only with respect to action brought in Miccosukee Tribal Court. Owner does not waive immunity in any form for actions in any court (including Miccosukee

106

Tribal Court) **not in connection with this Part 2 or any of
the transactions contemplated in this Part 2**." [Emphasis
added for this purpose].

Based on a plain reading of the above section and the specific language,
"in connection with any action" or "any transactions contemplated," the arguments
presented by the Defendant's Counsel, it is clear that the Defendant intended to
waive sovereign immunity only with respect to "any action or transaction" that related
to the Agreements, and only before this Court. The clear language of Section 14.4.1.2
is the critical distinction between this case and the <u>Miorelli</u> decision, where there was no
express waiver of immunity by Brevard County in its contract with Miorelli.

In the case at bar, the argument by the Defendant's Counsel that Section 14.4.1.2
should be interpreted as only conferring upon the Plaintiff a right to file the claim with
this Court, without further recourse is illogical. There cannot be a waiver for purposes
of addressing the claim, and at the same time prevent the forum from providing a remedy.
Similarly, the Defendant's argument that the waiver was limited to "actual costs" is
not persuasive. There is no mention of "actual costs" anywhere in the waiver provision.
Having found that there was a waiver of immunity, the next question for the Court is
whether the person that agreed to the waiver had the legal authority to do so.

The record shows that the Agreements, including the waiver provision, was
executed by the Chairman, in his capacity as the authorized Agent for the Defendant.
The Defendant's Counsel argues that Defendant's Trial Exhibit T ("General Council

107

Minutes of August 7, 1997") and Article 2, Section 1(b), of the By-Laws of the

Miccosukee Tribe of Indians of Florida show that the Chairman did not have the

inherent authority to waive the Defendant's sovereign immunity with respect to any

additional work that increased the cost of the projects.

The language in Defendant's Trial Exhibit T reads:

> "the budget agreed to and contracted for will be binding
> with no changes (increase) to be made."

Article 2, Section 1(b), of the By-Laws of the Miccosukee Tribe of Indians of

Florida reads:

> "the chairman shall have general and active management
> of the business activities of the Tribe, except that he shall
> not act on matters binding the Tribe until either the General
> Council or the Business Council has deliberated and enacted
> appropriate resolution."

The Defendant's Counsel makes the following argument:

> "Even if Chairman Cypress had signed the contested change
> orders submitted as a group after the project was completed
> in July, the signature by Chairman Cypress to those change
> orders would not constitute a waiver of sovereign immunity
> by the Tribe.   Waiver of sovereign immunity with respect to
> change orders, could only occur if the General Council
> enacted a resolution approving them or authorizing Chairman
> Cypress to enter into change orders waiving sovereign
> immunity and increasing the cost of the project."

Although the Court may agree with this argument in principle, the Defendant's

Counsel's inability to follow it to its logical conclusion leaves the Court with no option

but to reject it based on the following reasons.

First, a review of the pleadings does not show any allegations by the Defendant's Counsel that the Chairman lacked the legal authority as Agent for the Defendant to sign and agree to the waiver.   This argument was not presented until the Court's recent request for additional legal arguments on this issue.   The Defendant's Counsel never raised the issue as part of its case-in-chief.   Second, the Defendant's Counsel never challenged all the signed Change Orders signed by Chairman Cypress that increased the costs of the projects, including Change Order No. 1, that incurred an increase of more than $1,000,000.   The logical conclusion of the argument would have been that the Chairman, lacking the authority to approve anything in excess of the amounts stated in the Agreements, could not have approved any work that increased the cost of the projects, even if he approved and signed the Change Order.   Consequently, any additional costs paid by the Defendant, even if authorized by the Chairman, should be returned to the Defendant.   Counsel, however, never makes this argument.   Third, there is the clear language of Section 14.4.1.9 of the Addendum:

Section 14.4.1.9 reads:

"Billy Cypress is hereby designated as the agent of the Owner **to act on behalf of the Owner in all respects** while performing its responsibilities under this **Part 2**." [Emphasis added for this purpose].

Based on the specific language, "to act on behalf of the Owner in all respects," the previously noted absence of a mechanism or procedure to guide this Court in determining whether sovereign immunity on behalf of the Defendant was properly waived, and the

109

decision by the Defendant's Counsel not to contest the signed Change Orders that increased the costs of the projects, indicate to this Court that Chairman Cypress did have the legal authority to effectuate the waiver.

The Court would like to be clear that this finding of a waiver of sovereign immunity in the Agreements is limited to the facts and circumstances of this particular case, and should be narrowly construed for this purpose only.   Nothing in this decision shall be interpreted as setting judicial precedent on the issue of the Defendant's sovereign immunity or the waiver of such immunity.   Although the Court is always careful to avoid interfering with the other branches of Miccosukee Government, this Court is mindful of its solemn duty of "protecting the sovereign and judicial rights of future generations of the Miccosukee People."   Because the waiver of sovereign rights is such an important issue, this Court may not be inclined in the future to find a waiver, even if clearly stated in a contract, unless such a waiver comes directly from the legislative branch, the Miccosukee General Council.

The Court recognizes the several decisions from State and Federal courts cited by the Defendant in response to the Court's Order for Additional Legal Arguments. Furthermore, the Court has extensively researched all major Florida cases dealing with sovereign immunity as a bar to additional work performed, and how this issue has evolved in construction litigation.  (See, <u>Pan-Am Tobacco Corporation v, Department of Corrections</u>, 471 So.2d 4 (Fla. 1984);  <u>Southern Roadbuilders, Inc. v. Lee County</u>, 495

110

So.2d 189 (Fla. 2d DCA 1986); Champagne-Webber, Inc. v. City of Fort Lauderdale,

510 So.2d 696 (Fla. 4th DCA 1988); County of Brevard v. Miorelli Engineering, Inc.,

703 So.2d 1049 (Fla. 1997); W&J Construction Corporation v. Fanning/Howey

Associates, 741 So.2d 582 (Fla. 5th DCA 1999); Frenz Enterprises, Inc. v. Port

Everglades, 746 So.2d 498 (Fla. 4th DCA 1999); Ajax Paving Industries, Inc. v. Charlotte

County, 752 So.2d 143 (Fla. 2d DCA 2000); C.O.B.A.D. Construction Corporation v.

School Board of Broward County, 765 So.2d 844 (Fla. 4th DCA 2000); Town of Palm

Beach v. Ryan Incorporated Eastern, 786 So.2d 665 (Fla. 4th DCA 2001); Bill Stroop

Roofing, Inc. v. Metropolitan Dade County, 788 So.2d 365 (Fla. 3d DCA 2001)).

However, the facts in all of those cases show a lack of a waiver of sovereign immunity

provision in the contracts.   In the case at bar, the presence of the waiver of sovereign

immunity provision in the Agreements, not the fact that the Chairman ordered the work,

is what distinguishes this case from the Florida cases wherein the claim was prevented.

Having found that the doctrine of sovereign immunity does not prevent the Plaintiff's

Claim, the next question is whether there has been a breach of the express terms of the

Agreements.

Article 8 and Section 8.1.2.1 of the Agreements address the issue of changes in

the work.   Article 8 reads:

> "**8.1.1** A Change Order is a written order signed by the Owner and
> Design/Builder, and issued after execution of Part 2, authorizing a
> change in the Work or adjustment in the contract sum or contract
> time.   The contract sum and contract time may be changed only

111



by Change Order.

**8.1.2**   The Owner, without invalidating Part 2, may order changes In the Work within the general scope of Part 2 consisting of additions, deletions or other revisions, and the contract sum and contract time shall be adjusted accordingly.   Such changes in the Work shall be authorized by Change Order, and shall be performed under applicable conditions of the Contract Documents.

**8.1.3**   If the Owner requests the Design/Builder to submit a proposal for a change in the Work and then elects not to proceed with the change, a Change Order shall be issued to reimburse the Design/Builder for any costs incurred for Design Services or proposed revisions to the Contract Documents.

**8.1.4**   Cost or credit to the Owner resulting from a change in the Work shall be determined in one or more of the following ways:

> .1   by mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;
> .2   by unit prices stated in the Contract Documents or subsequently agreed upon;
> .3   by cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or
> .4   by the method provided below.

**8.1.5**   If none of the methods set forth in Clauses 8.1.4.1, 8.1.4.2 or 8.1.4.3 is agreed upon, the Design/Builder, provided a written order signed by the Owner is received, shall promptly proceed with the Work involved.   The cost of such Work shall then be determined on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including the expenditures for design services and revisions to the Contract Documents.   In case of an increase in the contract sum, the cost shall include a reasonable allowance for overhead and profit.   In case of the methods set forth in Clauses 8.1.4.3 and 8.1.4.4, the Design/Builder shall keep and present an itemized accounting together with appropriate supporting data

112

for inclusion in a Change Order.   Unless otherwise provided in the Contract Documents, cost shall be limited to the following: cost of materials, including sales tax and cost of delivery; cost of labor, including social security, old age and unemployment insurance, and fringe benefits required by agreement or custom; workers' or workmen's compensation insurance; bond premiums; rental value of equipment and machinery; additional costs of supervision and field office personnel directly attributable to the change; and fees paid to architects, engineers and other professionals.   Pending final determination of cost to the Owner, payments on account shall be made on the Application for Payment.   The amount of credit to be allowed by the Design/ Builder to the Owner for deletion or change which results in a net decrease in the contract sum will be actual net cost.   When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of the net increase, if any, with respect to that change.

**8.1.6**  If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed Change Order that application of agreed unit prices to quantities proposed will cause substantial inequity to the Owner or Design/Builder, applicable unit prices shall be equitably adjusted."

Section 8.1.2.1 of the Addendum reads:

"Owner and Design/Builder hereby agree that Owner will not issue any Change Order, Constructive Change Directive or any other amendment or modification to the Contract Documents without obtaining the prior resolution from the Miccosukee Tribal Council."

It is clear from the language in the above provisions that the Defendant had the right to be presented with a written Change Order itemizing all the costs of the additional work.   The Plaintiff's Counsel's argument that no written Change Order was necessary

113

before the additional work was commenced is nonsensical.   Since the purpose of a Change Order is to present the Owner with an estimate of the cost of the work, so the Owner can either accept or reject the work, it makes no sense to think that such an estimate is proper after the work has been completed.   A review of the record shows that the Plaintiff was reminded that the Defendant wanted a written Change Order reflecting actual costs before the work was performed.   The Plaintiff's excuse, that it could not prepare the Change Orders because the actual costs were not known at the time, is not persuasive.   If there was a dispute regarding these costs, Sections 8.1.4, 8.1.5, and 8.1.6 provided the method to deal with this situation.   The Plaintiff, however, simply ignored these relevant sections, and waited until after the projects had been completed to submit all the unsigned Change Orders for signature.   Under these circumstances, the Court finds that this failure to submit a written Change Order constitutes a breach of the Agreements.   Thus, the next question to decide is what remedy to apply for such a breach.

The Defendant argues that the proper remedy should be a complete award of all the additional work, without compensation to the Plaintiff.   The Court does not agree.   The record unequivocally shows that the Defendant ordered the design and construction of all the additional work contained in these unsigned Change Orders.   The record and testimony presented leaves no doubt that the Defendant intended for the work to be done and for the Plaintiff to do it.   Moreover, most of the additional work involves

114

permanent fixtures that cannot be removed and which the Defendant is presently using and benefiting from.

A review of unsigned Change Orders Nos. 8, 17, and 18 reveals that they represent deduct Change Orders for materials directly purchased by the Defendant. If the Court were to accept the literal interpretation and harsh result being advocated by the Defendant, the result would be a loss of $9,416,533.76 in credits the Defendant is otherwise entitled to receive. Such a result would be disproportionately unfair and unreasonable.

Miccosukee law, the product of Miccosukee customs and traditions, is clear that in all aspects of life, whether personal matters or commercial activities, people should deal with each other fairly and in good faith. At no time should the people's freedom to contract and engage in commercial activities be interpreted as the freedom to unfairly and unscrupulously take advantage of others. Miccosukee law, as applied by this Court, is a reflection of the principles, values, and traditions of the Miccosukee people and the Miccosukee way of life, as passed on from generation to generation of Miccosukees. Thus, this Court can never enforce an award, law, or remedy that is contrary to such values and beliefs. Florida law also reflects this concept of fairness.

Under Florida law, a covenant of good faith, fair dealing, and commercial reasonableness is implied in every contract in order to protect the contracting parties' reasonable expectations. Maxwell v. First United Bank, 782 So.2d 931 (Fla. 4th DCA

115

2001).   A duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms of the contract have been performed. Insurance Concepts and Design, Inc. v. Healthplan Services, Inc., 785 So.2d 1232 (Fla. 4th DCA 2001).   Even in situations where a contract provision grants sole discretion to one party, sole discretion must still be exercised in good faith.   Sepe v. City of Safety Harbor, 761 So.2d 1182 (Fla. 2d DCA 2000).

In the case at bar, the Court considers an award without compensation for all the work included in the unsigned Change Orders, as unjust to the Defendant and not supported by Miccosukee or Florida law.   In fashioning an equitable remedy, the Court must also take into consideration that the Defendant is being asked to pay the full price, without having been afforded the rights to acceptance, refusal, or modification.   In other words, the Defendant was denied its right to bargain as provided in the Agreements. Under these circumstances, allowing the Plaintiff to profit from its improper conduct would be similarly unjust to the Defendant.

Based on the aforementioned principles of equity and law, it is hereby ordered that the Plaintiff shall receive and award for the work reflected in the unsigned Change Orders for all the projects, but not the fees (4% on the Hotel Project and 6% on the Campus and School Projects) for costs in those unsigned Change Orders.

116

### 2.    Costs Incurred On Direct Purchases

The Plaintiff argues that it is entitled to the fees listed in Section 13.1.1(b) of the Agreements (4% on the Hotel Project and 6% on the Campus and School Projects) as Purchasing Agent for the Defendant.   The Defendant argues that the Plaintiff should not receive the fees because the purchases were directly made by the Defendant and were not "costs incurred by Design/Builder in the interest of the project."

A review of the record shows that the parties agreed to have the Plaintiff act as Purchasing Agent on behalf of the Defendant.   This agreement was incorporated into Section 14.4.1.3 of the Addendum to the Agreements and became an integral part of the Agreements.   However, after commencement of the work, the State of Florida notified the parties that in order to maintain its tax-exempt status, the purchases had to be made by the Defendant directly.

A review of Plaintiff's Trial Exhibit No. 209 shows that on July 13, 1998, the Defendant's current Counsel sent a letter to the Defendant explaining the position of the State of Florida Department of Revenue on this issue and advising some options. One of the options, which the Defendant followed, was for the Defendant to issue its own Purchase Orders directly to third-party vendors.   A second option was to amend the Agreements between the parties outlining this procedure.   The Defendant, however, never amended the relevant section and continued to compensate the Plaintiff with its fee, as provided in the Agreements, until the conclusion of the projects.

117

A review of Section 11.10.1 of the Addendum to the Agreements clearly states:

> "Part 2 may be amended **only by written instrument**
> signed by both Owner and Design/Builder."
> [Emphasis added for this purpose].

The absence of a written amendment to Section 13.1.1(b) plus the Defendant's continuous and uninterrupted payment of the fees clearly show that the parties never intended to change their original arrangement.   This conclusion is supported by a second important factor.

The fee for "costs incurred in the interest of the projects" was a negotiated fee directly related to the Plaintiff's "Basic Compensation."   This provision was an integral part of the negotiations which preceded the execution of the Agreements and was later reflected in Section 13.1.1(b).   Thus, had the Plaintiff reasonably believed that the Defendant would alter the terms of its compensation, it would likely have taken active steps to address the situation.   However, the Defendant's lack of action in respect to the amendment and subsequent conduct in continuing to pay the fee allowed the Plaintiff to reasonably conclude that nothing had changed with respect to this issue.   Florida law is clear.   The party that wishes to be excused from the requirements of the contract must show such intent by **affirmative** conduct.

Based on the **afore**mentioned, it is hereby ordered that the Plaintiff shall receive the fees (4% on the **Hotel** Project and 6% on the Campus **and** School Projects) for the materials directly purchased by the Defendant.

118

3.    Interest On Payments Due

The Plaintiff requests an award for interest on payments due pursuant to Section 5.3.1 of the Agreements.   This section reads:

> "Payments due the Design/Builder under Part 2 which are not paid when due shall bear interest from the date due at the rate specified in Article 13, or in the absence of a specified rate, at the legal rate prevailing where the principal improvements are to be located."

It is clear from the language in the above section that the Plaintiff is entitled to interest payments on payments due.   Since the Defendant has presented several counter-claims, this issue will be discussed in the Damages Section of this decision.

C.    The Defendant's Counter-Claims

The Defendant has presented several counter-claims.   They involve allegations of improper charges for overtime, travel, living expenses, per diem, corrective work, defective work, employees' unit billing, personnel expenses, legal expenses, transportation, additional corrective work necessary to cure improper work by the Plaintiff, delay damages on the Hotel Project, the Smoke Evacuation System on the Hotel Project, ineffective and expensive design of the School Project, and unauthorized improvements.

1.    Overtime

The Defendant argues that all overtime charges were improper because the use of overtime, without prior approval, was not allowed by the Agreements.   During his

119

testimony, Mr. Sackett testified that overtime was necessary because of delays caused by weather conditions, the addition of the parking lots and retail spaces on the Hotel Project, and the Defendant's failure to hire a Code Consultant and provide water and sewer services for the Hotel Project in a timely fashion, Chairman Cypress' refusal to grant requests for extensions of time and his decision to change the date of substantial completion on the Hotel Project to June 1, 1999, also necessitated the use of overtime.

A careful analysis of the Agreements does not show any provision addressing the issue of overtime.   Therefore, the Agreements do not provide guidance on this issue. Consequently, the Court has no choice but to rely on the testimony and evidence presented during the Trial.

A review of the record clearly shows that the weather was not a factor in any of the projects.   No evidence was presented that weather conditions or any of the other reasons argued by the Plaintiff had negatively impacted the construction schedule.

With regards to the impact that any additional work may have caused, the record does not indicate, either by letter, meeting minutes, or memorandum, that the additional work, ordered by the Defendant and agreed to by the Plaintiff, had an impact on the construction schedule.   Furthermore, despite hundreds of pages of letters, minute meetings, and memorandums written by the Plaintiff, the record does not show a single written request for extension of time.   Had the Plaintiff shown such a written request, and that such request was either denied or ignored, the Court might have reached

120

a different conclusion on this issue.   Similarly, had the Plaintiff informed the Defendant

that overtime was necessary and the Defendant denied such request, the Court would

have reviewed the reasonableness of such a denial.   However, the Defendant was never

given such an opportunity, and the Plaintiff took it upon itself to charge a substantial

amount of overtime without authorization.

     With respect to Mr. Sackett's explanation that he interpreted the Chairman's letter

of May 3, 1999, as a change to the contract for an earlier date of substantial completion,

the Court does not agree with such an interpretation.   A review of the language used in

the letter does not indicate a request for a change to an earlier completion date.   As an

experienced contractor and the main drafter of the language in the Agreements, the

Plaintiff was well aware that any substantial changes to the Agreements could only be

achieved by a formal amendment negotiated between the parties.   Therefore, any

interpretation that the letter of May 3rd was an amendment to the Agreements that

justified the use of overtime cannot be accepted by the Court.   Moreover, the evidence

presented by the Plaintiff during the Trial further refutes this explanation.

     First, a review of Plaintiff's Trial Exhibit No. 42 ("Job Cost Ledger – Hotel")

shows that the Defendant was charged for overtime as early as June 6, 1998, before

any of the conditions argued by the Plaintiff to justify the use of overtime could have

taken place.   Second, Mr. Sackett testified that from the very beginning, he intended to

use overtime, and that he had authorized his subcontractors to use overtime before the

Chairman's letter of May 3rd.  Third, a review of the record shows that the

subcontractors' contracts did not allow charges for overtime without prior authorization

from the Plaintiff.

Based on the foregoing, the Court finds that the charge of overtime, without prior

authorization from the Defendant, was improper.   Therefore, it is hereby ordered that

the Defendant shall be reimbursed for the overtime paid on the projects, plus fees

on such costs (4% for the Hotel Project and 6% for the Campus and School Projects).

### 2.   Additional Expenses

The Defendant argues that there should not have been additional charges for

travel, living expenses, transportation, per diem, employees' personal expenses, legal

expenses, subcontractor bonding, and umbrella liability because these expenses were

covered by the 0.5% listed in Section 13.1.1(a) of the Addendum.   In response, the

Plaintiff argues that the 0.5% was an additional compensation that was negotiated and

that the Defendant was made aware before the execution of the Agreements that these

expenses were separate and not covered by the 0.5%.

In support of its position that the Defendant knew about these charges, the Plaintiff

introduced in evidence Plaintiff's Trial Exhibit No. 20 ("Concept Budget Estimate

Summary") which reflected these items.   The Plaintiff argued that this exhibit was sent to

Mr. Martinez via facsimile on August 6, 1997, and became part of the Hotel Project's

Agreement.   However, Mr. Martinez testified during  the Trial that the first time he ever

saw this document was after the Hotel Project had been completed and he had started the

auditing process.   Mr. Martinez testified that after he questioned some of the billing rates

for employees that were charged to the projects, Mr. Sackett referred to this document

and then sent him a copy via facsimile.

Article I, Section 1.1.1 of the Hotel Project's Agreement reads:

> "The Contract Documents consist of the Design/Builder's
> Proposal identified in Article 14, this Part 2, the Construction
> Documents approved by the Owner in accordance with
> Subparagraph 2.2.2 below and Modifications issues after
> execution of Part 2.   A Modification is a Change Order or a
> written amendment to Part 2 signed by both parties.   These
> form the Contract, and are fully a part of the Contract **as if
> Attached to this Part 2 or repeated herein."**   [Emphasis
> added for this purpose].

Section 13.1.1 of the Addendum reads:

> "Basic Compensation shall be as follows:   (a) costs incurred
> by Design/Builder in the interest of the project including
> design services, administrative, clerical and accounting
> persons located in office and field, construction labor,
> materials and equipment, an amount equal to sixty five
> percent **(65%)** of gross payroll of the workers **and** personnel
> described **a**bove directly employed by the Design/Builder
> **to compensate the Design/Builder for taxes, insurance,
> contributions, assessment and benefits, temporary
> utilities, heat and water as required,** an amount equal to
> one-half of one percent (0.5%) of the Guaranteed Maximum
> Contract Sum (as herein defined) **to compensate the
> Design/Builder for a portion of the cost of its umbrella
> liability insurance, legal costs (other than those arising
> from disputes between the Owner and Design/Builder
> or from disputes between Design/Builder and any sub-
> contractor of Design/Builder), transportation, sub-**

123

**contractor bonding, and other facilities and services necessary for proper execution of the Work, whether, temporary or permanent, within the following program as described in the eleven page document attached hereto as "Exhibit A", entitled, "Miccosukee Resort and Convention Center; Hotel & Convention Expansion, Miami, Florida; Pre-Design Phase, Preliminary Space Program; Prepared For: Kraus-Anderson Construction Co. and ESG Architects Inc.; Prepared by: ICI Design International; Revised & Updated August 21, 1997" (including a landscaping allowance of $200,000) plus**

**(b) a fee in an amount equal to the product of four percent (4%) multiplied by the costs described in sub-paragraph (a) above." [Emphasis added for this purpose].**

A review of the attached "Exhibit A" shows a document titled  INDEX.

On the left side of this document is a section titled, HOTEL SPACE DESCRIPTION, that describes the different sections of the Hotel, followed by NET AREA (SF)  that lists the square feet for the spaces, followed by PAGE that lists the page for such entry.   There is nothing in this document indicating a monetary amount for any of the entries.   A review of the document sent by Mr. Sackett on August 6, 1997, shows a twenty-four (24) page document that describes the Hotel spaces, square feet, and the total sum for each entry.   This document is totally different from the one attached to the Hotel Project's Agreement as "Exhibit A."   Therefore, the question for the Court is whether the Plaintiff's Trial Exhibit No. 20 was incorporated into the Hotel Project's Agreement.

The Florida Supreme Court has addressed the issue of incorporation by reference

124

and held that "[I]t is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." OBS Co. v. Pace Construction Corp., 558 So.2d 404, 406 (Fla. 1990).  Florida law is clear that mere reference to another document is not sufficient to incorporate that other document into a contract, particularly where the incorporating document makes no specific reference that is "subject to" the collateral document.   Temple Emanu-El of Greater Fort Lauderdale v. Tremarco Industries, Inc., 705 So.2d 983, 984 (Fla. 4th DCA).

A review of the Hotel Project's Agreement specifically includes a reference to the attached "Exhibit A."  However, there is no place in the Agreement where the attachment is described or any language that refers to "subject to" any other attachments.   Therefore, in light of the record and the doctrine of incorporation by reference, the Court has only considered the document titled "Miccosukee Resort and Convention Center;  Hotel & Convention Expansion, Miami, Florida" that was attached as "Exhibit A" as part of the Hotel Project's Agreement.   Thus, the Court must decide whether there is ambiguity in the language of Section 13.1.1(a) of the Addendum, and if there is, which of the interpretations should prevail.

Counsels for the parties have admitted that the language in Section 13.1.1(a) of the Addendum is ambiguous and subject to different interpretations.   Florida law states that the fundamental test of ambiguity in a term, word, phrase, or provision is whether it

125

may be fairly understood in more than one way.   Friedman v. Virginia Metal Prods.

Corp., 56 So.2d 515 (Fla. 1952).   If a portion of an agreement is ambiguous or uncertain,

evidence outside the contract itself (usually testimony of qualified witnesses or of the

parties) is properly heard by the court to explain the intent of the parties and clarify the

questionable matter.   Royal American Realty, Inc. v. Bank of Palm Beach & Trust Co.,

215 So.2d 336 (Fla. 4th DCA 1968).   The primary goal of contract interpretation is to

discern what the parties intended the contract to mean.   Klaxon Co. v. Stentor Electric

Mfg. Co., 313 U.S. 487 (1941);   Metric Systems Corp. v. McDonnell Douglas Corp., 850

F.Supp. 1568 (N.D. Fla. 1994).   When a court looks at this intent, the court places itself

in the theoretical position of the parties and views the surrounding circumstances and

apparent purposes of the parties and their contract.   Bornstein v. Somerson, 341 So.2d

1043 (Fla. 2d DCA 1977).   However, the intent of the parties to the contract must be

determined from the contract language itself.   U S B Acquisition Co., Inc. v. Stamm, 660

So.2d 1075 (Fla. 4th DCA 1995).   Furthermore, if the terms of a written instrument are in

dispute and are reasonably susceptible to different interpretations, then an issue of

fact is presented as to the parties' intent.   Maccaferri Gabions, Inc. v. Dynateria, Inc., 91

F.3d 1431 (11th Cir. 1996).

A fundamental rule frequently used in contract construction is that language is

interpreted most strictly against the party who prepared the writing and chose its wording.

Hancock v. Brumer Cohen Logan Kandell & Kaufman, 580 So.2d 782 (Fla. 3d DCA

1991);  U S B Acquisition Co., Inc. v. Stamm, 660 So.2d 1075 (Fla. 4th DCA 1995).   A

review of the record unequivocally shows that the Plaintiff prepared this section of the

Agreements and chose its wording.

> The relevant language in Section 13.1.1(a) reads:

> > "an amount equal to one-half of one percent (0.5%) of the
> > Guaranteed Maximum Contract Sum (as herein defined)
> > **to compensate the Design/Builder for** a portion of the
> > cost of its umbrella liability insurance, legal costs (other
> > than those arising from disputes between the Owner and
> > Design/Builder and any subcontractor of Design/Builder),
> > transportation, subcontractor bonding, and other facilities
> > and services necessary for proper execution of the Work, . . ."
> > [Emphasis added for this purpose].

The record is clear that the parties negotiated that one basis of compensation for

the Plaintiff was a fee on costs incurred in the interest of the projects.   Therefore, there is

no reasonable explanation for the Defendant agreeing to pay an extra one-half of one

percent (0.5%) of the GMP for anything other than the costs described in the

aforementioned section.   The Court is further persuaded by the punctuation style selected

by the Plaintiff and the testimony offered by the Plaintiff's expert witness,  Mr. Blair.

In this specific situation, the Plaintiff selected the language to read, "to

compensate for ...," immediately followed by the listed items, and chose only a comma

as the punctuation mark to separate those listed items.   However, a review of other parts

of the same section, such as the title of "Exhibit A" ("Miccosukee Resort and Convention

Center;  Hotel & Convention Expansion, Miami, Florida;  Pre-Design Phase, Preliminary

Space Program;  Prepared For: ..." and what legal costs were excluded ("other than ..."),

show that when the Plaintiff intended for items not to be the same and to be interpreted

separately, it used semicolons and parenthesis to separate them.  This leads the Court to

believe that had the Plaintiff intended for "a portion of the cost of its umberella liability

insurance, legal costs ..." not to be included within the compensation provided for by the

payment of the one-half of one percent (0.5%), it would have selected to separate them.

With regards to Mr. Blair, he testified as an expert witness on behalf of the

Plaintiff.  The record shows that when he reviewed Section 13.1.1, he placed semicolons

to separate those items that he understood were intended to be considered separate.

Moreover, Mr. Blair agreed that items separated by a comma meant that they were

considered together and as a part of the same thought process.  Mr. Blair's testimony

further convinces this Court that the Defendant's interpretation of the one-half

of one percent (0.5%) to be applied towards payment of the listed items that followed was

a reasonable one.

With regards to the charges for legal fees, Section 13.1.1, clearly states that the

Defendant was not to be charged for legal costs "arising from disputes between the

Owner and Design/Builder or from disputes between Design/Builder and any

subcontractor of Design/Builder."   A review of the record shows that the Defendant

was charged for legal costs incurred by the Plaintiff as a result of disputes between

128

the Plaintiff and some of its subcontractors.   Although Mr. Sackett testified that such

charges were proper because the conflicts with the subcontractors were "settlements,"

instead of "disputes," the Court cannot agree with such a spurious distinction.   Simply

put, it is illogical to accept the premise that a party will settle a matter that is not in

dispute.   Furthermore, the record does not show the nature of the disputes between the

Plaintiff and the subcontractors.   Although the Plaintiff has asserted that the settlements

were "in the interest of the project," the Court is not persuaded by such an assertion since

there was no legally enforceable contractual relationship between the Defendant and any

of those third-party subcontractors.   Moreover, the Defendant was being charged the

legal costs, plus the Plaintiff's fee on those additional costs.

Based on the foregoing, the Court finds that, without the Defendant's prior

authorization, the charges for umbrella liability insurance, legal costs, transportation, and

subcontractor bonding were improper.   Therefore, it is hereby ordered that the Defendant

shall be reimbursed for payments made for umbrella liability insurance, legal costs,

transportation, and subcontractor bonding, plus the fee on such costs (4% for

the Hotel Project and 6% for the Campus and School Projects).

3.      Temporary Utilities And Water

The Defendant argues that there should not have been additional charges for

temporary utilities, heat, and water because these expenses were covered by the 65%

fee also listed in Section 13.1.1(a) of the Addendum.   In response, the Plaintiff offers

129

the same argument as that presented on the issue of additional charges discussed above.

The relevant language in Section 13.1.1(a) reads:

> "an amount equal to sixty five percent (65%) of gross payroll of the workers and personnel described above directly employed by the Design/Builder **to compensate the Design/Builder for** taxes, insurance, contributions, assessments and benefits, **temporary utilities, heat and water** as required, . . ."   [Emphasis added for this purpose].

In regards to charges for temporary utilities and water, the Court finds that these charges were included within the sixty-five percent (65%) of gross payroll of the workers and personnel described in the above section.   The Court's decision is based on the same analysis regarding charges under the one-half of one percent (0.5%) fee.

Based on the foregoing, the Court finds that the charges for utilities and water, without prior authorization by the Defendant, were improper.   Therefore, it is hereby ordered that the Defendant shall be reimbursed for payments made for utilities and water, plus the fee on such costs (4% for the Hotel Project and 6% for the Campus and School Projects).

4.    Personnel Expenses

The Defendant argues that there should have been no additional charges for living expenses, meals, per diem, and the costs of flying the Plaintiff's personnel to and from Minneapolis, and other places during the course of the job.   The Plaintiff argues that the Defendant was aware of these charges prior to the execution of the Agreements and that those charges were allowed under the Agreements because they were in the interest of

130

the projects.

The Plaintiff's argument that the Defendant had prior knowledge of these charges based on Plaintiff's Trial Exhibit No. 20 is moot as the Court has already decided this issue.   The Court will review the language in the Agreements.

Section 13.2 addresses the issue of Reimbursable Expenses.   Section 13.2.1 reads:

> "Reimbursable Expenses are in addition to the compensation for Basic and Additional Services and include actual expenditures made by the Design/Builder in the interest of the Project for the expenses listed as follows:
>
> 13.2.1.1    Tribal Taxes and Fees
> 13.2.1.2    Building Permits
> 13.2.1.3    Building Code review of building, structural, mechanical, electrical and fire protection system and alternative design/review costs for fire protection system."

Section 13.2.2 reads:

> "FOR REIMBURSABLE EXPENSES, compensation shall be a multiple of one and 5/100 (1.05) times the amounts expended."

There are no other sections in the Agreements or the Addendum that address the issue of reimbursable expenses.   Therefore, the Court must rely on the evidence presented at Trial on this issue.

A review of the evidence presented during the Trial shows that the Plaintiff included specific provisions in its contracts with several of the subcontractors covering these charges.   In some of these contracts, these charges were either not allowed or

limited to a specific amount.   The Agreements between the parties do not contain such provisions.   Pursuant to the Agreements, the Plaintiff was entitled to be reimbursed for only those expenses enumerated in Sections 13.2.1.1-13.2.1.3.   However, under Section 13.1.1(a) of the Addendum, the Plaintiff was entitled to additional compensation for "costs incurred by Design/Builder in the interest of the project" and other enumerated costs.   The Agreements do not define what costs may be "in the interest of the project." Since the personnel costs charged were not listed in the "Reimbursable Expenses" Section, the only argument that may justify these additional charges is that they were incurred "in the interest of the project."   Since these additional charges were incurred by the Plaintiff and not approved by the Defendant, the burden is on the Plaintiff to prove that they were justified.

The Plaintiff argues that the Defendant had implied knowledge of these charges since it knew it had contracted with an out-of-state contractor, and therefore, out-of-state personnel were being transported to work on these projects.   The Court, however, is not persuaded by this argument because the same thing can be said about the Plaintiff.

The record shows that the Plaintiff entered into Agreements that were restricted by a Guaranteed Maximum Price provision.   The Plaintiff, as an experienced General Contractor, knew that performance of the work would require these additional costs. Nevertheless, the Plaintiff did not provide for them under the "Reimbursable Expenses" Section of the Agreements.   Additionally, Mr. Mason testified that in his previous

132

employment as Cost Engineer with Turner Construction Co., these costs were included in the "General Conditions" Section of the Agreements, and the General Contractor was specifically authorized to recover these costs.  Mr. Mason also testified that he had not read the Agreements between the parties in this particular case.  Based on this record, the Court finds that it was reasonable for the Defendant to believe that the GMP agreed to, plus the absence of any of these additional charges in the "Reimbursable Expenses" Section of the Agreements, meant that it was not responsible for them.

Based on the foregoing, the Court finds that the personnel charges for living expenses, meals, per diem, and flying without prior authorization by the Defendant, were improper.  Therefore, it is hereby ordered that the Defendant shall be reimbursed for payments made for living expenses, meals, per diem, and flying, plus the fee on such costs (4% for the Hotel Project and 6% for the Campus and School Projects).

## 5.    Employees' Billing Rate

The Defendant argues that under the Agreements, the Plaintiff was only entitled to "costs incurred," and therefore, employee charges based on unit-billing instead of hourly rates were unauthorized.  In response, the Plaintiff argues that charges based on unit-billing rates are the standard method in the industry.  Mr. Blair confirmed this during his testimony.  Mr. Wright, however, stated that it was usually the terms of the contract, as opposed to the industry standard, that controlled the billing process.

A review of the Agreements and the Addendum show very little guidance on this

133

issue.   The use of unit-billing rates is not mentioned in either the Agreements or the

Addendum.   However, the issue of hourly rates is mentioned in the Addendum, but only

with respect to increases to the Contract Sum.

Section 13.1.1(b) reads:

> "For additional services, compensation shall be computed on
> an **hourly basis at standard hourly rates** or a mutually agreed
> lump sum cost."   [Emphasis added for this purpose].

A review of general construction principles shows that unit price contracts work

best when there is an unknown quantity of work to be done or materials to be furnished,

as opposed to when such work or materials can be broken down into a cost for a

particular unit.   Larry R. Leiby, Florida Construction Law Manual, §7.04, Page 186

(West's Florida Practice Series, 2003 ed.).   It is important in a unit price contract to

carefully define the scope of the unit for which payment will be made.   Id.   Florida law

states that no agreement is reached until a specific unit is ordered.   Pick Kwik Food

Stores, Inc. v. Tenser,  407 So.2d 216 (Fla. 2d DCA 1981).

A review of the Agreements does not show any express language authorizing the

Plaintiff to charge unit-billing rates for any of its employees.   In the case at bar, the

quantity of work was substantial, and the Plaintiff had negotiated in the Agreements

a percentage fee on "costs incurred" as additional compensation.   Therefore, the Court

finds that the use of a unit-billing rate, without prior approval from the Defendant, was

not proper.

134

It is important to point out that this holding should not be interpreted as a rejection of unit-billing rates in future construction cases.   The decision by this Court is limited to the specific facts of the present case.   Consequently, where the contracting parties have agreed to a specified method of payment and such method of payment is expressly stated in the contract, this Court will not interfere with the parties' intent.

Based on the foregoing, it is hereby ordered that the charges for employees based on unit-billing rate was improper and such charges shall be calculated based on actual hourly rates.   Therefore, it is ordered and adjudged that the Defendant shall be compensated for any excess costs paid due to the unit-billing rate, plus the fee on such costs (4% for the Hotel Project and 6% for the Campus and School Projects).

### 6.   Corrective Work

The Defendant argues that it should not have been charged for additional work needed to correct damaged work.   The Plaintiff argues that the "fast track" method of construction used in the projects and "traffic damage" were responsible for the damaged work.   Additionally, the Plaintiff argues that the corrections were in the interest of the project.

Section 2.2.8 of the Agreements reads:

> "The Design/Builder shall correct Work which does not
> conform to the Construction Documents."

Section 2.2.9 of the Agreements reads:

> "The Design/Builder warrants to the Owner that

135

materials and equipment incorporated in the Work will
be new unless otherwise specified, and that the Work
will be of good quality, free from faults and defects,
and in conformance with the Contract Documents.
Work not conforming to these requirements shall be
corrected in accordance with Article 9."

Article 9 ("Correction of Work") reads:

"**9.1**   The Design/Builder shall promptly correct Work
rejected by the Owner or known by the Design/Builder
to be defective or failing to conform to the Construction
Documents, whether observed before or after Substantial
Completion, and whether or not fabricated, installed or
completed, and shall correct Work under this Part 2 found
to be defective or nonconforming within a period of one
year from the date of Substantial Completion of the Work
or designated portion thereof, or within such longer period
provided by any applicable special warranty in the Contract
Documents.

**9.2**   Nothing contained in this Article 9 shall be construed
to establish a period of limitation with respect to other obligations
of the Design/Builder under this Part 2.   Paragraph 9.1 relates
only to the specific obligation of the Design/Builder to correct the
Work, and has no relationship to the time within which the
obligation to comply with the Contract Documents may be sought
to be enforced, nor to the time within which proceeding may be
commenced to establish the Design/Builder's liability with
respect to the Design/Builder's obligations other than correction
of the Work.

**9.3**   If the Design/Builder fails to correct defective Work as
required or persistently fails to carry out Work in accordance
with the Contract Documents, the Owner, by written order
signed personally or by an agent specifically so empowered by
the Owner in writing, may order the Design/Builder to stop the
Work, or any portion thereof, until the cause for such order has
been eliminated; however, the Owner's right to stop the Work
shall not give rise to a duty on the part of the Owner to exercise
the right for benefit of the Design/Builder or other persons or
entities.

136

> 9.4    If the Design/Builder defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within seven days after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may give a second written notice to the Design/Builder and, seven days following receipt by the Design/Builder of that second written notice and without prejudice to other remedies the Owner may have, correct such deficiencies.  In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Design/Builder costs of correcting such deficiencies.  If the payments then or thereafter due the Design/Builder are not sufficient to cover the amount of the deduction, the Design/Builder shall pay the difference to the Owner.  Such action by the Owner shall be subject to arbitration."

The record is clear that the Plaintiff was responsible for delivering a final product in accordance with the Contract Documents and free of defects.   The record is devoid of any evidence that the "fast track" method of construction was part of the parties' bargaining or that the Defendant agreed to assume the responsibility for construction defects.

In this case, there was mutual assent regarding the time frame for completion of the projects.   A review of the record shows that Mr. Sackett had initially suggested a time frame that was shorter than the one eventually agreed to.   Moreover, even if the Court were to accept the Plaintiff's argument that mistakes and defects were an inherent risk of the "fast track" method of construction used, the Agreements continued to place the risk for such construction defects on the Plaintiff and not on the Defendant.

The Plaintiff further argues that it should not be responsible for damages caused

137

by subcontractors (referred to as "traffic damage") where the party at fault could not be identified. The Plaintiff states that the Defendant should bear the cost for the corrections because they were in the interest of the projects. The Court does not find this argument reasonable or supported by the Agreements.

Section 1.1.2 of the Agreements reads:

> "The Project is the total design and construction for which the Design/Builder is responsible under Part 2, including all professional design services **and all labor**, materials and equipment used or incorporated in such design and construction." [Emphasis added for this purpose].

Section 11.5.3 of the Agreements reads:

> "Costs caused by defective or ill-timed work **shall be borne by the party responsible.**"

The record is devoid of any action by the Defendant that caused or contributed to any damages to the work. Consequently, it is unreasonable to expect the Defendant to incur additional costs for damages it did not cause.

A review of the record shows that the Plaintiff was in control of the construction site and the subcontractors performing the work. The evidence presented during the Trial shows that the Plaintiff had different options in dealing with the situation. One option would have been to equally apportion the costs of the damages among the subcontractors when unable to determine fault. The Defendant introduced in evidence several samples of AIA Agreements wherein the General Contractor had dealt with the

138

issue in this fashion.   Similarly, the Defendant introduced in evidence several samples of AIA Agreements that contained specific provisions addressing which party was responsible for the cost of corrective work.   In this case, the Agreements clearly placed the responsibility for correction of the work on the Plaintiff.   There is no language in the Agreement that allows the Plaintiff to charge the Defendant for damages caused by its subcontractors.   It is difficult for this Court to imagine a situation where an owner would voluntarily agree to assume the risk of mistakes and damages that it did not cause.

Based on the foregoing, the Court finds that the charges for corrective work, without prior authorization from the Defendant, were improper.   It is hereby ordered that the Defendant shall be reimbursed for the corrective work paid on the projects, plus the fees on such costs (4% for the Hotel Project and 6% for the Campus and School Projects).

### 7.   Defective Work

The Defendant argues that it should not have been charged for additional work that was required because of defects in the design.   The Plaintiff argues that it is not responsible for design defects for the following reasons:  (1) the "fast track" method of construction, (2) field conditions, (3) the waiver of design liability in the Agreements, and (4) the additional work was necessary and in the interest of the projects.

The Court has already addressed and decided the "fast track" method of

139

construction argument.   The Court now will address the issue of field conditions.

There is no language in the Agreements or the Addendum that addresses the issue of field conditions.   Therefore, the Court has no choice but to rely on the testimony and evidence presented during the Trial.

During the Trial, the Plaintiff's expert witness, Mr. Blair, testified that due to the "fast track" type of construction used and the size of these projects, a contractor would normally anticipate that damages and defects would take place.   Mr. Blair testified that most contracts have specific provisions that list these events as reimbursable expenses, allowing the contractor to recover from the owner for those defective and nonconforming work expenses.   He noted that the Agreements in this case did not contain such specific provision.   With regards to field conditions, Mr. Blair defined them as follows:

> "For this project it could be an event that causes additional monies to be expended that was not, would normally not be a desirable situation.   In other words, if we use his column example in a design/bid/build situation up top there, that design is totally coordinated however long it took them to do that and there would be very few field conditions over on the C for the construction, but in this case field conditions arise as a result of the design/build system that I described on the bottom.
> You can't know everything as you're putting together the original bid packages.   There are situations made later on in the project, including interiors and furnishings and moving things that necessitate changes, and that change might be something like moving a column."   [Trial Record, Pages 2528, 2529].

Mr. Blair further explained:

"I think in the scenario above, the design/bid/build there are
a lot fewer field conditions, but there are field conditions.
There is never in my experience a set of contract drawings
and specifications that's perfect.   That scenario produces a
much closer to perfect set of documents than the design/bid/
build situation, but nonetheless there are still field conditions.
One of the engineers that designed that top project may have
forgotten something and there's an interference between a
pipe and a wall.   That field condition is typically done and
you add up all the costs for something like that, it's usually
an extremely minor number.

It's accepted in the industry that those things happen.   The
subcontractor might get a change order for it.   If it's real
minor the general contractor in that situation might even, I
don't know, charge it to another subcontractor.   But field
conditions in this job I think are extremely minor given --
it's like $250,000.   That's certainly a big number, I'm not
saying it isn't, but in $50 million it's not that big."
[Trial Record, Pages 2530, 2531].

In the case at bar, the record shows that it was the Plaintiff who suggested

the design/build method to the Defendant.   A review of the record shows that when the

Plaintiff was bargaining to be selected as the contractor for the projects, it strongly

emphasized the many advantages of also being the Design/Builder.

The record clearly reveals that the Plaintiff was successful in negotiating the

use of its own design/team for all the projects, without competitive bidding.   This

decision resulted in substantial benefits for the Plaintiff in terms of time and profit.

However, with these substantial benefits came substantial responsibilities.   The Plaintiff

cannot expect to reap the benefits of its bargain but avoid its responsibilities.

Under these circumstances, the Court cannot accept the Plaintiff's argument that

141

the design/build under the time-frame agreed to by the Plaintiff increased the risk of field conditions and defects and that the Defendant should bear the responsibility.   Since these field conditions and defects were anticipated, the Plaintiff should have specifically provided for them in the Agreements, either in the form of reimbursable expenses or as a separate contingency category.   The Court will next address the waiver of design liability argument.

The Plaintiff argues that Section 14.4.1.12 ("Design Liability) of the Addendum is a valid disclaimer of liability for design services.   This section reads:

> "Notwithstanding anything in Part 2 to the contrary, **Design/Builder shall have no responsibility or liability for or with respect to design services or for any loss, injury or damage arising out of or relating to errors or omissions in the drawings, specifications and other documents prepared by the Architect, electrical design/build engineer or the mechanical design/build engineer for the Work including but not limited to the architectural, civil, structural, mechanical, electrical, interior finishes and kitchen equipment, provided,** however, that **Design/Builder shall continue to accept full responsibility and liability for the performance of the Work, including, but not limited to, Article 9 Correction of Work.**" [Emphasis added for this purpose].

A reading of the above section reveals that the Plaintiff is excused from responsibility regarding the design services while in the same sentence continues to be fully responsible for the performance and correction of the Work.   Thus, there is a clear contradiction regarding the responsibility for design services.

In the present case, the record shows that the Defendant relied completely on the design services provided by the Plaintiff.   As the Court has previously noted, this being a

design/build type of project, the Plaintiff was responsible for recommending, hiring, and supervising the design services. The record shows that the design services were hired without competitive bidding and that the Defendant was relying completely on the Plaintiff for the work being performed by the design services. As a matter of fact, the record clearly shows that the Plaintiff had almost absolute control and discretion with regard to the design services. Based on these facts and the conflict in language reflected in the Addendum, the Court finds that a provision excluding liability under the circumstances of this case would be unconscionable and against public policy.

Florida law states that contracts which attempt to relieve a party of any liability are valid and enforceable where not unconscionable and where the intention was made clear and unequivocal in the contract. Orkin Exterminating Co. v. Montagano, 359 So.2d 512 (Fla. 4th DCA 1978). An unconscionable provision must be both procedurally and substantively unconscionable in order to make the provision unenforceable. Powertel, Inc. v. Bexley, 743 So.2d 570 (Fla. 1st DCA 1999). The procedural component of unconscionability relates to the manner in which the contract was entered, and it involves consideration of such issues as the relative bargaining power of the parties and their ability to know and understand the disputed contract terms. Id. The substantive component of unconscionability focuses on the agreement itself. A case is made for substantive unconscionability by showing that the terms of the contract are unfair and unreasonable. Powertel, Inc. v. Bexley, 743 So.2d 570 (Fla. 1st DCA 1999).

143

In the case at bar, the contractual provision that is supposed to reflect the parties' intent with regards to liability for design services is contradictory and fails to clearly reflect the parties' intent on the issue.   Although the Court has considered the interpretation proposed by the Plaintiff, it finds such interpretation unfair and unreasonable under the facts of this case.   It would be unfair and unreasonable to allow a party in a design/build construction contract, who recommends, employs, and supervises its own design/build services, and who controls all design phases of the project, to be completely exempted from responsibility for the errors and omissions of its design/build team.

Based on the foregoing, the Court finds that the charges for errors and omissions of the design/build, without prior authorization from the Defendant, were improper. Therefore, it is hereby ordered that the Defendant shall be reimbursed for those charges, plus the fees on such costs (4% for the Hotel Project and 6% for the Campus and School Project).

8.      Additional Corrective Work Done by the Defendant

The Defendant argues that the Plaintiff shall be held responsible for improper work on the School Project that required corrective work by the Defendant.   Mr. Pardo and Mr. Martinez testified that the air conditioning system on the School Project did not work properly.   Mr. Martinez testified that the Defendant hired a consultant, Earl Heywood, to correct the malfunction and that the cost for such corrective work was

144

$97,020.00.  The Defendant did not present to the Court the amount for damages to the atrium or the air handlers above the classrooms.

A review of the record shows that Mr. Heywood and Mr. Betancourt had been listed as witnesses with first-hand knowledge of the alleged problems with the air conditioning system on the School Project.  According to the Defendant's Counsel, these two parties had worked on the School Project and could present relevant evidence on the issue of corrective work done by the Defendant.  However, the record shows that these two critical witnesses never testified, and no evidence, other than the testimony of Mr. Pardo and Mr. Martinez, was presented on this issue.

A review of Article 9, Sections 9.1 and 9.4 imposes upon the Defendant a duty to notify the Plaintiff of work that is not correct and to give the Plaintiff an opportunity to correct the defective or nonconforming work.  In the case at bar, no evidence was presented that the Defendant had given the Plaintiff notice and an opportunity to cure the alleged defective or nonconforming work.  The record shows that the Defendant arbitrarily took upon itself to make the repairs without meeting any of the specific requirements of Article 9.  Moreover, during Mr. Martinez's cross-examination, it was revealed that the Defendant first contacted Mr. Heywood approximately 22 months after the School Project had been completed.  Had the Defendant produced written evidence showing that the Plaintiff had been contacted and informed of the nonconforming work, or expert testimony that the malfunction was the result of nonconforming work, the Court

145

might have reached a different conclusion on this issue.

Based on the foregoing, the Court finds that the Defendant's claim for additional corrective work performed on the School Project shall be denied.

### 9.      Inefficient And Expensive Design

The Defendant argues that the Plaintiff's design for the School Project employed a more expensive and less efficient design more common in the northern United States instead of utilizing standard techniques common in South Florida.   The Defendant listed Mr. Betancourt as witness on this issue.

A review of the record shows that the Defendant never offered any damage calculation on this issue.   Furthermore, the witness listed by the Defendant who could offer expert testimony about school designs, Mr. Betancourt, was never called to testify. Similarly, no evidence was presented at Trial to support the claim that the design for the School Project was inefficient and expensive.   The record shows that the Defendant all but abandoned the prosecution of this claim.

Based on the foregoing, the Court hereby finds that the Defendant's claim for inefficient and expensive design for the School Project shall be denied.

### 10.      The Smoke Evacuation System

A review of the record clearly shows that the parties agreed that the Smoke Evacuation System was required for the first and second floors of the Hotel Project. The only issue for the Court to decide is which party should bear the cost.   The

146

Defendant argues that it should not pay for the Smoke Evacuation System because the

Agreements state that the Hotel Project had to be designed according to the South Florida

Building Code, and the Plaintiff represented that the Defendant would not have to pay

for it. The Plaintiff argues that the installation of the system did not increase the GMP

and that the Defendant is responsible for the cost.

The Court has carefully reviewed the Trial testimony, Plaintiff's Trial Exhibits

No. 30, No. 122, No. 124, No. 148, and No.149, and Defendant's Trial Exhibits No. 7

and No. 8. The record is clear that the Smoke Evacuation System should have been

incorporated in the original design. Furthermore, there is the additional representation in

Plaintiff's Trial Exhibit No. 124.

Plaintiff's Trial Exhibit No. 124 is a letter from Chairman Cypress to Mr. Sackett

with regard to payment for the installation of the Smoke Evacuation System. In this

letter the Chairman states:

> "The Tribe has contracted, and paid for, a building that should
> have been designed to the South Florida Building Code. That
> is the fact. We know that Kraus Anderson specified that in
> its design contract with Elness Swenson Graham Architects.
> Subsequently, there should be no further finger pointing or
> looking for answers. Our code official Mr. Felix Pardo, has
> clearly stated that the design is not in accordance with the
> code and that must be corrected immediately. **We do not
> expect to pay for this re-design, nor do we expect a delay
> of any kind as a result.** Please take whatever steps you
> deem necessary to resolve this issue." [Emphasis added
> for this purpose].

147

In response to the above letter, the Plaintiff's Chairman of the Board and Chief Executive Officer, Mr. Englesma, wrote a response, which is reflected in Plaintiff's Trial Exhibit No. 124. The response reads:

> "It's my understanding from our staff that our engineers have corrected the smoke evacuation system design for the hotel and have presented a new system design for your building code consultant that will meet the South Florida Building Codes. **I assure you that any costs that have been expended to correct this matter are included in the contract sum.**" [Emphasis added for this purpose].

The Court has closely analyzed the language in Mr. Englesman's letter from the "reasonable person standard" commonly used in contract interpretation. The Court finds that any reasonable person in the position of the Defendant would have interpreted the specific language "any costs that have been expended to correct this matter are included in the contract sum" as a representation that there would be no additional costs for it. Had the Plaintiff explained in the letter its interpretation of "contract sum" versus "GMP," and all the other arguments presented at Trial on this issue, the Court may have reached a different conclusion.

Based on the foregoing, the Court finds that the charges for the Smoke Evacuation System were improper. Therefore, it is hereby ordered that the Defendant shall be reimbursed for the Smoke Evacuation System on the Hotel Project, plus the 4% fee on such costs.

11.   Delay Damages

148

The Defendant argues that the Plaintiff failed to complete the Hotel Project

by February 2, 1999, as stated in the Agreement.   The Defendant argues that since the

Plaintiff did not complete the project until June 14, 1999, the Plaintiff is liable for

liquidated damages at a rate of $1,000.00 per day.   In response, the Plaintiff argues that

the date of substantial completion was extended in Change Order No. 1 to June 10,

1999.  The Court will review the "Liquidated Damages" Section of the Addendum,

the language in Change Order No. 1, and the "Temporary Certificate of Completion"

issued by Mr. Pardo for a decision on this issue.

Section 14.4.1.15 of the Addendum reads:

> "**Liquidated Damages**   Owner and Design/Builder understand and
> do hereby agree that the unexcused delay in achieving the Substantial
> Completion date may cause the Owner consequential, compensatory,
> or special damages.   The parties hereto do agree that said damage
> amount or amounts including loss of use or loss of said profits is and
> will be impossible to determine.   Accordingly, Owner and Design/
> Builder do hereby agree that in the event of said unexcused delay,
> Design/Builder shall be liable to Owner for the payment of ONE
> THOUSAND AND NO/100 DOLLARS ($1,000.00) per calendar
> day of delay as liquidated damages.   Owner covenants not to use
> Design/Builder for or otherwise seek recovery of any damages
> (consequential, compensatory, special loss of use, loss of business
> profits) for the unexcused delay in completion of the Work in
> excess of said liquidated damage amount.   Payment of said
> liquidated damage amount is Owner's sole and exclusive remedy
> against the Design/Builder for said unexcused delay.   The date of
> Substantial Completion shall be extended by a period of time equal
> to any period by which Substantial Completion is delayed as a
> result of any of the following events: (1) Owner's, Architect's or
> Consultant's failure to give written notice of approval or disapproval
> of any drawings, plans, specifications or other items requiring such

149

approval, within the time provided in the Contract Documents;
(2) Change Orders;  (3) strikes or other labor disturbances, civil
disturbances, future orders of any court or governmental or
regulatory body, unavailability of materials despite reasonable lead
times procurement efforts, fire, casualty or any other cause beyond
Design/Builder's reasonable control, other than lack of funds."

The relevant language in Section 14.1 of the Agreement reads:

" . . . subject to authorized adjustments and to delays not caused
by the Design/Builder, Substantial Completion of the Project
(other than the Hotel and Recreation Center) shall be achieved
by December 17, 1998 and Substantial Completion of the Hotel
and Recreation Center shall be achieved by April 15, 1999."

The relevant language in Change Order No. reads:

"The Date of Substantial Completion as of the date of this
Change Order therefore is Hotel and Recreation Ctr 6/10/99
Bal. of Project 2/11/99."

A review of Plaintiff's Trial Exhibit No. 36 E shows that Mr. Pardo issued

a Temporary Certificate of Completion for floors 1 through 9 on June 2, 1999.   The

language in the certificate reads:

"After observing the completion of the punch list items for the
Temporary Certificate of Completion as presented to the
Contractor, it is my professional opinion that the building may
be occupied.   The remaining corrections are minor and can be
accomplished while the building is occupied with the
cooperation of the Tribe.

It is my professional opinion, representing the interests of the
Miccosukee Tribe of Indians of Florida, that the above
mentioned building is suitable for human habitation and that
the life, safety and welfare of its occupants have been met
through compliance with the approved construction
Documents and its compliance with the South Florida

150

Building Code."

After a review of the language in the signed and approved Change Order No. 1 and the "Temporary Certificate of Completion" reflected in Plaintiff's Trial Exhibit No. 36 E, the Court finds that the date of substantial completion on the Hotel Project was extended to June 10, 1999, and that the Plaintiff timely completed the project on June 2, 1999.

Based on the foregoing, the Defendant's claim for delay damages is hereby denied.

### 12.   Upgrades And Enhancements

The Defendant argues that there were charges for upgrades and enhancements on the projects that were unauthorized.   The Defendant argues that such upgrades and enhancements required signed and approved Change Orders.   In response, the Plaintiff argues that it had the authority to effectuate the upgrades and enhancements because they were in the interest of the projects.   The Plaintiff further argues that no Change Orders were required because the charges did not increase the GMP.   The Court has carefully reviewed the Agreements and the arguments presented by the parties' Counsels in deciding this issue.

A review of the record makes it clear that the parties have conflicting interpretations regarding the issues of compensation under the Agreements, the use of Change Orders, and the terms "contract sum" versus the GMP.   The answer to these questions will determine if the improvements and enhancements to the projects by the Plaintiff were proper or not.   It is important to clarify that the record shows that in

151

contrast to the additions reflected in the unsigned Change Orders, the additions here were not specifically ordered by the Defendant.   The Court has carefully reviewed all the Meeting Minutes reflected in Plaintiff's Trial Exhibit No. 32.1-32.31 and they do not show any of the Defendant's representatives ordering or authorizing any of the additions.

The record shows that the parties agreed to a contract with a GMP.   The Plaintiff's compensation was derived from four sources:  (1) costs incurred by the Design/Builder in the interest of the project, (2) an amount equal to 65% of the gross payroll of administrative, clerical and accounting persons located in office and field, (3) an amount equal to 0.5% of the Guaranteed Maximum Contract Sum, and (4) a 4% fee of the costs described in (1) through (3) above.

The record shows that Section 8.1.1 of the Agreements required a written Change Order signed by both parties to the contract if there was "a change in the Work or adjustment in the contract sum or contract time."   This section specifically stated that "The contract sum and contract time may be changed only by Change Order." The next paragraph, Section 8.1.2 allowed the Defendant to order changes within the general scope of the work and for an adjustment of the "contract sum and contract time" accordingly.   This section specifically stated that "Such changes in the Work shall be authorized by Change Order, . . ."

The record shows that the parties agreed to a contract that contained a Guaranteed

152

Maximum Price for each of the projects.   The testimony presented during Trial by witnesses for both parties reveal that this Guaranteed Maximum Price was a protection for the Defendant because it guaranteed that the projects would not go over that price, unless the Defendant ordered additional work beyond the scope of the original contracts. It is clear to the Court that the Agreements did not guaranteed the Plaintiff the maximum price listed in the Agreements.   The maximum price in these Agreements was, to use a construction description, an upper surface, not a foundation to build on top of.

A review of the record reveals that the Plaintiff managed the compensation part of the Agreements as a "Lump Sum" type contract with a GMP.   Pursuant to this interpretation, the Plaintiff interpreted the terms "contract sum" and GMP to be synonymous.   The Plaintiff further interpreted that its responsibility under Section 2.2.5 of the Agreements for coordinating "all construction means, methods, techniques, sequences, and procedures" to include the discretion to order improvements and enhancements to the projects without a written and singed Change Order.   The Plaintiff's interpretations were simply incorrect.

A review of the record unequivocally shows that in this case the "contract sum" is a term to quantify the accumulated and accumulating costs for the projects to include the Plaintiff's fees.   Therefore, any change to the original scope of work stipulated by the supporting construction documents, whether upward or downward, that affected that "contract sum" required a Change Order written and signed by the parties.   A plain

153

reading of Article 8 of the Agreements clearly supports this conclusion as the only term used in this provision is "contract sum" and not "GMP." Consequently, any and all improvements, enhancements, or additions by the Plaintiff (other than those reflected in the unsigned Change Orders previously decided by this Court) where unauthorized charges.

This Court has carefully considered the Plaintiff's argument regarding its discretion under Section 2.2.15 of the Agreements to authorize "minor changes in the design and construction." The main weakness with the Plaintiff's interpretation is that these "minor changes" were substantial and in excess of $1,000,000.00. The Court doubts that such a large sum could be seriously classified as "minor changes." The issue is further compounded by the fact that the Plaintiff was earning additional fees for each of those "minor changes."

Based on the foregoing, the Court finds that any and all additions, enhancements, and improvements (other than those reflected in the unsigned Change Orders) were not authorized without a written and signed Change Order. It is hereby ordered that the Defendant shall be reimbursed for those charges, plus the fee (4% for the Hotel Project and 6% for the Campus and School Projects) for those charges.

VI.    DAMAGES

The parties' failure to provide all the relevant and necessary records in support of their respective claims and arguments resulted in a substantial delay of this decision, and

154

has made the task of allocating damages a very difficult one for the Court.   The issue of

damages has been decided based on a review of all the records introduced into evidence

by the parties during the Trial, the supplemental records submitted pursuant to the Order

to Produce issued by this Court on February 20, 2004, and the parties' arguments.

1.      The Hotel Project

The Plaintiff's claim in regards to the Hotel Project consists of the balance of three

(03) Applications for Payment, fees for costs incurred, retainage, and interest on

payments due.   The Applications for Payment involved are No. 18 for an unpaid balance

of $1,302,435.11, No. 19 for an unpaid balance of $1,677,436.00, and No. 20 for an

unpaid balance of $1,139,332.86.   The total retainage held is $1,252,302.17.   The total

claim, as amended by the Plaintiff, is $4,444,039.88.

A review of Application for Payment No. 18 shows a total request of

$3,045,987.00.   This amount is based on a charge of $1,554,357.00 for Change

Orders No. 9-16, $138,845.00 for General Conditions costs, and $1352,785.00 for

original contract work.   Pursuant to the decision on the substantive issues, the Court

awards the Plaintiff **$1,199,086.25** on this Application for Payment.

A review of Application for Payment No. 19 shows a total request of

$1,736,652.00.   Pursuant to the decision on the substantive issues, the Court awards the

Plaintiff **$1,479,657.82** on this Application for Payment.

A review of Application for Payment No. 20 shows a total request of

155

$1,139,332.86.  However, this Application for Payment, dated October 6, 1999, does not offer any details or specific breakdown of the charges.   A review of the Trial Record does not show any testimony or evidence regarding this Application for Payment. Furthermore, despite this Court's specific request for this information in its "Order to Produce of February 20, 2004, no such information or documentation was provided.   The record is clear that Articles 5.1.1 and 14 of the Agreements imposes upon the Plaintiff an affirmative duty to provide an itemized Application for Payment.   In the absence of this information, the Court is unable to determine any award on this Application for Payment.

A review of the record and Applications for Payment No. 2-19 show that the amount of $1,252.302.17 was withheld from the Plaintiff as retainage.   Pursuant to the language in the Agreements, the Plaintiff is entitled to an award for this amount.

In regards to interest on payments due, since the Defendant's award on its Counter-Claim for the Hotel Project completely off-sets and exceeds the Plaintiff's claim, there are no "payments due" to the Plaintiff for purposes of interest payments.

Based on the foregoing, it is hereby ordered that the Plaintiff shall receive an award of **$3,931,046.24 for** all its claims on the Hotel Project.

The Defendant's Counter-Claims in regards to the Hotel Project consists of unauthorized charges for overtime, travel, living expenses, transportation, per diem, employees' personal expenses, legal expenses, subcontractor bonding, umbrella liability, corrective work, charges for the Smoke Evacuation System, delay damages, and

156

unauthorized enhancements and improvements.

A review of the record shows that the Defendant's original damage calculations on the Hotel Project was reduced by $3,225,487.53 by Mr. Wright's Trial testimony.   The Court found the Defendant's Counsel's method of substantially amending its damage calculations during Trial, and through the testimony of its expert witness, confusing to the issues at hand, inconsistent, and an unnecessary waste of the Court's time.   The Court will first address the issue of the Plaintiff's 4% fee with regards to the unsigned Change Orders.

As stated in the Court's discussion of the issue of the fees for unsigned Change Orders, the Court hereby awards **$105,478.84** to the Defendant.   The Court will next address the damage award on the issues of administrative and field labor, employee's billing rate, the 65% of gross payroll of those workers, temporary utilities, heat, and water.

On the issues of administrative and field labor costs, and the 65% burden on those costs, a review of the Plaintiff's Trial Exhibit No. 42 ("Job Cost Ledger") and the Defendant's Trial Exhibit Q ("Plaintiff's Employee Labor Payment Summary Log"), reveal that the Plaintiff did not utilize hourly rates for its calculations, and included some overtime charges.   A review of these trial exhibits also reveals that the Plaintiff did not uniformly calculated the burden at the listed 65% rate.   Therefore, based on a review of Invoices No. 31301, No. 31337, No. 31385, and No. 31420, Applications for Payment

157

No. 1-20, and the Final Revised Application, dated October 10, 2002, the Plaintiff charged the Defendant $1,937,994.40 for administrative and field labor, and the 65% burden on this labor.  Pursuant to the decision of the Court in favor of hourly rates instead of unit-billing rates, this amount shows an overcharge of $729,218.46, which reduces the total on the Plaintiff's Revised Final Application to $1,208,775.94.

A review of all the Plaintiff's Applications for Payment No. 2-8 show that Mr. Mason was listed as an employee of Snelling Services, a temporary employment company.  As such, Mr. Mason's salary should have been covered by the 0.5% fee for "temporary services" under Section 13.1.1(a) of the Addendum.  Consequently, the unauthorized amount charged is decreased to $967,598.46.  Since the record shows that the Plaintiff provided a credit to the Defendant of $190,582.50, the unauthorized amount charged is adjusted accordingly to $777,015.96.  Since the record shows that the Defendant paid $39,686.50 for temporary utilities and water, the Court finds that the Defendant is entitled to a reimbursements for this amount, plus the Plaintiff's 4% fee.

Based on the foregoing, the Court awards the Defendant the amount of $849,370.56 for unauthorized charges for administrative and field labor, employee's billing rate, the 65% of gross payroll, temporary utilities, heat, and water on the Hotel Project.  The Court will next address the issue of overtime.

The Court has reviewed the overtime charged by the Plaintiff's employees and subcontractor.  Based on a review of the Defendant's Trial Exhibits No.1 and No. 7, the

158

Court awards the Defendant **$1,166,148.02**, which includes the Plaintiff's 4% fee, for unauthorized overtime.   The Court will next address the issue of charges under the 0.5% fee.

The Court has reviewed the "General Conditions" section of the costs reflected in the Plaintiff's Trial Exhibits No. 13, No. 14, No. 20, and No. 42 and subtracted from the Final Revised Application those charges in excess of the allotted costs reflected in the General Conditions section.   The Court has already decided that the charges for umbrella liability insurance, legal costs, transportation, subcontractor bonding, and other facilities or services necessary for the proper execution of the work in excess of the agreed upon compensation rate, were not justified without an approved and signed Change Order. Therefore, this Court finds that the Plaintiff is not entitled to any increases that resulted from the 0.5% compensation on those amounts.   Therefore, the Defendant is awarded **$1,049,190.79** as reimbursement of these costs, plus the Plaintiff's  4% fee

In regards to the issue of personnel's unauthorized expenses, the Court has reviewed the Plaintiff's Final Revised Application for Payment which show that the Plaintiff charged the amount of **$557,479.32** for personnel's travel, living expenses, rental vehicles, per diem, personal expenses, meals, per diem, and air fares, plus **$22,299.17** for its 4% fee.   Having found that these charges were not authorized, the Defendant is hereby awarded the amount of **$579,778.48** on this issue.   The Court will next address the issue of corrective work.

159

In regards to the issue of corrective work, the Court has reviewed the Defendant's Trial Exhibit No. 1 and the Trial testimony of Mr. Wright, which show that the Plaintiff charged **$260,510.08** for corrective work, plus **$10,420.40** for its 4% fee.   Having found that these charges were unauthorized, the Court hereby awards the Defendant the amount of **$270,930.48** for corrective work on this project.   The Court will next address the issue of defective work.

In regards to the issue of defective work, the Court has reviewed the Defendant's Trial Exhibit No. 1 and the testimony of Mr. Wright, which show that the Plaintiff charged **$935,714.72** for defective work, plus **$37,428.59** for its 4% fee.   Having found that these charges were unauthorized, the Court hereby awards the Defendant the amount of **$973,143.31** for defective work on this project.   The Court will next address the issue of delay damages.

The Court having found that the Plaintiff completed the project within the substantial completion date, there is no award for the Defendant on this issue.   The Court will next address the issue of the Smoke Evacuation System.

With regards to the Smoke Evacuation System for the first and second floors, a review of the record shows that the Plaintiff charged **$267,000.00** for this system, plus **$10,680.00** for its 4% fee.   Having found that the Plaintiff should not have charged the Defendant for the Smoke Evacuation System, the Court hereby awards the Defendant the amount of **$277,680.00** on this issue.   The Court will address the issue of

160

unauthorized enhancements and improvements.

With regards to enhancements and improvements without a signed Change Order, a review of the records shows charges made under this category for **$1,319,557.50**, which included the Plaintiff's 4% fee.   Having found that these charges were not authorized, the Court hereby awards the Defendant this amount on this issue.

2.   <u>The Campus Project</u>

The Plaintiff's claim in regards to the Campus Project is $416,119.08 for unpaid balances for work and fees on the clinic, treatment center, and judicial building. A review of the record shows that the Defendant did not specifically challenge the unpaid balance being claimed by the Plaintiff.   Consequently, the Court is unable to determine if any of the charges contained therein were unauthorized.   Therefore, the Court hereby credits the Plaintiff with the unpaid balance of **$416,119.08**.  In addition to this amount, and pursuant to its decision on the issue of administrative and field labor costs, and the 65% burden, the Court also credits the Plaintiff with the additional amount of **$23,039.94** for a total credit of **$439,159.02** on this project.   There was no retainage on this project.

In regards to interest on payments due, since the Defendant's award on its Counter-Claim for this project completely off-sets and exceeds the Plaintiff's claim, there are no "payments due" to the Plaintiff for purposes of interest payments.

Based on the foregoing, it is hereby ordered that the Plaintiff's shall receive a

credit of **$439,159.02** on the Campus Project.

The Defendant's Counter-Claim in regards to the Campus Project is based on the same issues previously addressed during the discussion on the Hotel Project, with the exception of the Smoke Evacuation System and delay issues.   Therefore, the Court will first address the issues of administrative personnel, field labor, employee's billing rate, the 65% burden, temporary utilities, heat, and water.

As to the Change Orders for the Campus Project, the Court has already held that the Plaintiffs' fees are to be reimbursed to the Defendant for any Change Orders, which were not signed by the Defendant. As such, the Court awards **$166,361.15** to the Defendant for these amounts.

In regards to the issue of administrative personnel, the Court has based its award on the hourly rates for administrative personnel provided by the Plaintiff.   Based on this decision, the Defendant's award, including the Plaintiff's 6% fee, and charges for temporary utilities, heat and water charged by the Plaintiff, is **$23,040.05** on this issue. The Court will next discuss the issue of overtime.

In regards to the issue of overtime, a review of the record shows that the Plaintiff charged $5,519.27, plus $331.16 for its 6% fee.   The record also shows an additional charge of $450.92, plus $27.06 for the Plaintiff's 6% fee.   Having found that the charges for overtime were not authorized, the Court awards the Defendant the total amount of **$6,328.41** on this issue.

162

In regards to the 0.5% burden issue, the record shows that the GMP on this project was $4,056,229.00. Pursuant to Section 13.1.1(a) of the Addendum, the Plaintiff was entitled to $20,281.15, which represented the 0.5% fee of the GMP, to cover the costs mentioned in this section. A review of the Plaintiff's Trial Exhibit No. 6 (Final Request for Payment") dated February 8, 2000 shows that Plaintiff charged $156,896.38 under this section. Therefore, the Court awards the Defendant the additional amount of **$136,615.23**, plus the **$8,196.91** charged by the Plaintiff for its 6% fee on this amount, for a total award of **$144,812.14** on this issue. The Court will next address the issue of corrective work.

In regards to the issue of corrective work, a review of the record shows that the Plaintiff charged $33,212.96, plus $1,992.78 for its 6% fee, for corrective work. Having held that the charges for corrective were unauthorized, the Court award the Defendant the amount of **$35,205.74** on this issue. The Court will next address the issue of defective work.

In regards to the issue of defective work, a review of the record does not show that the Defendant included a claim for defective work on this project. The Court will next address the issue of unauthorized personnel expenses. A review of the record shows that the Plaintiff charged $162,545.13, plus $9,752.71 for its 6% fee, for personnel expenses. Having found that the charges for personnel expenses were not authorized, the Court awards the Defendant **$172,297.84** on this issue.

163

3.     The School Project

The Plaintiff's claim in regards to the School Project consists of $1,261,028.37 for Change Orders No. 1-3 and its 6% fee.   In addition to this amount, and pursuant to its Decision on the issue of administrative and field labor costs, and the 65% burden, the Court awards the Plaintiff the additional amount of **$6,357.51**.

The Defendant's Counter-Claim in regards to the School Project is based on the same issues previously discussed in the two other projects.   Therefore, the Court will first address the issues of administrative personnel, field labor, employee's billing rate, the 65% burden, temporary utilities, and water.

In regards to the issues of administrative personnel, field labor, employee's the 65% burden, temporary utilities, and water a review of the record shows that the Defendant did not specifically challenge the amount charged by the Plaintiff, and the evidence presented did not clearly reveal any charges.   Consequently, the Court is unable to determine if any of the charges contained therein were unauthorized.   The Court will next address the issue of overtime.

In regards to the issue of overtime, the Court has reviewed the subcontractors' overtime charges.   A review of the record finds that the Plaintiff charged $18,119.40 for subcontractor's overtime, plus $1,087.16 for its 6% fee.   The record also shows an additional overtime charge of $233.76, plus $14.03 for the Plaintiff's 6% fee.   Having held that the Plaintiff was not authorized to charge for overtime, the Court awards the

Defendant the amount of **$19,454.35** on this issue.   The Court will next address the issue of the 0.5% fee.

In regards to the 0.5% fee issue, the record shows that the GMP on this project was $8,626,000.00.   Pursuant to Section 13.1.1(a) of the Addendum, the Plaintiff was entitled to $43,130.00, which represented the 0.5% fee of the GMP, to cover the costs mentioned in this section.   A review of the Plaintiff's Trial Exhibit No. 9 ("Final Request for Payment") dated November 7, 2002 shows that the Plaintiff charged $156,048.68 under this section.   Therefore, the Court awards the Defendant the additional amount of **$112,918.68**, plus the **$6,775.12** charged by the Plaintiff for its 6% fee on this amount, for a total award of **$119,693.80**.   The Court will next address the issue of corrective work.

In regards to the issue of corrective work, a review of the record shows that the Plaintiff charged $794.26, plus $47.66 for its 6% fee, for corrective work.   Having held that the charges for corrective work were unauthorized, the Court awards the Defendant the amount of **$841.92** on this issue.   The Court will next address the issue of defective work.

In regards to defective work, the record shows that the Defendant did not include any damages on this issue.   The Court will next address the issue of unauthorized personnel expenses.   A review of the record shows that the Plaintiff charged the amount of $169,473.90, plus $10,168 for its 6% fee, for personnel expenses.   Having found that

165

the charges for personnel expenses were not authorized, the Court awards the Defendant the amount of **$179,642.33** on this issue.

Based on the award on the Defendant's counter-claim, the Plaintiff's award is reduced to **$1,144,119.85** for the School Project, which includes all fees and interests. with regards to the Defendant's counter-claim, the Court finds that the Defendant is entitled to **$2,769,118.06**.

In conclusion, based on the aforementioned calculation, the Defendant is awarded the sum of **$1,654,998.88** as total for all three projects.

DONE AND ORDERED this 18th day of June, 2004.

_____
TRIBAL JUDGE

_____
TRIBAL JUDGE

166

**EXHIBIT B**

II-31

(1)   receipt by the jury of evidence not authorized by the
      Court;

(2)   determination of a verdict by lot, through intimidation,
      or otherwise without a fair expression of opinion;

(3)   when the Court has refused to instruct the jury correctly
      as to the law;

(4)   when for any other cause the defendant has not received
      a fair and impartial trial.

Sec. 12.2.   After a jury verdict of guilty is announced, the
defendant may move to set aside the verdict on the grounds that it
was contrary to the law or the evidence.   The Court shall grant
such a motion if it determines that there was insufficient evidence
to support the verdict or that, as a matter of law, there was
reasonable doubt as to the defendant's guilt.

Section 13.   Appeals.   Appeals may be taken from the final
order of the Miccosukee Court to the Miccosukee Court of Appeals by
filing with the Clerk a notice of appeal within fifteen (15) days
of the entry of the order from which the appeal is taken with the
approval of the Miccosukee Business Council.   The Clerk shall
transmit any notice of appeal to the Chairman of the Business
Council promptly upon receipt, and the Business Council shall
disallow the appeal or refer it to the Court of Appeals within ten
(10) days.   The Court of Appeals may affirm or reverse the order of
the Miccosukee Court, order a new trial, or may increase or
decrease any sentence or fine.   On appeal, each case shall be tried

II-32

anew, except for questions of fact submitted to a jury at the trial in the Miccosukee Court.   Proceedings in the Miccosukee Court of Appeals shall be in accordance with the procedures specified in section 4.1, except that there shall be no jury and the Chairman of the General Council shall preside.   Decisions of the Miccosukee Court of Appeals shall be by majority vote of the members present. The Miccosukee Court of Appeals may issue rules governing the conduct of its proceedings and appropriate forms not inconsistent with the provisions of the Code.

**Section 14.   Interpretation.**   In the interpretation of the provisions of this Code and in deciding cases hereunder, the Miccosukee Court and the Miccosukee Court of Appeals shall apply Miccosukee customary law and, insofar as it is not inconsistent therewith, any applicable law of the State of Florida.

**EXHIBIT C**

# MICCOSUKEE TRIBAL COURT

## MICCOSUKEE TRIBE OF INDIANS OF FLORIDA

### CIVIL DIVISION

KRAUS-ANDERSON )
CONSTRUCTION COMPANY, )
               )
         Plaintiff, )
               )
vs. )
               )    Case No.: CV-00-21-A
MICCOSUKEE TRIBE OF INDIANS )
OF FLORIDA, )
               )
         Defendant. )

### NOTICE OF APPEAL

COMES NOW Plaintiff Kraus-Anderson Construction Company ("KACC") and hereby submits its notice of intent to appeal the Trial Decision issued June 18, 2004 in the above-referenced case on the basis of certain issues contained in the decision.  Those issues include, but are not limited to, the following:

    1.     The Trial Court exceeded its powers by deciding on matters that was not before the Court for decision and not presented to the Court at trial;

    2.     The decision contains several mistakes on the calculation of figures that significantly alters the proper award to the parties;

    3.     By excluding certain evidence material to the controversy, the Court severely prejudiced KACC's ability to present its case in a just and equitable manner, and;

    4.     The number of errors of law and fact contained in the decision demonstrates an overall prejudice against the interests of KACC such that a new trial must be granted in order to protect the fairness and integrity of the judicial process for the Miccosukee Tribe.



These and other issues proper for appeal will be formally presented in the appellate brief to be submitted in this matter.

Dated this 1st day of July, 2004.

PITCHLYNN & ASSOCIATES, P.A.

By: _____
GARY S. PITCHLYNN, OBA # 7180
124 East Main Street
P.O. Box 427
Norman, OK 73070
Telephone: (405) 360-9600
Facsimile: (405) 447-4219

AND

DORSEY & WHITNEY LLP
Steven K. Champlin #0016044
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Fax: (612) 340-2868

ATTORNEYS FOR PLAINTIFF

-2-

## CERTIFICATE OF SERVICE

This is to certify that on the _1st_ day of July, 2004, a true and correct copy of the within and foregoing Notice of Appeal was sent via facsimile and/or mailed, postage prepaid thereof, to the following counsel of record:

Davisson F. Dunlap, Jr.
Dunlap & Toole, P.A.
2057 Delta Way
Tallahassee, FL 32303

Attorney for Defendant

GARY S. PITCHLYNN

-3-

**EXHIBIT D**



# Miccosukee Tribe of Indians
## of Florida

**Business Council Members**
Billy Cypress, Chairman

Jasper Nelson, Ass't. Chairman
Max Billie, Treasurer

Andrew Bert Sr., Secretary
Jerry Cypress, Lawmaker

July 15, 2004

**VIA FACSIMILE & CERTIFIED MAIL**

**PITCHLYNN & ASSOCIATES, P.A.**
Gary S. Pitchlynn, Esquire
124 East Main Street
P.O. Box 427
Norman, OK 73070

**DORSEY & WHITNEY, LLP**
Steven K. Champlin, Esquire
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402-1498

Re:   **Kraus-Anderson Construction Company vs. Miccosukee Tribe of Indians of Florida**
      **Case No.:  CV-00-21-A**
      **Notice of Appeal**

Dear Messrs. Pitchlynn & Champlin:

This is in response to the July 2, 2004, Notice of Appeal of the Trial Decision issued June 18, 2004 by the Miccosukee Tribal Court in Kraus-Anderson Construction Company vs. Miccosukee Tribe of Indians of Florida, Case No. CV-00-21-A.

In accordance with Tribal procedure, the Miccosukee Business Council conducted a review of the record in this case and convened a special session to consider your appeal. After careful consideration, the Miccosukee Business Council has determined that the Miccosukee Tribal Court Order, which is the subject of your Notice of Appeal, does not constitute a departure from the essential requirements of Miccosukee Law and/or procedure and other applicable laws and raises no issues meriting review by the Miccosukee Court of Appeals.

Accordingly, the Miccosukee Business Council has decided to disallow the appeal. The decision of the Miccosukee Business Council is final.

Sincerely,

Billy Cypress, Chairman
Miccosukee Tribe of Indians of Florida

cc:   Clerk of the Court
      Counsel of Record

RECEIVED
JUL 19 2004
Dave Dunlap, Jr.

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET     04-22774

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**MAGISTRATE JUDGE**

## I. (a) PLAINTIFFS
Miccosukee Tribe of Indians of Florida

## DEFENDANTS
Kraus-Anderson Construction Whitney Brown

**CIV-UNGARO-BENAGES**

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
William E. Whitney
2057 Delta Way
Tall, FL  32303

ATTORNEYS (IF KNOWN)

(d) CIRCLE COUNTY WHERE ACTION AROSE: (DADE,) MONROE, BROWARD, PALM BEACH, MARTIN, ST LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

Docket: 04CV22774 UUB/STB

## II. BASIS OF JURISDICTION     (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff     ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant     ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES  (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Federally recognized Indian Tribe PTF | | | | | |
| Citizen of Another State | ☐ 2 | ☒ | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN     (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT     (PLACE AN "X" IN ONE BOX ONLY)   domestication of Tribal judgment

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | A☐ 791 Empl Ret Inc Security Act | A☐ 871 IRS – Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | A☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | A OR B |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Suit to domesticate Tribal judgment brought under 28 US Code, section 1331;
Section 1332; and section 1738.

LENGTH OF TRIAL
na   days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P 23

DEMAND $ _____

CHECK YES only if demanded in complaint
JURY DEMAND:   ☐ YES   ☒ NO

## VIII. RELATED CASE(S)   IF ANY   (See instructions):
JUDGE   none   DOCKET NUMBER _____

DATE   10/29/04

SIGNATURE OF ATTORNEY OF RECORD
William L Whitney

FOR OFFICE USE ONLY

$150.00   910100

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____

11/02/04